**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN**

DONALD J. TRUMP FOR PRESIDENT,
INC.,

        Plaintiff,

    v.

NORTHLAND TELEVISION, LLC, d/b/a
WJFW-NBC,

        Defendant.

Case No. 20-cv-00385-WMC

---

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**

---

## <u>INTRODUCTION</u>

Defendant's motion to dismiss must be denied.  Accepting all allegations of the Complaint as true and drawing all reasonable inferences therefrom in favor of plaintiff, as this Court must, the Complaint states a claim for defamation against the defendant.  The defamation at issue in this case is a falsified, manufactured statement contained in a television advertisement broadcast by defendant.  Such falsified statement was comprised of audio of candidate Trump's own words at a campaign rally, but such words were synthetically altered to form a sentence that candidate Trump never said:

**The coronavirus, this is their new hoax.**

This false statement is defamatory of the Trump Campaign.  Candidate Trump did not make this statement.  Yet it was intentionally crafted by Priorities USA ("PUSA") to deceive viewers of the ad into believing he did.  The opening of the PUSA ad (as defined below) presents audio of candidate Trump purportedly making this statement by stitching together separate audio clips of his voice saying, from multiple sentences and sources:  "the coronavirus," immediately

followed by "this is their new hoax." To ensure the deception is complete and to compound the falsity, the text of the manufactured statement appears on screen at the same time the stitched-together audio clips are played. The text shows these words together as a single sentence, with capital "T" in "the," a comma after "The coronavirus," and a period after "new hoax." Each and every other audio segment in the advertisement is a full sentence accompanied by a textual sentence that matches the audio clips, leading the viewer to believe that at each point in the advertisement, the textual representation is accurate and reflects full and complete sentences.

The PUSA ad's manufactured statement is false because it presents audio and text of a statement by candidate Trump that he never made. This is admitted by defendant. Defendant does not contend that the manufactured statement was uttered by candidate Trump.

The false, manufactured statement is a statement of and concerning the Trump Campaign because it is presented as a statement actually made by candidate Trump at a campaign rally of the Trump Campaign in the midst of his re-election campaign. It defamed the Trump Campaign to falsely state that candidate Trump made the manufactured statement when he didn't. The false, manufactured statement is defamatory of the Trump Campaign because it expresses that candidate Trump proclaimed the coronavirus to be a "hoax." It has a tendency to deter persons from associating with the Trump Campaign. Indeed, the falsified statement has been utilized as a point of attack by opponents of the Trump Campaign, and has a tendency to cause voters to not support or vote for the Trump Campaign's candidate.

The Complaint alleges that WJFW-NBC acted with reckless disregard as to the falsity of the manufactured statement in the PUSA ad. The day after the ad began airing, plaintiff provided WJFW-NBC with detailed information demonstrating the falsity of the manufactured statement, including multiple determinations of falsity by independent third-party fact checkers.

2

The Trump Campaign sent defendant a cease and desist letter specifically detailing that the manufactured statement was never said by candidate Trump and it falsely represents a statement that he never made.  It provided detailed information establishing that third-party independent fact checkers categorically confirmed that the manufactured statement was false.  These fact checkers made this analysis weeks before defendant's airing of the ad after pundits inaccurately characterized candidate Trump's words at the campaign rally, in late February, and after an ad released by Joe Biden on March 3rd including the same false, manufactured statement later included in the PUSA ad.

WJFW-NBC therefore had notice and reason to know of the falsity when it first aired the PUSA ad, and it was given substantial evidence of the falsity and a cease and desist demand the next day.  Despite overwhelming proof of the falsity, which readily is confirmed by viewing the PUSA ad and the campaign speech from which the clips audio were drawn, defendant chose to continue broadcasting the ad, accepting PUSA's purchase of advertising time, airing the PUSA ad at least 36 more times after notice of falsity.

To dismiss this action at this juncture would be to endorse false manipulation of the news and intentional deception of the public.  Defendant invokes the First Amendment repeatedly throughout its brief, seeking safe haven there for the admittedly falsified statement.  In fact, defendant will find no solace or protection in the First Amendment.  The First Amendment does not protect known lies, and publishing fabricated statements establishes actual malice.  Indeed, the falsified advertising statement offends the First Amendment, because it deceives and misleads the public, using technology to create false facts that, through viral distribution, become accepted as true.  The technological tools available at everyone's fingertips today allow all persons – professional broadcasters and at-home bloggers alike – to potentially create and

manipulate the news by falsifying audio recordings or manipulating visual images.  The danger of falsified audio and video, "deepfakes," is substantial and deepfakes are rapidly polluting our information universe.  *See* "What are deepfakes – and how can you spot them?," The Guardian (Jan. 13, 2020) ("The AI firm Deeptrace found 15,000 deepfake videos online in September 2019, a near doubling over nine months.")*, available at*

https://www.theguardian.com/technology/2020/jan/13/what-are-deepfakes-and-how-can-you-spot-them

For the foregoing reasons, and as more fully discussed below, the Complaint states a claim for defamation against WJFW-NBC upon which relief may be granted.  Accordingly, the motion to dismiss must be denied.

## FACTUAL ALLEGATIONS

This case concerns a false and defamatory television advertisement produced by Priorities USA ("the PUSA ad")[1] that was broadcast by defendant Northland Television, LLC d/b/a WJFW-NBC ("defendant" or "WJFW-NBC"), thereby causing material harm to plaintiff Donald J. Trump for President, Inc. ("plaintiff" or the "Trump Campaign").  (Doc.1-2: 4-6, 7-8, 16-18, 19, 20, 23-25); (Compl. ¶¶ 1-4, 9-16, 53-59, 67-68, 73-75, Ex. A).  The advertisement, entitled "Exponential Threat," through the use of manufactured and synthetic audio and accompanying subtitles, maliciously puts a false statement into President Trump's mouth:  "*The coronavirus, this is their new hoax*."  (Doc.1-2: 4-5, 5-6, 9-10, 18); (Compl. ¶¶ 1, 3, 22-30, 61) (emphasis added).  The PUSA ad as broadcast by WJFW-NBC falsely pieced together the separate audio clips "The coronavirus" and "this is their new hoax" to create an audio clip of candidate Trump saying those words all together, as one sentence.  (Doc.1-2: 10); (Compl. ¶ 26).

---

[1] WJFW-NBC asserts that the PUSA ad was produced by PUSA.  (Doc.9: 11).

The PUSA ad compounds this falsity by displaying text representing that these words were said together.  (*Id.*)

The Complaint alleges that WJFW-NBC knew or should have known that the PUSA ad was produced through the use of technology that depicted a clearly false statement.   (Doc.1-2: 4-6, 15-17, 19-20, 59-64); (Compl. ¶¶ 1, 3, 47-57, 69-72, Ex. G).  The day after the PUSA ad began airing on WJFW-NBC, the Trump Campaign sent WJFW-NBC a cease and desist letter that detailed the false and manufactured stitched-together audio clips in the PUSA ad and demanded the station to cease broadcasting the ad.  (Doc.1-2: 5-6, 15-18, 18-19); (Compl. ¶¶ 2-3, 47-59, 69-72).  Notwithstanding that specific proof of falsity, WJFW-NBC nevertheless continued broadcasting the PUSA ad, airing it at least 36 more times.  (Doc.1-2: 15); (Compl. ¶ 51).

A.      **Plaintiff, the Trump Campaign**

The Trump Campaign is an authorized committee of presidential candidate Donald J. Trump ("candidate Trump") as defined by 11 CFR § 9032.1(a).  (Doc.1-2: 6); (Compl. ¶ 4).  The Trump Campaign has operated President Trump's reelection campaign for the 2020 Presidential election since January 20, 2017.  (*Id.*)

Donald J. Trump is the Trump Campaign's candidate for the 2020 Presidential Election. (Doc.1-2: 7); (Compl. ¶ 9).  Pursuant to 52 U.S.C. § 30102(e)(1) and (3), candidate Trump has established "Donald J. Trump for President, Inc." as his principal campaign committee.  (Doc.1-2: 7); (Compl. ¶ 10).  The Trump Campaign is responsible for, among other things, coordinating and organizing political and fundraising appearances, creating and/or purchasing political advertising on behalf of the candidate, collecting contributions for the candidate and reporting them to federal regulators as required by law, and making expenditures on behalf of the

candidate, each and all for the sole purpose of re-electing its candidate as President of the United States.  (Doc.1-2: 7); (Compl. ¶ 11).

Candidate Trump is one of many people authorized to speak and who does speak on behalf of the Trump Campaign.  (Doc.1-2: 7); (Compl. ¶ 12).  The purported statements of any authorized speaker alleged to have been made on behalf of the Trump Campaign impact the Trump Campaign.  (*Id.*)

The Trump Campaign's effort to raise money and acquire votes necessarily rests on its and its candidate's reputation.  (Doc.1-2: 7); (Compl. ¶ 15).  The public activities and statements made by the Trump Campaign's candidate while on the campaign trail are a material activity of the Trump Campaign, reflect upon the Trump Campaign, impact the candidate's ability to raise money and his chances for reelection, and thereby directly affect the fundamental trade and profession of the Trump Campaign.  (Doc.1-2: 8); (Compl. ¶ 16).  Those communications express to voters information upon which voters may consider and make the determination whether to cast their vote for the Trump Campaign's candidate.  (*Id.*)

B.     **WJFW-NBC**

WJFW-NBC is a broadcast television station licensed by the Federal Communications Commission.  (Doc.1-2: 8); (Compl. ¶ 17).  As a licensed broadcast TV station, under the Communications Act of 1934, WJFW-NBC has an obligation to operate in the public interest. (Doc.1-2: 8); (Compl. ¶ 18).  Within this obligation, WJFW-NBC has a responsibility to protect the public from false, misleading, and deceptive advertising.  (*Id.*)

Unlike the qualified campaign committees of candidates for public office,[2] third parties such as PUSA have no right under the Communications Act to command the use of broadcast

---

[2] FCC regulations require that licensees "allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting stations…by a legally qualified *candidate*." 47 U.S.C. § 312(a)(7) (emphasis

facilities to air their advertisements.  (Doc.1-2: 8); (Compl. ¶ 19).  That is, WJFW-NBC may refuse to air the advertising of third parties such as PUSA and it may censor such ads.[3]  (*Id.*)

As a licensed broadcast TV station, WJFW-NBC has the authority—indeed, the obligation—to ensure that advertisements such as the PUSA advertisement are not false, misleading, or deceptive.  (Doc.1-2: 8); (Compl. ¶ 20).  WJFW-NBC is subject to liability under the law for false and defamatory statements contained in advertising aired by persons other than candidates' campaign committees, such as the PUSA advertisement.  (Doc.1-2: 8); (Compl. ¶ 21).

C.    **The PUSA Advertisement**

The PUSA ad, a television advertisement created or produced by PUSA, began airing on WJFW-NBC on March 24, 2020.  (Doc.1-2: 9); (Compl. ¶ 22).  The PUSA ad takes audio clips of candidate Trump and pieces them together to manufacture a false statement that was not made by the President:  "The coronavirus, this is their new hoax."  *See* PUSA, "Exponential Threat" available at https://www.youtube.com/watch?v=aK0KPNPveYY (Last visited May 27, 2020). (Doc.1-2: 9); (Compl. ¶ 23).

The PUSA ad takes audio clips from a speech given by candidate Trump on February 28, 2020 at a campaign rally for the Trump Campaign in Charleston, South Carolina (the "South

---

added).  Further, while not required to provide any airtime to candidates, if a licensee "permit[s] any such candidate to use its facilities, it shall afford equal opportunities to all other candidates for that office to use such facilities."  47 CFR § 73.1941(a).  This does not extend to advertising and other materials to broadcast by non-candidates, such as political action committees (PACs).

[3] *See Felix v. Westinghouse Radio Stations*, 186 F.2d 1, 6 (3d Cir. 1950) ("Since Section 315 applies only to the use of a radio station by a candidate himself and not to such use by his supporters it follows that the section did not prohibit the defendants from censoring Meade's speeches. The defendants are, therefore, not entitled to assert the defense that they are not liable because the speeches could not have been censored without violating Section 315 and that accordingly they were not at fault in permitting the speeches to be broadcast.")

Carolina Campaign Speech").  (Doc.1-2: 9); (Compl. ¶ 24).[4]

      Contrary to the PUSA ad as broadcast by WJFW-NBC, the South Carolina Campaign Speech does not contain the statement:  "The coronavirus, this is their new hoax."  (Doc.1-2: 9); (Compl. ¶ 25).  Candidate Trump did not make this statement.

      The PUSA ad as broadcast by WJFW-NBC falsely pieced together the separate audio clips "The coronavirus" and "this is their new hoax" to create an audio clip of candidate Trump saying those words together, as one sentence.  (Doc.1-2: 10); (Compl. ¶ 26).  The PUSA ad compounds this falsity by visually displaying text representing to the viewer that these words were said together.  (*Id.*)

      The PUSA ad also displays subtitles of text that match with the words in the audio clips.  (Doc.1-2: 10); (Compl. ¶ 27).  In relevant part, the PUSA ad displays the following text:  "The coronavirus," then immediately following, displays the text:  "this is their new hoax."  (Doc.1-2: 10); (Compl. ¶ 28).  Screenshots of these frames of the PUSA ad are attached to the Complaint.  (Doc.1-2: 10, 23-25); (Compl. ¶ 28, Ex. A).  The phrase "The coronavirus" begins with a capitalized "T", the "t" in "this" is lowercase, and the word "hoax" is followed by a period.  (Doc.1-2: 10); (Compl. ¶ 29).

      The PUSA ad intentionally creates a false message by manufacturing fake audio and using such fake audio to create a false, captioned quotation, in both cases to make it appear as though candidate Trump said the phrase "The coronavirus, this is their new hoax."  (Doc.1-2: 10); (Compl. ¶ 30).  The pieced-together audio clips thus falsely represent that the candidate

---

[4] *See* President Donald J. Trump, Remarks at a Campaign Rally, Charleston, SC (Feb. 28, 2020), available at https://www.c-span.org/video/?469663-1/president-trump-campaign-event-north-charleston-south-carolina&start=405.2.  *See* South Carolina Campaign Speech at timestamp 6:05 minutes to 8:11 minutes.  (*Id.*)

stated at a Trump Campaign rally that the coronavirus is a "hoax," when in fact he did not make that statement.  (*Id.*)[5]

WJFW-NBC broadcast the PUSA ad approximately forty-three times on WJFW-NBC between March 24 and April 6, 2020.  (Doc.1-2: 11); (Compl. ¶ 31).

D.  **Independent Fact Checkers Reject the "Hoax" Claim as False**

After the South Carolina Campaign Speech, from February 28, 2020 through March 2, 2020, pundits and authors falsely stated that candidate Trump called the coronavirus a "hoax" in the speech.  During that same time, independent fact-checkers and reporters published reports and articles correcting that error, calling such characterization false.  (Doc. 1-2: 11-12, 27, 29-34, 36-44); (Compl. ¶¶ 32-39, Exs. B-D).  On March 3, 2020, weeks before the PUSA ad began airing, presidential candidate Joseph Biden tweeted a campaign advertisement that included the false, manufactured statement.

Weeks before the PUSA ad began airing on WJFW-NBC, multiple independent fact-checking organizations debunked and proved false the manufactured statement of the PUSA ad.  Candidate Trump did not say:  "The coronavirus, this is their new hoax."

On February 28, 2020, after candidate Trump's South Carolina Campaign Speech, Slate's Will Saletan explained, tweeting the following:  "Trump's use of the word 'hoax' tonight (7:45 in this video) referred to what he said a minute earlier:  'The Democrats are politicizing the coronavirus.  …We did one of the great jobs.'  He was saying the hoax is that he's handled it badly.  Not the virus itself."  (Doc.1-2: 11, 27); (Compl. ¶ 33, Ex. B).[6]

---

[5] The phrase "this is their new hoax" was stated, and it referred to the Democrats' exploitation of a pandemic and related characterization of the candidate's response to the pandemic as inadequate.  (Doc.1-2: 10); (Compl. ¶ 30).
[6] Tweet from Will Saletan (Feb. 28, 2020), available at https://twitter.com/saletan/status/1233600059025035265.  (Doc.1-2: 11, 27); (Compl. ¶ 33, Ex. B).

On February 29, 2020, Check Your Fact published an article entitled "Fact Check: Did Trump Call The Coronavirus A 'Hoax' At His South Carolina Rally?"  (Doc.1-2: 11, 29-34); (Compl. ¶ 34, Ex. C).[7]  The Check Your Fact article analyzed a Politico "article claiming President Donald Trump called the novel coronavirus a 'hoax' at his Feb. 28 campaign rally in South Carolina."  (Doc.1-2: 11, 29-34); (Compl. ¶ 35, Ex. C).

The quote from the Politico article was:  "President Trump on Friday night tried to cast the global outbreak of the coronavirus as a liberal conspiracy intended to undermine his first term, lumping it alongside impeachment and the Mueller investigation."  (Doc.1-2: 12, 29-34); (Compl. ¶ 36, Ex. C).   The Check Your Fact article determined that the claim made by the Politico article was "False."  (Doc.1-2: 12, 29-34); (Compl. ¶ 37, Ex. C).

On March 1, 2020, in response to former Democratic presidential candidate Mike Bloomberg's comment that he "find[s] it incomprehensible that the President would do something as inane as calling it a hoax, which he did last night in South Carolina," CBS News' Scott Pelley replied, "[h]e said the—the Democrats making so much of it is a Democratic hoax, not that the virus was a hoax."  (Doc.1-2: 12); (Compl. ¶ 38).[8]  On March 2, 2020, Snopes, the popular, self-described "definitive fact-checking resource," published an article finding:  "Trump did not say in the passage above that the virus itself was a hoax."  (Doc.1-2: 12, 36-44); (Compl. ¶ 39, Ex. D).[9]

The Biden advertisement, which contained the same manufactured statement, was evaluated by fact checkers and concluded to be false.  That advertisement, which was included in

---

[7] Brad Sylvester, "Fact Check: Did Trump Call the Coronavirus A 'Hoax' At His South Carolina Rally?"  ("Check Your Fact") available at https://checkyourfact.com/2020/02/29/fact-check-donald-trump-coronavirus-hoax-south-carolina-rally/ . (Doc.1-2: 11, 29-34); (Compl. ¶ 34, Ex. C).

[8] Scott Pelley, *CBS Face the Nation*, available at https://www.cbsnews.com/news/full-transcript-of-face-the-nation-on-march-1-2020/.   (Doc.1-2: 12); (Compl. ¶ 38).

[9] Bethania Palma, "Did President Trump Refer to the Coronavirus as a 'Hoax'?" (Mar. 2, 2020) available at https://www.snopes.com/fact-check/trump-coronavirus-rally-remark/.  (Doc.1-2: 12, 36-44); (Compl. ¶ 39, Ex. D).

an advertisement tweeted on March 3 by the Biden campaign, included the audio clips stitched together to provide audio of candidate Trump saying the following words together:  "The coronavirus, this is their new hoax."  (Doc.1-2: 12); (Compl. ¶ 40).  That was the same false, manufactured audio clip of candidate Trump saying the coronavirus-hoax statement as contained in the PUSA ad.  (Doc.1-2: 13); (Compl. ¶ 41).

On March 13, 2020, the Washington Post published an article entitled "Biden ad *manipulates video* to slam Trump."  Meg Kelly, "Biden ad manipulates video to slam Trump," *The Washington Post* (Mar. 13, 2020) (emphasis added) ("Washington Post Article").  (Doc.1-2: 12, 45-51); (Compl. ¶ 40, Ex. E).   The Washington Post Article analyzed the Biden ad posted in a March 3rd tweet by the Biden campaign, including the false, manufactured audio clip of candidate Trump saying the coronavirus-hoax statement as contained in the PUSA ad.  *See* (*id.*)

The Washington Post Article found that statement to be false.  According to the fact-checker from the Washington Post:  "The full quote shows Trump is criticizing Democratic talking points and the media's coverage of his administration's response to coronavirus.  He never says that the virus itself is a hoax, and although the Biden camp included the word 'their,' the edit does not make clear to whom or what Trump is referring."  (Doc.1-2: 13, 45-51); (Compl. ¶ 42, Ex. E).  The Washington Post gave the Biden ad "Four Pinocchios," which is its highest rating for false information.   (Doc.1-2: 13, 45-51); (Compl. ¶ 43, Ex. E).

PolitiFact, a popular fact-checking website, also rated as "False" the Biden ad including the false, manufactured coronavirus-hoax audio clip (also later included in the PUSA ad).  (Doc.1-2: 13, 52-57); (Compl. ¶ 44, Ex. F).[10]  PolitiFact concluded that the Biden ad was a "deceptively edited ad," explaining that "Biden's video is inaccurate.  We rate it False."  The

---

[10] The PolitiFact article was authored by Daniel Funke and is entitled "Ad Watch:  Biden video twists Trump's words on coronavirus," (Mar. 15, 2020) available at  https://www.politifact.com/factchecks/2020/mar/15/joe-biden/ad-watch-biden-video-twists-trumps-words-coronavir/.  (Doc.1-2: 13, 52-57); (Compl. ¶ 44, Ex. F).

Biden ad was rated "False" because it included the false and manufactured "hoax" audio clip statement.  (*Id.*)  The manufactured, false audio clip of the "hoax" statement in the Biden ad is "an example of what the Washington Post calls 'splicing,' or 'editing together disparate videos' that 'fundamentally alters the story that is being told.' "  (*Id.*)

E.   **The Cease and Desist Letter**

Despite the overwhelming information in the public domain calling out the manufactured statement as false in the March 3rd Biden advertisement and refuting the suggestion that candidate Trump called the coronavirus a hoax at the campaign speech, WJFW-NBC nevertheless accepted PUSA's purchase of advertising time and it chose to broadcast the PUSA ad.  The PUSA ad was first broadcast on WJFW-NBC on March 24, 2020.  (Doc.1-2: 11); (Compl. ¶ 11).

Since defendant was not deterred by the overwhelming proof of falsity of the PUSA ad's opening statement, the Trump Campaign was forced to contact WJFW-NBC to demand that it cease airing the ad.  The next day, March 25, 2020, the Trump Campaign sent the Cease and Desist Letter to Steve Shanks, General Manager of WJFW-NBC, informing him that the PUSA ad is "false, misleading and deceptive."  (Doc.1-2: 15, 59-64); (Compl. ¶ 47, Ex. G).   The Cease and Desist Letter explained, in relevant part, that the PUSA ad stitched together audio clips from candidate Trump's statements to fraudulently and maliciously represent that he called the coronavirus pandemic a "hoax."  (Doc.1-2: 15, 59-64); (Compl. ¶ 48, Ex. G).  The Cease and Desist Letter referenced and attached source material from "multiple independent fact-checking organizations [that] have debunked the core claim of the PUSA ad."  (Doc.1-2: 15, 59-64); (Compl. ¶ 49, Ex. G).

The Cease and Desist Letter was sent by Federal Express and e-mail on March 25. (Doc.1-2: 15, 59-64); (Compl. ¶ 50, Ex. G).  That same day, the Trump Campaign received a response to the e-mail from WJFW-NBC's General Manager within three hours, who confirmed receipt of the letter and stated that the station "is consulting with legal."  (*Id.*)

WJFW-NBC did not correspond further with the Trump Campaign beyond that response. (Doc.1-2: 15, 59-64); (Compl. ¶ 51, Ex. G).  WJFW-NBC continued to run the PUSA ad, broadcasting the PUSA ad thirty-six more times from March 26, 2020 through April 6, 2020. (*Id.*)  For example, WJFW-NBC broadcast the PUSA ad ten times on April 6, 2020.  (*Id.*)

## MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 8(a)(2)[11] requires a plaintiff to set forth "a short and plain statement of the claim showing that [he or she] is entitled to relief."  While it need not contain all relevant specific factual allegations and legal arguments, at minimum, a complaint must include allegations that " 'state a claim for relief that is plausible on its face.' "  *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In reviewing the Complaint, the Court must accept as true the facts as pled by the plaintiff and will "draw all reasonable inferences in favor of the plaintiff."  *Palka v. Shelton*, 623 F.3d 447, 452 (7th Cir. 2010).  " 'It is not necessary for plaintiff to plead specific facts but plaintiff must give defendants fair notice of the claims against them and the grounds supporting her claims.' "  *More v. Callahan*, 2013 WL

---

[11] Plaintiff has moved to remand this action to state court because the Court lacks subject matter jurisdiction. (Doc.13); (Doc.14); (Doc.15); (Doc.15-1-15-17).  The Court does not have the power to decide defendant's motion to dismiss if it has no subject matter jurisdiction.  The Court should refrain from taking any action upon the dismissal motion unless and until it denies the motion to remand and determines subject matter jurisdiction in this Court.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (court must determine subject matter jurisdiction as threshold matter); *see also Cook v. Winfrey*, 141 F.3d 322, 325 (7th Cir. 1998) ("It is axiomatic that a federal court must assure itself that it possesses jurisdiction over the subject matter of an action before it can proceed to take any action respecting the merits of the action.").

4718333, at *3 (W.D. Wis. Sept. 3, 2013) (quoting *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011) (citations omitted)).

The U.S. Supreme Court has explained that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556), and the factual allegations in the complaint must be "enough 'to raise a right to relief above the speculative level.' " *DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 589 F. Supp. 2d 1026, 1029 (E.D. Wis. 2008) (quoting *Twombly*, 550 U.S. at 555). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Allen-Noll v. Madison Area Tech. Coll.*, 2018 WL 6834477, at *4 (W.D. Wis. Dec. 28, 2018).[12] "Motions to dismiss are construed in the light most favorable to the plaintiff." *Hamus v. Bank of New York Mellon*, 2011 WL 13266806, at *4 (W.D. Wis. May 13, 2011).

These principles apply equally in this case. Plaintiff is entitled to the same favorable inferences for its Complaint in this defamation action, as this Court explained in denying a motion to dismiss a defamation complaint:

> "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief can be granted." *Diamond Ctr., Inc. v. Leslie's Jewelry Mfg. Corp.*, 562 F. Supp. 2d 1009, 1013 (W.D. Wis. 2008). In "[e]valuating the sufficiency of the complaint, [the court] construes it in the light most favorable to the nonmoving party, accept[s] well-[pleaded] facts as true, and draw[s] all inferences in her favor." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013). A plaintiff need not provide detailed factual allegations, but must provide enough facts to state a claim that is plausible on its face and allow the "court to infer more than

---

[12] "A failure to identify a proper legal theory does not necessarily require dismissal of the complaint. *Hatmaker v. Memorial Medical Center*, 619 F.3d 741, 743 (7th Cir. 2010); However, the facts alleged in the complaint must support a claim under some legal theory. *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992)." *Brodzki v. Wisconsin*, 2011 WL 1576388, at *1 (W.D. Wis. Apr. 26, 2011).

the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.
Ct. 1937, 173 L.Ed.2d 868 (2009).

*Amoroso v. Schuh*, 278 F. Supp. 3d 1106, 1111 (W.D. Wis. 2017).

Accepting as true all facts alleged in the Complaint and all reasonable inferences
therefrom, the Complaint states a claim for defamation upon which relief may be granted against
WJFW-NBC. It sets forth in detail allegations establishing the elements of a defamation claim.
It does not rely upon mere "recitals of the elements of a cause of action, supported by mere
conclusory statements." *Iqbal*, 556 U.S. at 678. Although it is "not bound to accept as true a
legal conclusion couched as a factual allegation[,]" the court is required to accept all factual
allegations as true. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## ARGUMENT

### I.     The First Amendment Does Not Protect Known Lies.

Defendant's dismissal brief leans heavily upon the First Amendment, arguing that speech
concerning the performance of public officials in public office and statements in election
campaigns are core political speech. (Doc.9: 8, 18, 26-27, 30). The First Amendment is indeed
aimed at ensuring that public debate is wide-open and robust. Defendant argues that this action
is an attempt to "chill" speech, and is a defamation action designed to punish speech that is
legitimate criticism in an election campaign. (*Id.*) That is not true. This case is not based on
public debate protected by the First Amendment. It is based upon a TV station's knowing
broadcast of a false, manufactured statement after receiving constructive and actual notice of its
falsity. Broadcast of known falsity finds no haven in the First Amendment.

The actual malice standard is generally applied to defamation of public officials and
public figures given the country's "profound national commitment to the principle that debate on
public issues should be uninhibited, robust, and wide-open, and that it may well include

vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

However, this case does not involve statements critical of a political candidate implicating these core First Amendment values. Rather, the false statement in this case was a manufactured, false statement that the producer knowingly manufactured to literally put words in the candidate's mouth, to deceive the public into believing that the candidate said "The coronavirus, this is their new hoax." – combining disparate audio clips to represent that the statement was made by the candidate when it was not.

Indeed, in these times, the dangers of falsified news and manufactured and manipulated audio and video are extreme, and ever increasing. The Supreme Court in 1964 could not have even imagined how polluted and even dangerous the national and worldwide information ecosystem would become. "Deepfakes" are "[a] devastating new tool in the disinformation wars [and are] poised to be deployed on a large scale that may soon supplant memes and fake news as industry standards for perverting truth and accuracy in the age of digital confrontation." "Deepfakes Are Very Real --  And Very Dangerous," Forbes (Oct. 16, 2019), available at https://www.forbes.com/sites/theyec/2019/10/16/deepfakes-are-very-real-and-very-dangerous/#2b5139c9493f

Supreme Court justices may not have been technological futurists in 1964, but as is often the case, the Court's First Amendment jurisprudence was prescient. The Court always cautioned of the price of free speech, and clearly stated that the First Amendment provides no haven for knowing lies such as the stitched-together false audio and textual statement in the PUSA ad. Such knowing falsity is not protected by the First Amendment and it finds no safe harbor in the actual malice standard. As the U.S. Supreme Court held in *Gertz v. Welch, Inc.*, 418 U.S. 323,

340 (1974):  "[T]here is no constitutional value in false statements of fact.  Neither the

intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust,

and wide-open' debate on public issues."

Known lies are a danger to democracy and thus they are not protected by the First

Amendment, as one court explained:

> The First Amendment, however, does not afford defamatory political speech
> absolute immunity.  *See id.* at 455, 548 S.E.2d at 876;  *Stevens v. Sun Publ'g Co.*,
> 270 S.C. 65, 71, 240 S.E.2d 812, 815 (1978) ("An individual's status as a public
> figure does not immunize a publisher from liability when it prints defamatory
> articles with malice.");  *Harte–Hanks Communications, Inc. v. Connaughton*, 491
> U.S. 657, 688, 109 S. Ct. 2678, 105 L.Ed.2d 562 (1989) ("We have not gone so
> far ... as to accord the press absolute immunity in its coverage of public figures or
> elections.").

As the Supreme Court has stated:

> That speech is used as a tool for political ends does not automatically
> bring it under the protective mantle of the Constitution.  For the use of the
> known lie as a tool is at once at odds with the premises of democratic
> government and with the orderly manner in which economic, social, or
> political change is to be effected.  Calculated falsehood falls into that class
> of utterances which "are no essential part of any exposition of ideas ...."
> Hence the knowingly false statement and the false statement made with
> reckless disregard of the truth [ ] do not enjoy constitutional protection.

> *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S. Ct. 209, 13 L.Ed.2d 125 (1964)
> (citation omitted); *see Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 150, 87 S. Ct.
> 1975, 18 L.Ed.2d 1094 (1967) ("[T]hat dissemination of information and opinion
> on questions of public concern is ordinarily a legitimate, protected and indeed
> cherished activity does not mean ... that one may in all respects carry on that
> activity exempt from sanctions designed to safeguard the legitimate interests of
> others.").

*Anderson v. The Augusta Chronicle*, 585 S.E.2d 506, 513 (S.C. Ct. App. 2003) (emphasis

added).

" '[T]he actual-malice standard is not an impenetrable shield for the benefit of those who

engage in false speech about public figures.' "  *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893,

901 (N.C. Ct. App. 2002), *writ denied, review denied, appeal dismissed*, 580 S.E.2d 361 (N.C.

2003) (quoting *McKimm v. Ohio Elections Comm.*, 729 N.E.2d 364, 373 (Ohio 2000)) (emphasis added); *see also Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex. 2000) ("This rule stems from the actual malice standard's purpose of protecting innocent but erroneous speech on public issues, while deterring 'calculated falsehoods.' A publisher's presentation of facts may be misleading, even negligently so, but is not a 'calculated falsehood' unless the publisher knows or strongly suspects that it is misleading.") (citation omitted).

## II.   **The Manufactured Statement Was "Of and Concerning" the Campaign.**

On a motion to dismiss, the factual allegations of the Complaint are accepted as true and all reasonable inferences must be drawn from those allegations. The Court must determine if a plausible claim for defamation has been stated by those allegations. The elements of a claim for defamation under Wisconsin law are: (1) a false statement; (2) communicated by speech, conduct, or in writing to a person other than the one defamed; and (3) the communication tends to harm one's reputation, lowering him or her in the estimation of the community or deterring third persons from associating or dealing with him or her. *Ladd v. Uecker*, 2010 WI App 28 ¶ 8, 323 Wis. 2d 798 (citing *Torgerson v. Journal/Sentinel, Inc.*, 201 Wis. 2d 524, 534, 536 N.W.2d 472 (1997)). Additionally, the plaintiff must allege that defendant communicated the false statement with actual malice, that is, knowledge of falsity or reckless disregard for the falsity of the statement. *Storms v. Action Wisconsin Inc.*, 2008 WI 56, ¶¶ 38-39, 309 Wis. 2d 704, 750 N.W.2d 739.

Defendant suggests that the Court is a "gatekeeper" and defamation actions are commonly decided on dismissal motions. That is not the case. Contrary to defendant's suggestion (Doc.9: 15), *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 538–39, 563 N.W.2d 472 (1997) did not hold that resolution on motions to dismiss is encouraged for

defamation actions.  In fact, *Torgerson* is a summary judgment case, suggesting that in some circumstances defamation actions may be resolved on summary judgment.  However, in *Torgerson* the Court also noted that factual issues such as actual malice are not typically well suited for decision on summary judgment.  (*Id.* at 535-36).

A.    **The "Of and Concerning" Element.**

The defamatory communication must be "of and concerning" the plaintiff, meaning that a recipient of the statement might reasonably understand that it was intended to refer to plaintiff. Restatement (Second) of Torts § 564.  This element is established on a motion to dismiss if a reasonable person could believe that the published statement referred to the plaintiff.  3 Dobbs, et. al, The Law of Torts § 527, at 199 (2d Ed. 2011).  It is not necessary that <u>all</u> recipients understood it that way, just that <u>one</u> recipient could have so understood it.   Restatement § 564, Comment b.  It is an issue of fact for the jury to determine whether the statement was in fact understood by at least one person to refer to the plaintiff.  3 Dobbs, et. al, The Law of Torts § 527, at 199 (2d Ed. 2011).  Thus, in order to satisfy this element, the jury need only determine that a single person believed the statement referred to the plaintiff.  (*Id.*)

WJFW-NBC contends that the Complaint must be dismissed, asserting that the false, manufactured statement was not "of and concerning" the Trump Campaign.  It argues that the statement is "of and concerning" President Trump, not the Trump Campaign.  (Doc.9: 16).

This argument fails for several reasons.  First, defamation need not mention the plaintiff by name to be "of and concerning" the plaintiff.  Second, a statement may be defamatory of different persons at the same time; just because it arguably concerns one person does not mean it does not also concern another person.  Third, the "of and concerning" element is established here because a reasonable viewer of the PUSA ad would understand that it concerns the Trump

Campaign.  The falsified statement was made stitching together disparate audio clips of words said by candidate Trump at a campaign rally in South Carolina.  (Doc.9: 10, 11-12).  The purported words or actions of a campaign's candidate are on behalf of the campaign and the campaign and candidate are inextricably intertwined for purposes of campaign statements by the candidate.  A listener or viewer of a false communication utilizing audio clips of the candidate from a campaign speech would reasonably believe that the communication concerned the campaign.

1.     **A Defamatory Communication Need Not Mention the Plaintiff By Name and It Can Defame More Than One Person.**

WJFW-NBC argues that the false, manufactured statement was not "of and concerning" the Trump Campaign because it did not mention the campaign by name.  (Doc.9: 11, 16, 18).  That, however, is not the law.  It is well established that a defamatory statement need not mention plaintiff by name to be of and concerning plaintiff.[13]  *See Amoroso v. Schuh*, 278 F. Supp. 3d 1106, 1112–13 (W.D. Wis. 2017).

A communication may be published under such circumstances as to be defamatory of a person not named or described.  Restatement § 564, Comment e.   It is not necessary that the plaintiff be referenced by name in the communication, it is enough that at least one person who

---

[13] *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 189 (3d Cir. 1998) (defamatory statement need not explicitly name plaintiff by name so long as it was reasonably understood by one third party to refer to plaintiff); *Church of Scientology of California v. Flynn*, 744 F.2d 694, 697 (9th Cir. 1984) ("[t]here is no requirement that the person defamed be mentioned by name.... It is sufficient if from the evidence the jury can infer that the defamatory statement applies to the plaintiff ... [or] if the publication points to the plaintiff by description or circumstance tending to identify him."); *Keohane v. Stewart*, 882 P.2d 1293, 1300 n.10 (Colo. 1994) ("While the letter does not refer to [plaintiff] by name, the evidence at trial established that the letter was widely understood as referring to [plaintiff . . . ."); *Croixland Properties Ltd. P'ship v. Corcoran*, 174 F.3d 213, 216–17 (D.C. Cir. 1999) ("To satisfy the 'of and concerning' element, it suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed."); *Caudle v. Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1996) ("Even though the statements do not explicitly refer to Caudle, Caudle may prevail if a listener would reasonably believe that the statements referred to him."); *Gosden v. Louis*, 687 N.E.2d 481, 495 (Ohio Ct. App. 1996) ("A plaintiff need not have been specifically named in a libelous statement to have been defamed.").

heard or read it reasonably understood it to concern the plaintiff.  Restatement § 564, Comment b; *see Ogren v. Employers Reinsurance Corp.*, 119 Wis. 2d 379, 383, 350 N.W.2d 725 (Ct. App. 1984) (an article referring to an individual's "family" could "therefore be reasonably understood to refer to [his] mother and sister").

Additionally, WJFW-NBC asserts that the false, manufactured statement concerns President Trump and, therefore, it cannot also be "of and concerning" the Trump Campaign or the candidate.  Again, this misapplies the law.  A defamatory statement can defame more than one person.  A defamatory communication may concern more than one person.[14]  A communication referring to one person can refer to another person as well, if a reasonable recipient of the publication can and does interpret the communication as being in substance about plaintiff.  3 Dobbs, et. al, The Law of Torts § 530, at 206 (2d Ed. 2011); *see also Writers Guild of Am., W., Inc. v. Superior Court for Los Angeles Cty.*, 78 Cal. Rptr. 520, 524 (Cal. Ct. App. 1969) ("The general rule is that when two or more persons are affected by the same defamatory matter, the defamation is deemed several as to each of them, and each may therefore sue for it independently of the other.").

2.  **An Individual May be Inextricably Intertwined With an Entity for Purposes of a Defamation Claim.**

WJFW-NBC argues that statements about officers of a corporation are held to not be "of and concerning" the corporation itself.  (Doc.9: 12).  That is not a rule; the determination depends upon the allegations of the complaint.  Courts have held that a corporate executive may

---

[14] *Peagler v. Phoenix Newspapers, Inc.*, 560 P.2d 1216, 1222–23 (Ariz. 1977) (article held to refer to corporation and the owner); *Schiavone Const. Co. v. Time, Inc.*, 619 F. Supp. 684, 697 (D.N.J. 1985) (statements concerning company also could be of and concerning the chief executive officer; corporation bore CEO's last name); *Klentzman v. Brady*, 456 S.W.3d 239, 254–55 (Tex. App. 2014) (article was defamatory of both chief sheriff's deputy and his son), *aff'd*, 515 S.W.3d 878 (Tex. 2017); *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 66–67 (D.D.C. 2018) (Store team leaders for various Whole Foods grocery stores in the Washington, D.C., metropolitan area stated a claim for defamation against Whole Foods for defamation although statements did not name plaintiffs and there were more than 20 Whole Foods stores in the region).

sue for defamation based upon statements about the corporation.  For example, in *Caudle v. Thomason*, the court held that Caudle, the chief executive officer and president of a corporation, AOA, stated a claim for defamation for statements that accused the corporation of fraud and corrupt practices but did not explicitly refer to Caudle.  942 F. Supp. 635, 638 (D.D.C. 1996).  The complaint alleged that Caudle " 'made all business decisions regarding corporate actions which are the subject matter of [the] lawsuit.' "  (*Id.* at 638.)  The court was therefore "unable to say that a reasonable listener . . . would not infer that [the plaintiff] was responsible for or involved with the alleged wrongdoings."  (*Id.*)  The allegations of fraud and corruption were, in other words, not only about the plaintiff's company, but also about the individual plaintiff.  *See also Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (Statements defamatory of corporate officers generally do not defame their corporations, and vice versa; "This principle is not absolute, of course.  If, for example, one person is solely in charge of corporate decision making, an attack on a corporation would vicariously attack the decision maker.")

Moreover, even if statements about corporate officers are generally not considered "of and concerning" the corporation, that is particular to business (for profit) corporations.  A different analysis applies to nonprofit corporations, as recognized by the Restatement (Second) of Torts.

Where a statement concerns an individual who is inextricably intertwined with a non-profit or other organization lead by the individual, courts have held that a defamatory statement concerning the individual may be "of and concerning" the entity for purposes of a defamation claim.  The Restatement recognizes that a non-profit corporation may bring a defamation action for statements that prejudice the corporation in the estimation of the public.  Restatement (Second) of Torts § 561 ("A communication can be defamatory concerning a nonprofit

corporation where it depends upon support from the public and the defamatory matter tends to interfere with its activities by prejudicing it in the public's estimation.")

For example, in *Gorman v. Swaggart*, 524 So. 2d 915 (La. Ct. App. 1988), a religious non-profit corporation and its minister brought an action for defamation against defendants, Jimmy Swaggart and other leaders and entities in the Assemblies of God organization.  The defamation action arose out of actions and events leading up to and following the dismissal and/or resignation of Pastor Marvin Gorman from his position as a minister of the Assemblies of God.  (*Id.* at 917.)  Gorman was pastor of the First Assembly of God Church in New Orleans and a member of the national governing body of the Assemblies of God.  (*Id.*)  Gorman was also president and founder of Marvin Gorman Ministries, Inc. ("MGM"), a non-profit religious corporation which used television as a means to raise money and carry the corporation's message to the public.  (*Id.*)  Defendant Swaggart and others publicly accused Gorman of committing immoral acts over a period of years.  (*Id.*)

Defendants moved to dismiss MGM's defamation claims, arguing that "MGM could not bring suit based upon allegedly defamatory statements made about Gorman but not about MGM."  (*Id.* at 919.)  The court rejected that argument, holding that the reputation of MGM, Gorman's ministry, was "inextricably tied to his personal reputation" and thus statements defamatory of Gorman were defamatory of MGM, his ministry.  As the court explained:

> This case is not like that of a business corporation seeking damages for statements made about the personal morality of one of its officers or a member of its board of directors in matters unrelated to business.  Gorman's personal reputation was one of MGM's primary assets.  By questioning ***his*** moral integrity, the integrity of the corporation itself was called into question.  <u>In many ways, defamation of Gorman was defamation of his ministry.  He was its principal spokesman. It was with him that the public identified.  His reputation for spiritual and moral integrity was the cornerstone on which the ministry was built.</u>  Attacks on Gorman, which included allegations that he embezzled MGM funds, could (and allegedly did) decrease contributions to MGM and lessen the confidence of

lenders in the stability and integrity of the ministry.  <u>Under these circumstances, we believe it was possible for MGM to be defamed by statements about Gorman even if MGM was not mentioned by name in those statements.</u>  For a discussion of this type of defamation see generally, W. Prosser, Handbook of the Law of Torts, Sec. 111, p.745 (4th ed. 1971) and Restatement of Torts 2d, Sec. 564, comment (e).

In our opinion, the reputation of Gorman's ministry was inextricably tied to his personal reputation.  . . .

(*Id.* at 919) (italics emphasis in original; underlining emphasis added).

### 3.      There are Many Examples of Campaign Committees as Plaintiffs or Defendants in Defamation Actions.

There are numerous examples of defamation actions and matters in other contexts in which a candidate's campaign committee is a plaintiff or defendant in a case involving statements by or about the candidate or the campaign.  Candidates' personal campaign committees have filed defamation actions as plaintiffs[15], and have been sued as defendant in defamation actions or other election related actions.[16]  Also, state election authorities will bring election violation charges against campaign committees along with their candidates.[17]  Campaign committees have been appropriate plaintiffs in other contexts as well.[18]

---

[15] *See Valento v. Ulrich*, 402 N.W.2d 809, 812 (Minn. Ct. App. 1987) ("[T]o the extent that the committee is a proper party plaintiff, we treat it as a public figure."); *Goodson v. Republican State Leadership Comm. - Judicial Fairness Initiative*, 2018 WL 6430825 (E.D. Ark. Nov. 1, 2018) (Candidate and candidate's campaign committee plaintiffs in a defamation action for advertisement broadcast during an election.)

[16] *See Boyce & Isley, PLLC v. Cooper*, 673 S.E.2d 694, 696 (N.C. Ct. App. 2009) (A candidate and committee both were defendants for the same act of the candidate); *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893 (N.C. Ct. App. 2002); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 53 (1st Cir. 2012); *Vander Linden v. Wilbanks,* 128 F. Supp. 2d 900, 902 (D.S.C. 2000); *Pub. Office Corp. v. Clinton for President Comm.,* 194 F.3d 139, 142 (D.C. Cir. 1999) (Committee was proper defendant for alleged defamatory comments by the committee in a response to the Federal Elections Commission).

[17] *See The Team Working for You v. Ohio Elections Comm.,* 754 N.E.2d 273, 281 (Ohio Ct App. 2001) (finding that individual members of a committee and the committee itself could be liable for the same act); *Dewine v. Ohio Elections Comm'n,* 399 N.E.2d 99, 101 (Ohio Ct. App. 1978) ("The minutes further indicate that the defendant commission found no violation with respect to two other complaints made against either plaintiff or his committee.")

[18] *Miller v. F.C.C.,* 66 F.3d 1140, 1145 (11th Cir. 1995) (Candidate campaign committees have been proper plaintiffs in cases against regulatory agencies where they have alleged a harm of restriction of "the goal of increased candidate access to the broadcast media."  Plaintiffs' claims were denied on other grounds.); *See generally Republican Party of Minnesota v. White*, 536 U.S. 765, 777 (2002) (Political committees had standing to bring First Amendment challenges.); *Nat'l Right To Life Political Action Comm. v. Friends of Bryan*, 741 F. Supp. 807, 811 (D. Nev. 1990) (Finding that the "Plaintiff is sufficiently distinguishable from the corporation, National Right to Life

For example, one court found that a candidate's claim in a defamation case was so intertwined with his campaign committee that expenditures for legal fees in a defamation action brought by a candidate must be reported as campaign expenditures. *Thirteen Comm. v. Weinreb*, 214 Cal. Rptr. 297, 299 (Cal. Ct. App. 1985) ("In light of the findings that the primary objective of the lawsuit was to vindicate her personal reputation in furthering her quest for the elective office, the trial court's determination that the attorney fees were incurred and expended for a *political* purpose must be upheld") (emphasis in original).

WJFW-NBC argues that in other circumstances the Trump Campaign has distinguished itself from Donald Trump in his personal capacity.  (Doc.9: 11).   This is not relevant to whether the false, manufactured statement is "of and concerning" the Trump Campaign.  Moreover, the cited material merely shows that the candidate and his campaign committee are distinct from Donald Trump acting in his capacity as President.  In the FEC matter defendant references (Doc.9: 11); (Doc.12-4: 2 n.1), the Trump Campaign reiterates that Donald Trump in his "capacity as a candidate" is intertwined with the Trump Campaign, and again, that there is a "very clear distinction between being 'President' and being 'a candidate in a campaign.'" (Doc.9: 12); (Doc.12-5: 7).  This is consistent with the fact that the Trump Campaign and the candidate, when he is acting in his capacity as candidate – for example, speaking as the candidate at a campaign rally – are inextricably intertwined.[19]

---

Committee, Inc., so as to maintain this suit as a party plaintiff."); *Friends of Phil Gramm v. Americans for Phil Gramm in '84*, 587 F. Supp. 769, 778 (E.D. Va. 1984) (Plaintiff, a personal campaign committee, had standing to allege harm to its candidate and the ability to solicit funds and other First Amendment claims.)

[19] In this case, the only plaintiff is the Trump Campaign.  Candidate Trump has chosen not to join the action as a plaintiff, which is his right.  This action asserts a defamation claim by the Trump Campaign and seeks to recover its damages from the defamation.

B.    **The False, Manufactured Statement is "Of and Concerning" the Trump Campaign.**

The false, manufactured statement in the PUSA ad was "of and concerning" the Trump Campaign.  Donald J. Trump is of course the Trump Campaign's candidate for the 2020 Presidential Election.  (Doc.1-2: 7); (Compl. ¶ 9).  The Trump Campaign is responsible for, among other things, coordinating and organizing political and fundraising appearances, creating and/or purchasing political advertising on behalf of the candidate, collecting contributions for the candidate and reporting them to federal regulators as required by law, and making expenditures on behalf of the candidate, each and all for the sole purpose of re-electing its candidate as President of the United States.  (Doc.1-2: 7); (Compl. ¶ 11).

Candidate Trump is one of many people authorized to speak, and who does speak, on behalf of the Trump Campaign.  (Doc.1-2: 7); (Compl. ¶ 12).  The purported statements of any authorized speaker alleged to have been made on behalf of the Trump Campaign impact the Trump Campaign.  (*Id.*)

Statements represented as made by candidate Trump at campaign appearances and speeches of course reflect upon and concern the Trump Campaign.  The false statement depicted in the PUSA ad as being made by candidate Trump reflects upon the Trump Campaign since it was purportedly a statement made by the Trump Campaign's candidate at a campaign rally. (Doc.1-2: 7); (Compl. ¶ 13); *see also* (Doc.9: 10, 11-12) (Asserting that "The President's 'hoax' statement, included in the montage, came from his address to a South Carolina rally" and arguing that candidate Trump "made the 'hoax' comment at a campaign rally in Charleston, South Carolina on February 28, 2020.").

As WJFW-NBC itself notes, the PUSA ad was broadcast "just months before a presidential election."  (Doc.9: 8).  A recipient/viewer of the PUSA ad would reasonably

26

understand the false communication to refer to the Trump Campaign.  The manufactured statement took audio clips of separate words said by candidate Trump at a campaign rally, taking audio of the candidate's words "The coronavirus" from earlier in the speech, and stitching them together with words said later in the speech:  "this is their new hoax."

The PUSA ad communicates a false, manufactured statement of the candidate, which he did not make.  It manufactures an audio clip statement by stitching together audio clips, putting them together and representing it textually as one sentence:  "The coronavirus, this is their new hoax."

This statement is of and concerning the Trump Campaign because it falsely communicates a statement in the candidate's own words that the candidate did not say.  Portions of the audio clips were made at a campaign rally.  After seeing the PUSA ad, if a viewer searched for the South Carolina Campaign Speech, he or she would see the candidate speaking at a campaign rally.  (Doc.1-2:9, 10, 11, 28); (Compl. ¶¶ 24, 30, 34, 35, Ex. C).  Indeed, articles published after the rally identified the false, manufactured statement as utilizing audio clips pulled from the rally, purporting to represent the candidate's words stated at the rally.  (Doc.1-2: 12-13, 46-51, 53-57); (Compl. ¶¶ 40-44, Exs. E, F).  By manufacturing a false statement purportedly made by the candidate at a campaign rally that he did not make, defendant made a false communication of and concerning the Trump Campaign.

The Trump Campaign is a nonprofit corporation that depends upon support from the public, and the false, manufactured statement tends to interfere with its activities by prejudicing it in the public's estimation.  Restatement (Second) of Torts § 561.  The Trump Campaign's effort to acquire votes necessarily rests upon its and its candidate's reputation.  (Doc.1-2: 7);

27

(Compl. ¶ 15).  The PUSA ad was created in order to affect voting behavior of members of the voting public and influence the 2020 presidential election.   (Doc.1-2: 7); (Compl. ¶ 14).

Further, the false, manufactured statement, "The coronavirus, this is their new hoax" was communicated by presidential candidate Joe Biden in a campaign advertisement distributed on March 3, 2020.  (Doc.1-2: 12); (Compl. ¶ 40).  (See pages 9, 10-12, above).  Similarly, in an interview, former presidential candidate Mike Bloomberg accused candidate Trump of calling the coronavirus a "hoax" at the South Carolina campaign rally.  (Doc.1-2: 12); (Compl. ¶ 38).  That statement was immediately corrected as being wrong by CBS reporter Scott Pelley.  (*Id.*)

Because the false, manufactured statement was represented to be an actual statement made by candidate Trump at the South Carolina rally, an event of the Trump Campaign, made by the candidate Trump, a viewer or listener of the PUSA ad would reasonably understand the false statement to concern the Trump Campaign.  A viewer or listener would also understand the false statement to concern the Trump Campaign because the last sentence of the PUSA ad demonstrates it is about the Presidential campaign, saying at the closing:  "America needs a leader we can trust."

Accordingly, the Complaint states a claim for defamation "of and concerning" the Trump Campaign and it has standing to assert the defamation claim in this case.  (Doc.1-2: 19); (Compl. ¶¶ 65, 67 68).

III.   **The Manufactured Statement Was False and Defamatory**

WJFW-NBC misunderstands or intentionally mischaracterizes the defamation claim in this case.  In its Complaint, the Trump Campaign asserts that the following statement – the opening statement – in the PUSA ad is defamatory of the Trump Campaign:

**The coronavirus, this is their new hoax.**

This action does not claim defamation for each and every statement in the PUSA ad.  As described by WJFW-NBC, the PUSA ad consists of a "montage" of statements purporting to be statements made by candidate Trump.  (Doc.9: 9, 10 & n.2).  Those nine separate statements are depicted through both audio clips and a visual representation of the same statement in text, appearing on the screen at the same time as the corresponding audio clips.  According to WJFW-NBC, these statements were made at different times, in different speeches or press conferences.  (Doc.9: 9-10 n.2).

The PUSA ad begins with the statement consisting of stitched together audio representing in the manufactured audio clips and the textual representation that candidate Trump made the following statement, as a sentence:   "The coronavirus, this is their new hoax."  That statement is false and defamatory of the Trump Campaign.

If the false representation that candidate Trump made that statement is susceptible to a defamatory meaning by some number of persons (even a minority), then it is defamatory as a matter of law and the motion to dismiss must be denied.  The Trump Campaign sues based upon this single false statement, which is defamatory of the Trump Campaign.  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 509–10 (1991) (" '[T]he test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text,' though the California courts recognize that '[w]hile a drop of poison may be lethal, weaker poisons are sometimes diluted to the point of impotency.' ") (quoting *Washburn v. Wright*, 68 Cal. Rptr. 224, 228 (Cal. Ct. App. 1968).)

WJFW-NBC is simply wrong in suggesting that the defamatory nature of the manufactured statement can be minimized or eliminated by placing it first in a "montage" of different statements made by candidate Trump or by the President at press conferences or other

appearances.  *See Amoroso v. Schuh*, 278 F. Supp. 3d 1106, 1113 (W.D. Wis. 2017)

("[O]therwise defamatory statements cannot be rendered non-actionable simply because they are

incorporated into a larger communication having a proper purpose.").  Moreover, the false

statement is the opening sentence of a 30-second attack ad.  Since the statement opens the PUSA

ad and the ad is so brief, the false statement is not "diluted to the point of impotency" by being

included in the montage ad.

The Complaint properly pleads that the manufactured statement is false in that it was

never made by candidate Trump and it is represented to be a sentence uttered by him.  Further,

the defamation is the representation that the false statement was said by candidate Trump.  The

representation that the manufactured statement was said is defamatory because it has a tendency

to deter persons from supporting the Trump Campaign and it is used to attack the campaign and

its candidate.

### A.  Statement Must be False and Defamatory.

The elements of a defamation claim are: (1) a false statement, (2) communicated by

speech, conduct, or in writing to a person other than the person defamed, and (3) the

communication is unprivileged and is defamatory, that is, tends to harm one's reputation so as to

lower him or her in the estimation of the community or to deter third persons from associating or

dealing with him or her.  *Hart v. Bennet*, 2003 WI App 231, ¶ 21, 267 Wis. 2d 919, 672 N.W.2d

306.

### 1.  Statement Must be Capable of a Defamatory Meaning

Whether a particular communication is capable of a defamatory meaning is a question of

law.  *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 800 (W.D. Wis. 2006).

" 'The legal standard for determining whether a statement or implication is capable of conveying

a defamatory meaning is whether it is reasonably capable of conveying a defamatory meaning to an ordinary mind and whether the meaning ascribed by the plaintiff is a natural and proper one.' " (*Id.*) (citation omitted).

If the asserted statement is "capable of a conveying a defamatory implication about plaintiff," the motion to dismiss must be denied. (*Id.*) Whether viewers or listeners "actually ascribed a defamatory meaning to the error cannot be determined on a motion to dismiss." (*Id.*) "At this stage of the pleadings, however, it is sufficient that the error is capable of a conveying a defamatory implication about plaintiff." (*Id.*)

If the alleged defamation is capable of both a defamatory and non-defamatory meaning, the motion to dismiss must be denied. *See Liberty Mut. Fire Ins. Co. v. O'Keefe*, 205 Wis. 2d 524, 527, 556 N.W.2d 133 (Ct. App. 1996) ("If we conclude that statements are capable of both a defamatory and a non-defamatory meaning, we must reverse and remand for trial, for in that instance, the ultimate determination is for the jury."); *Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 462, 113 N.W.2d 135 (1962) ("If the court determines the communication is capable of an innocent meaning as well as a defamatory meaning, it is then for the jury to determine whether the communication capable of a defamatory meaning was so understood by its recipient."); *see also Starobin v. Northridge Lakes Dev. Co.*, 94 Wis. 2d 1, 10, 287 N.W.2d 747, 751 (1980) ("If the communication is capable of a defamatory as well as a non-defamatory meaning then a jury question is presented. Only if the communication cannot reasonably be understood as defamatory can the motion to dismiss be granted.").

2.    **A False, Manufactured Statement Misstating What the Plaintiff Said is Actionable Defamation.**

WJFW-NBC desperately seeks to avoid the actual claim asserted in this case, wrongly assuming that this action sues for the PUSA ad as a whole, claiming all of its statements are false

and defamatory.  That is not the case.  This action alleges that the lead-off statement in the PUSA

ad is false and defamatory of the Trump Campaign because it stitches together audio clips to

represent that candidate Trump made a statement he did not make:  "The coronavirus, this is

their new hoax."  The PUSA ad, by stitching together the audio clips and representing it by text

as a single sentence, represents that the candidate made that statement.  On this motion to

dismiss, it must be assumed as true the candidate did not make that statement.  As seen by the

remarks at the South Carolina campaign rally, the candidate did not say that sentence as

represented.

By taking disparate audio clips of the candidate said at different times and putting them

together as a single sentence, the manufactured statement presents audio of a sentence never

uttered by the candidate.  This is analogous – though far worse – to an article of an interview

with a person, purporting to include the person's own words, verbatim, by placing them in

quotes, but intentionally altering the person's words in a manner that changes their meaning.   In

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991), the New Yorker published an article

and Alfred A. Knopf published a book about Jeffrey Masson, a noted psychoanalyst.  The article

and book were published including passages purporting to include verbatim quotes of Masson's

own words.  Masson's actual statements were captured in audio recordings of the interviews.

In *Masson*, the U.S. Supreme Court held that a claim for defamation is established by

showing that purported quotations of the plaintiff, which were substantively altered in a manner

that negatively affects the plaintiff's reputation.  The Supreme Court explained:

> Deliberate or reckless falsification that comprises actual malice turns upon
> words and punctuation only because words and punctuation express meaning.
> Meaning is the life of language.  And, for the reasons we have given, quotations
> may be a devastating instrument for conveying false meaning.  In the case under
> consideration, readers of In the Freud Archives may have found Malcolm's
> portrait of petitioner especially damning because so much of it appeared to be a

self-portrait, told by petitioner in his own words.  <u>And if the alterations of petitioner's words gave a different meaning to the statements, bearing upon their defamatory character, then the device of quotations might well be critical in finding the words actionable.</u>

*Masson*, 501 U.S. at 517-18 (emphasis added).

The use of statements in quotation marks, which a reasonable reader would conclude purports to be a verbatim statement by the speaker, represent the speaker's own words and not the article author's own interpretation of the speaker's intended meaning.  As the Supreme Court explained:

> <u>Where . . . a writer uses a quotation, and where a reasonable reader would conclude that the quotation purports to be a verbatim repetition of a statement by the speaker, the quotation marks indicate that the author is not involved in an interpretation of the speaker's ambiguous statement, but attempting to convey what the speaker said.</u>  This orthodox use of a quotation is the quintessential "direct account of events that speak for themselves."  *Time, Inc. v. Pape*, supra, 401 U.S., at 285, 91 S. Ct., at 637. More accurately, the quotation allows the subject to speak for himself.

*Masson*, 501 U.S. at 519 (emphasis added).

The Court reasoned that a "fabricated quotation may injure reputation" by attributing  "an untrue factual assertion to the speaker," which is harmful to the speaker's reputation.  (*Id.* at 511.)  Alternatively, beyond a factual assertion, a fabricated quotation "may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold."  (*Id.*)  Thus, a falsified statement of opinion by the plaintiff may be defamatory.  In *Masson*, the Court cited as an example a controversial statement such as John Lennon's purported statement about the Beatles:  "We're more popular than Jesus Christ now."  Assuming Lennon did not in fact say that, the Court reasoned that the misattribution would be defamatory of John Lennon because it quotes him as expressing a view by a statement he did not actually make.  (*Id.* at 511-12.)

Given a statement falsely quoting a speaker as making a statement he did not say, and/or altering the speaker's words, the Supreme Court explained that it must determine whether the published statement differs "materially in meaning from the" speaker's actual words, so as to create an issue of fact regarding falsity and to establish defamation.  (*Id.* at 521-22).  In *Masson*, the Court considered each altered quote separately, to determine whether the difference was material and the altered quote was injurious to the speaker's reputation.  (*Id.* at 523-24).   The elements of falsity and defamation were established where the actual words and falsely attributed quotations materially differed in a manner such that the altered quote reflected poorly on the plaintiff.  (*Id.*)

B.    **The Manufactured Statement is False and Defamatory Under *Masson*.**

*Masson* is controlling authority in this case.  WJFW-NBC fails to apply the *Masson* test, which separately considers the false statement attributed to the plaintiff to determine whether alterations in the speaker's words are materially different and defamatory.  Defendant wrongly argues for application of "substantial truth," asserting that the Court should consider all the separate statements in the PUSA ad to determine whether the ad as a whole is more true than false.  (Doc.9: 27-29).  That analysis has no application here because only a single statement in the "mosaic" advertisement is alleged to be defamatory.

Defendant also wrongly argues, contrary to *Masson*, that the manufactured statement must be considered in the context of the other statements in the PUSA ad.  (Doc.9: 29).  For this point, defendant improperly cites *Marjala*, a "per curiam" decision of the Wisconsin Court of Appeals.  (Doc.9: 22, 23, 26).  That case cannot be cited for any purpose and it must be disregarded.  Wis. Stat. § 809.23(3); *Munger v. Seehafer*, 2016 WI App 89, ¶ 49 n.15, 372 Wis. 2d 749, 890 N.W.2d 22 ("In responding to this argument, the Respondents cite an unpublished

court of appeals per curiam decision.  This is improper, and we admonish counsel that future violations of the Rules of Appellate Procedure may result in sanctions.  *See* WIS. STAT. RULE 809.23(3)(a); 809.83(2)").[20]

As noted at page 29, above, a defamation action may be premised upon a single statement communicated concerning plaintiff.  WJFW-NBC fails to apply the test required by *Masson* and compare the manufactured statement to determine whether it was materially different than the actual statement made at the South Carolina rally.

Applying the Supreme Court's two-step test of *Masson*, the manufactured statement must be examined to compare the actual statement to the manufactured, altered statement.  The opening sentence of the PUSA ad puts together audio clips of candidate Trump to falsely represent that he said:  "The coronavirus, this is their new hoax."  The ad has those words with that punctuation, represented to be a sentence.

This is materially different from the words actually stated by candidate Trump at the South Carolina rally.  First, the candidate did not say those words together.  He did not say: "The coronavirus, this is their new hoax. "

Second, the actual words of the candidate in the South Carolina Campaign Speech are different and have a materially different meaning.  In the speech, candidate Trump says that the Democrats' attack on the administration's response to the coronavirus is "politicizing" the

---

[20] *See Harnischfeger Corp. v. Harbor Ins. Co.*, 927 F.2d 974, 976, 1991 WL 34587 (7th Cir. 1991) ("A noncase for Wisconsin's own purposes is a non-case in federal courts under *Erie*."); *Wisconsin Cent. Ltd. v. Acuity*, 2011 WL 208404, at *4 n.5 (E.D. Wis. Jan. 21, 2011) ("WCL also cites to an unpublished appellate court decision, but this court may not consider it because the rules of Wisconsin appellate procedure prohibit the citation of unpublished appellate opinions for precedent or authority.")  The Court has considered cases issued after July 1, 2009 that are authored but unpublished and therefore citeable under the Wisconsin rules.  *See, e.g.*, *A & B Distrib., Inc. v. Heggie's Pizza, LLC*, 2019 WL 6837858, at *2 n.1 (W.D. Wis. Dec. 16, 2019)

coronavirus.  That tactic is the Democrats' new hoax.  Utilizing defendant's "transcript"[21] of the South Carolina campaign rally speech of February 28, 2020 (Doc.10, Ex. A); (Doc.10-1), candidate Trump says "Now the democrats are politicizing the Coronavirus.  You know that, right."  (Doc.10, Ex. A); (Doc.10-1: 6).   Candidate Trump says:  "Coronavirus, they're politicizing it.  We did one of the great jobs.  You say, 'How's President Trump doing?'  They go, 'Oh, not good, not good."  (Doc.10-1: 7).  Candidate Trump goes on to discuss the ways in which opponents attempted to attack the administration, including "Russia," and the "impeachment hoax."  (Doc.10-1: 7).  He goes on to say "They've been doing it since you got in." and some more words.  (Doc.10-1: 6).  He then states:  "And this is their new hoax." (Doc.10-1: 8).

The opening audio and text of the PUSA ad falsely represents candidate Trump as saying: "The coronavirus, this is their new hoax."  As shown, these words were not uttered by the candidate.  The manufactured audio falsely represents that the candidate said these words together, in a sentence, when he did not make that statement.   The manufactured audio materially alters candidate Trump's words stated at the South Carolina rally.

The South Carolina Campaign Speech was approximately 1 hour and 25 minutes in total, and during this speech candidate Trump's remarks covered a number of issues, including the coronavirus pandemic, the vote counting issues at the Iowa Caucus, immigration and healthcare policy, and tactics used by his political opponents to affect his reelection, including the "impeachment hoax."  (Doc.1-2:  9); (Compl. ¶ 25).  Six minutes and 5 seconds into the speech, candidate Trump says:  "Now the Democrats are politicizing the coronavirus . . . ."  (*Id.*)  After saying other words, approximately 45 seconds later, candidate Trump then refers to the

---

[21] Plaintiff does not stipulate to the admissibility or authenticity of the transcript or admit that it is correct.  Plaintiff will accept it for purposes of responding to defendant's motion to dismiss, preserving all rights to challenge its authenticity or admissibility.

"impeachment hoax" and about 15 seconds later he refers to his political opponents' characterization of his response to the coronavirus, saying "this is their new hoax." (Doc.1-2: 9-10); (Compl. 25).

The opening audio and textual sentence of the PUSA ad was not said by the candidate and the change was a material alteration under the *Masson* test. And a jury could find the altered statement to be defamatory of the Trump Campaign and it has a tendency to deter other persons from dealing with the campaign, affecting votes or monetary support. In short, the manufactured statement provided a basis to attack the merits of the Trump Campaign. (Indeed, the false representation that candidate Trump made that statement was used by his political opponents to attack him in the presidential campaign. See pages 9, 10-12, above.

The statement is defamatory because the altered statement reflects poorly on the candidate and the campaign. That element is properly pleaded in the Complaint. (Doc.1-2: 16-17, 19-20); (Compl. ¶¶ 54, 64, 65, 67, 68, 73, 74). WJFW-NBC mischaracterizes the defamation claim, arguing that it is not defamation because the statement does not charge "dishonorable, unethical, unlawful, or unprofessional conduct." (Doc.9: 17). However, the Complaint alleges that the manufactured statement has a tendency to deter third parties from dealing with the Trump Campaign, for example, by not voting for the candidate. (Doc.1-2: 16-17, 19); (Compl. ¶¶ 54, 65). It has that tendency because the manufactured statement is defamatory on its face.[22] That is, the false representation that candidate Trump made the manufactured statement is defamatory.

---

[22] In that respect, this case is distinguishable from *Tatur v. Solsrud*, 174 Wis. 2d 735, 498 N.W.2d 232 (1993), cited by WJFW-NBC (Doc.9: 20). In that case, letters falsely represented how political candidates voted on particular issues, allegedly causing voters not to vote for them. The Court held that a defamation claim was not stated because the letters on their face did not contain statements "capable of a defamatory meaning." (*Id.* at 740.) To state a claim, the statement must be defamatory on its face, causing the plaintiff to lose votes. Here, the false, manufactured statement is defamatory on its face.

The PUSA ad falsely represents that candidate Trump stated at a campaign rally that "The coronavirus, this is their new hoax."   It is a manufactured statement by candidate Trump that he never actually said.  The actionable falsity is the representation that this was candidate Trump's statement.  He never said it, and WJFW-NBC knew that when it chose to continue broadcasting the ad.  See pages 12 to 13, above, and pages 45 to 47 below.

The PUSA ad's statement comprised of stitched together audio clips is defamatory.  A reasonable listener or viewer hearing or seeing the false, manufactured statement would hear and/or see that that candidate Trump called the coronavirus a "hoax."  From that false statement, the listener or viewer could reasonably conclude that candidate Trump believed the coronavirus was not real or was exaggerated and/or that he did not take the coronavirus danger seriously. The only nouns in the falsified statement are "The coronavirus" and "new hoax," communicating that candidate Trump was referring to the coronavirus as "their new hoax," suggesting it was a crisis made up by others ("their").  This material difference is defamatory, and, similar to the false quotations in *Masson*, a jury could reasonably find the altered statement to be defamatory of the Trump Campaign.  The false, manufactured statement was utilized to reflect negatively on candidate Trump.

For these reasons, the false, manufactured statement could reasonably be interpreted to be defamatory.  Accordingly, the Complaint states a claim for defamation as a matter of law.

C.      **Defendant's "Opinion" and "Entire Ad" Arguments Are Inapplicable.**

WJFW-NBC argues that the PUSA ad is not actionable because the ad, as a whole, expresses an "opinion" about candidate Trump's policies, not a "verifiable fact."  (Doc.9: 21, 23-27).  It also argues that the PUSA ad "as a whole" is substantially true in conveying the "gist" of candidate or President Trump's statements, considering all nine of the separate statements in the

ad.  (Doc.9: 27-30).  Again, this mischaracterizes or misunderstands the nature of the claim in this case.  Plaintiff is not claiming that every one of the nine separate sentences in the PUSA ad is false and defamatory.  Rather, this action was filed because the opening sentence of the ad is comprised of manufactured audio of candidate Trump making a statement he did not make.  The ad's communication that candidate Trump made that statement is false and defamatory.

Whether candidate Trump said the sentence communicated by the manufactured statement is a verifiable fact question.  It is not a statement of opinion.  The defamation in this case is not opinion because it is audio purporting to set forth the candidate's own words.  Defendant misunderstands the concept of opinion under the First Amendment.  The PUSA ad includes statements purportedly by President Trump, with a closing line about needing "a leader we can trust."  Excluding the closing tag line of the ad, the PUSA ad purports to communicate verbatim statements by the President.  Thus, WJFW-NBC is simply wrong in arguing that the PUSA ad "as a whole reflects not a verifiable fact," but PUSA's opinion concerning the President's handling of the coronavirus.  (Doc.9: 22).

Indeed, as defendant describes the PUSA ad, it is an "audio montage" of statements by President Trump.  (Doc.9: 9).  A "montage" is a juxtaposition of "heterogeneous elements," a composite picture made by combining several separate pictures, or a mixture of items.  *See* https://www.merriam-webster.com/dictionary/montage   There are nine separate sentences in the PUSA ad, consisting of audio clips of each sentence made by the President.  Those statements purportedly come from seven different speeches or statements, made at different times.  (Doc.9: 10 & n.2).  Each of these statements purports to be a factual statement, that is, audio of nine different sentences presented by audio in the candidate Trump's own words.  It is not claimed

that the other eight sentences have alterations of the audio clips or that they inaccurately communicate the candidate's words.

The false and defamatory statement at issue in this case is not opinion.  It is not a statement providing a characterization and conclusion by another person (PUSA) expressing its view of what the administration or candidate did or did not do.  Rather, it is a montage of the candidate's own statements.   That is not opinion.

A defamation action may involve another person's statement about the plaintiff, characterizing the plaintiff's position on something, or stating something plaintiff did.  That is not this case.  In this case, the defamation is the representation that candidate Trump made the manufactured opening statement, comprised of stitched -together audio clips of his words.

In this case, the defamation is not a summary or characterization of the candidate's position or words, which were misinterpreted or inaccurately summarized.   Rather, the PUSA ad communicated a manufactured statement by candidate Trump that he never actually said.  The actionable falsity is that this was candidate Trump's statement.

Accordingly, defendant's opinion argument has no relevance to the allegations and the defamation claim in this case.  Moreover, as recognized by *Masson*'s Beatles hypothetical (see page 33, above), falsely representing the plaintiff's statement of an opinion the plaintiff did not say is actionable defamation.

## IV.     **The Complaint Properly Pleads Actual Malice.**

Because plaintiff is the campaign committee for a candidate for re-election to the office of President of the United States, it is a public figure or public official under the First Amendment for purposes of a defamation claim.  WJFW-NBC, as a broadcaster of a false and defamatory statement concerning a public official or public figure, is liable for defamation if it

knew the statement was false or it acted with reckless disregard of the truth or falsity of the statement.

A.    **Actual Malice is Established by Knowing Falsity Including Manufactured Statements Not Actually Made by Plaintiff.**

WJFW-NBC fails to set forth a complete and accurate statement of the "actual malice" standard, a standard that is well established in case law.  (Doc.9: 16, 30, 31).[23]  Actual malice requires proof "that the allegedly defamatory statement be made with 'knowledge that it was false or with reckless disregard of whether it was false or not.'  *Sullivan*, 376 U.S. at 280, 84 S. Ct. 710."  *Storms v. Action Wis. Inc.*, 2008 WI 56, ¶ 38, 309 Wis. 2d 704, 750 N.W.2d 522. Reckless disregard is a "subjective standard."  *Storms*, 2008 WI 56, ¶ 39.  "It requires showing that the false statement was made 'with a high degree of awareness of ... probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 13 L.Ed.2d 125 (1964), or that the defendant "in fact entertained serious doubts as to the truth of his publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

If the publisher knew the statement was false, the constitutional protection of actual malice does not apply.  Restatement (Second) of Torts § 580A, Comment d.  See also pages ** to 32-34, above.  That protection also does not apply if the publisher acted in reckless disregard of the truth or falsity of the statement.  (*Id.*)

Actual malice is determined based upon what defendant knew at the time it made the decision to publish the alleged defamatory matter.  *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013).   It is not actual malice to fail to retract once it is broadcast.  (*Id.*)

---

[23] Contrary to defendant's suggestion (Doc.9: 16), *Torgerson* applies this actual malice standard:  "Proof of actual malice requires a showing that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard for its truth."  *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 536, 563 N.W.2d 472 (1997).

That general rule does not apply, however, when the defendant faces the decision to broadcast the false matter again after learning of the falsity.   Actual malice must be determined anew.

"Republication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard." Restatement (Second) of Torts § 580A, Comment d.  *See Young v. Gannett Satellite Info. Network, Inc.*, 837 F. Supp. 2d 758, 766 (S.D. Ohio 2011) ("As this Court has recently explained, a showing of actual malice may be premised on evidence 'demonstrating that the alleged defamer purposefully avoided or deliberately ignored facts establishing the falsity of its statements.' "); *Bentley v. Bunton*, 94 S.W.3d 561, 596 (Tex. 2002) ("An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice.  A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is.  Imagining that something may be true is not the same as belief.").

Evidence of known fabrication proves actual malice.  *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 143–44 (D.D.C. 2017) ("The kinds of evidence that would 'likely support a finding of actual malice' include evidence of fabrication.").  Accordingly, disregard or avoidance of evidence of fabrication and publication of the fabricated statement would establish actual malice.  *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000) (A publisher's presentation of facts is a "calculated falsehood" if "the publisher knows or strongly suspects that it is misleading."); *Stevens v. Sun Pub. Co.*, 240 S.E.2d 812, 815 (S.C. 1978) ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.")

In a defamation action relating to advertising statements concerning a candidate for public office, a complaint can plead "actual malice."   Specifically:  "Among other allegations, plaintiffs stated that they repeatedly informed defendants as to the alleged falsity of their statements, but that defendants continued to publish the offending advertisement."  *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893, 901 (N.C. Ct. App. 2002), *writ denied, review denied, appeal dismissed*, 580 S.E.2d 361 (N.C. 2003).

Knowing and intentional fabrication of an audio statement published in an advertisement is by definition actual malice because it is publication with knowledge of or reckless disregard for the truth or falsity of the statement.  *See Masson*, 501 U.S. at 517-18.  In *Masson*, an author misquoted the plaintiff, changing the plaintiff's words in an interview, and falsely representing the plaintiff's words in quotations.   In other contexts, the Court reasoned that there is some room for "rational interpretation" of the plaintiff's meaning when the author is relying upon "ambiguous sources" to write about plaintiff.  (*Id.* at 519.)

However, where the author is purporting to quote the plaintiff's own words, the First Amendment does not afford the author "interpretative license":

> The protection for rational interpretation serves First Amendment principles by allowing an author the interpretive license that is necessary when relying upon ambiguous sources. <u>Where, however, a writer uses a quotation, and where a reasonable reader would conclude that the quotation purports to be a verbatim repetition of a statement by the speaker, the quotation marks indicate that the author is not involved in an interpretation of the speaker's ambiguous statement, but attempting to convey what the speaker said.</u> This orthodox use of a quotation is the quintessential "direct account of events that speak for themselves." *Time, Inc. v. Pape*, supra, 401 U.S., at 285, 91 S. Ct., at 637.  More accurately, the quotation allows the subject to speak for himself.
>
> <u>The significance of the quotations at issue, absent any qualification, is to inform us that we are reading the statement of petitioner, not Malcolm's rational interpretation of what petitioner has said or thought.</u>  Were we to assess quotations under a rational interpretation standard, we would give journalists the freedom to place statements in their subjects' mouths without fear of liability.  By

> eliminating any method of distinguishing between the statements of the subject
> and the interpretation of the author, we would diminish to a great degree the
> trustworthiness of the printed word and eliminate the real meaning of quotations.
> Not only public figures but the press doubtless would suffer under such a rule.
> Newsworthy figures might become more wary of journalists, knowing that any
> comment could be transmuted and attributed to the subject, so long as some
> bounds of rational interpretation were not exceeded.  We would ill serve the
> values of the First Amendment if we were to grant near absolute, constitutional
> protection for such a practice.  <u>We doubt the suggestion that as a general rule
> readers will assume that direct quotations are but a rational interpretation of the
> speaker's words, and we decline to adopt any such presumption in determining
> the permissible interpretations of the quotations in question here.</u>

*Masson*, 501 U.S. at 519 (emphasis added).  The Court held that "deliberate alteration" of a

plaintiff's words in a quotation included in an article will equate with knowledge of falsity for

purposes of the actual malice standard if "the alteration results in a material change in the

meaning conveyed by the statement."  (*Id.* at 517).  "The use of quotations to attribute words not

in fact spoken bears in a most important way on that inquiry, but it is not dispositive in every

case."  (*Id.*)

 *Masson* makes clear that the First Amendment does not permit a publisher to manipulate

the words of the plaintiff as the audio clips of candidate Trump's words were manipulated to

create a false statement in the PUSA ad.  Actual malice is established where the words are

manipulated to make a statement the plaintiff did not in fact make, when the difference between

the actual statement and the manipulated statement is material.

 Contrary to WJFW-NBC's argument, the truth or falsity of the manufactured statement

presented as audio of the statement of candidate Trump does not turn upon the candidate's

intended meaning in his statements at the South Carolina rally.   (Doc.9: 33).  *Masson* directly

rejects WJFW-NBC's argument that the "rational interpretation"  approach to falsity applies in

this case.[24]  As held in *Masson*, the "rational interpretation" approach to the meaning of a plaintiff's words <u>does not apply</u> when the plaintiff's words are purported to be presented verbatim in quotation marks.[25]  Thus, *Masson* expressly held that the rational interpretation analysis of *Time, Inc. v. Pape*, 401 U.S. 279 (1971) and *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485 (1984) do not apply to claims of defamation based upon falsely attributed statements.  WJFW-NBC is incorrect in suggesting that *Time* and *Bose* apply here. (Doc.9: 33).

That holding applies with equal, if not more, force to a statement comprised of audio clips purportedly of the plaintiff's own words.  The question in this case is not the candidate's intended meaning of statements made in the South Carolina Campaign Speech, but rather:  did the candidate make the statement, as represented by the pieced-together audio statement?  The answer here is indisputably no.

B.     **<u>The Complaint Adequately Pleads Actual Malice.</u>**

The day after the PUSA ad began airing on WJFW-NBC, plaintiff sent it the Cease and Desist Letter explaining the ad's falsity and providing information from third-party fact checkers confirming its falsity.  (Doc.1-2: 5, 15, 58); (Compl. ¶¶ 2, 47-50, Ex. G).   The Cease and Desist Letter explained the nature of the false, manufactured statement, that it consisted of stitched together fragments from different speeches and that it was falsely represented to be a statement of the candidate which he did not in fact make.  (Doc.1-2: 5, 15, 59-61); (Compl. ¶¶ 47-50, Ex.

---

[24] *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 848 (9th Cir. 2001) (even if a complete, unpublished statement would be subject to the rational interpretation doctrine, it is lost when the publisher uses only a small portion of the full text and substantially changes its meaning by removing qualifications; "The sound bite presented by Wornick and the station finds no protection in the rational interpretation doctrine."); *see also Anderson v. The Augusta Chronicle*, 585 S.E.2d 506, 517 (S.C. Ct. App. 2003) ("Masson, however, explicitly rejected 'rational interpretation' protection for defamatory statements in the context of alleged misquotations.), *aff'd*, 619 S.E.2d 428 (S.C. 2005).
[25] *John v. Journal Commc'ns, Inc.*, 801 F. Supp. 210, 211 (E.D. Wis. 1992), cited by defendant (Doc.9: 27-28) provides an example of an article reviewing historical matters and relying upon various sources.  The rational interpretation analysis properly applied in that case.

G).  The Cease and Desist Letter included a summary of the Washington Post Article, which states that the Biden ad utilizing the same false audio statement was "video manipulation." (Doc.1-2: 62).  The ad manipulated video to have candidate Trump call the coronavirus a hoax. (*Id.*)  It also summarizes the PolitiFact article calling the manipulated video "misleading" and stating that audio clips were edited and stitched together to create a statement the candidate did not make.  (*Id.*)  The Cease and Desist Letter further provided the actual words of candidate Trump at the South Carolina rally, showing that he did not say:  "The coronavirus, this is their new hoax."  (Doc.1-2: 63).

Thus, WJFW-NBC was provided in great detail information and evidence to show that the stitched-together statement in the PUSA ad was false.  Despite this overwhelming evidence, WJFW-NBC decided to continue broadcasting the PUSA ad, airing it at least 36 more times between March 25 and April 6.   (Doc.1-2: 5, 25); (Compl. ¶¶ 2, 3, 51, Ex. G).  The Complaint therefore fully and adequately pleads actual malice in order to plead a plausible defamation claim.  (Doc.1-2: 18-20); (Compl. ¶¶ 61-64, 69-72).  WJFW-NBC's continuing to broadcast the PUSA ad after receiving the Cease and Desist Letter establishes actual malice sufficient to state a claim for defamation.  *See Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 901 (9th Cir. 1992) ("Even if it finds that The New Yorker's editors did not make a conscious decision to let Malcolm alter Masson's statements, the jury could nevertheless conclude that The New Yorker had developed 'obvious reasons to doubt' the accuracy of the quotations but, in an effort to 'purposeful[ly] avoid[ ] ... the truth,' failed to conduct a reasonable investigation of Masson's claims of inaccuracy.")

WJFW-NBC argues that the Complaint fails to plausibly plead actual malice, because candidate Trump's full statement at the South Carolina rally shows that his intended meaning

was ambiguous, that it could be interpreted to have different meanings.  (Doc.9: 25-27).

However, as discussed above at pages 32 to 34, the meaning of the remarks in the candidate's

speech is not the issue in this defamation action.  The defamation is not an assessment or analysis

of the speech or a summary of the speech.  It is not a statement by a pundit that "I believe" the

candidate called the coronavirus a hoax or he referred to it as a hoax.  Rather, the false,

manufactured statement was comprised of manipulated audio clips stitched together to present

the candidate saying a sentence he never said.  That is the defamation.  Given this clear evidence

of fabrication, WJFW-NBC acted with actual malice in continuing to broadcast the PUSA ad

after being provided the evidence of the falsification.

The Complaint states a claim upon which relief may be granted against WJFW-NBC for

defamation, including the element of actual malice.  Accordingly, the motion to dismiss should

be denied.

V.   **The Court Should Disregard Materials Submitted From Outside the Pleadings.**

WJFW-NBC submits numerous items from outside the Complaint to argue for dismissal

of this action.  *See* (Doc.9: 10 n.2).  Most of these materials are news articles and other

published items and they are not properly submitted on defendant's motion to dismiss and

therefore must be disregarded by the Court.

"A motion under Rule 12(b)(6) can be based only on the complaint itself, documents

attached to the complaint, documents that are critical to the complaint and referred to in it, and

information that is subject to proper judicial notice."  *Geinosky v. City of Chicago*, 675 F.3d 743,

745 (7th Cir. 2012) (citations omitted).   "A court may take judicial notice of facts that are

(1) not subject to reasonable dispute and (2) either generally known within the territorial

jurisdiction or capable of accurate and ready determination through sources whose accuracy

47

cannot be questioned." *Ennenga v. Starns*, 677 F.3d 766, 773–74 (7th Cir. 2012) (citing *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997)). "Judicial notice is a powerful tool that must be used with caution." *Tobey v. Chibucos*, 890 F.3d 634, 648 (7th Cir. 2018)

The news articles are not undisputed facts of which the Court may take judicial notice and they are not properly considered on defendant's motion to dismiss. The articles are relied upon to argue against the elements of a defamation claim including the falsity and defamatory nature of the manufactured statement. The fact that defendant needs resort to outside materials tends to show that the elements of defamation are disputed questions of fact and therefore not appropriate for determination on a motion to dismiss. If the Complaint truly failed to state a claim upon which relief may be granted, defendant would premise that argument solely on the Complaint and its attachments and not need to rely upon the various outside articles.

Further, the news articles and publications are not relevant to the issues on the motion to dismiss. For example, WJFW-NBC asserts that it submits news articles and publications concerning candidate Trump's statement at the South Carolina rally to show that there was "public confusion and controversy about the import of President Trump's 'hoax' statement." (Doc.9: 13 n.5). That is not relevant in this case. As shown above, the interpretation of the meaning of the candidate's words is not at issue in this case, which involves a false, manufactured statement piecing together audio clips of words that were not in fact said together as represented. The manufactured statement is false because it presents audio of a statement that was never made by candidate Trump. Further, this information shows at minimum a dispute of fact that makes dismissal improper at this juncture.

The Court should exclude and not consider the outside materials submitted by WJFW-NBC on its motion to dismiss.[26] *See Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893 (N.C. Ct. App. 2002) (On a motion to dismiss defamation action, court held: "We also conclude that the trial court did not err in refusing to take judicial notice of various newspaper articles submitted by defendants, none of which was relevant to testing the legal sufficiency of plaintiffs' complaint or provided the basis for a complete defense to plaintiffs' claims.").

## CONCLUSION

WJFW-NBC's motion to dismiss should be denied.

Dated this 27th day of May, 2020.

By:

s/Eric M. McLeod
Eric M. McLeod
Lane E. Ruhland
Husch Blackwell LLP
P.O. Box 1379
33 East Main Street, Suite 300
Madison, WI 53701-1379
Email: eric.mcleod@huschblackwell.com
Email: lane.ruhland@huschblackwell.com

s/Lisa M. Lawless
Lisa M. Lawless
Husch Blackwell LLP
555 East Wells Street, Suite 1900
Milwaukee, WI 53202-3819
Email: lisa.lawless@huschblackwell.com

*Attorneys for Plaintiff Donald J. Trump for President, Inc.*

---

[26] Otherwise, if the Court considers the outside materials to determine whether the Complaint states a claim, the motion must be converted to a summary judgment and the Court must give the plaintiff notice of that fact and an opportunity to respond pursuant to summary judgment procedures. "If a moving party relies on additional materials, the motion must be converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d)." *Geinosky*, 675 F.3d at 745.