**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

DONALD J. TRUMP FOR PRESIDENT,
INC.,

        Plaintiff,

   v.

NORTHLAND TELEVISION, LLC, d/b/a
WJFW-NBC,

        Defendant

and

PRIORITIES USA ACTION,

        Intervenor Defendant.

Case No. 20-cv-00385-WMC

---

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**
**OF PRIORITIES USA ACTION**

---

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

FACTUAL ALLEGATIONS ............................................................................... 4

    A. Plaintiff, the Trump Campaign ................................................................ 6

    B. Defendant PUSA and the Distribution and Broadcast of the PUSA Ads. ................. 8

    C. WJFW-NBC ......................................................................................... 9

    D. The PUSA Advertisements .................................................................. 10

    E. The Manufactured Statement Concerns the Trump Campaign and it is Defamatory of the Trump Campaign. .............................................. 14

        1. The Manufactured Statement Concerns the Trump Campaign. ........... 14

        2. The Manufactured Statement Was False and Defamatory. ................ 15

        3. The Manufactured Statement Caused Damage to the Trump Campaign. ............ 19

    F. Independent Fact Checkers Reject the Manufactured Statement as False. ................. 19

    G. The Trump Campaign Cease and Desist Letters. ...................................... 23

    H. PUSA's Letter Response. ...................................................................... 24

MOTION TO DISMISS STANDARD. ................................................................. 27

ARGUMENT ...................................................................................................... 29

I.    The First Amendment Does Not Protect Known Lies. ...................................... 29

II.    The Trump Campaign Has Standing to Assert the Defamation Claim and The Manufactured Statement Was "Of and Concerning" the Campaign. .................. 32

    A. Article III Standing. .............................................................................. 32

    B. The Manufactured Statement is Of and Concerning the Trump Campaign. ............. 32

        1. A Defamatory Communication Need Not Mention the Plaintiff By Name and It Can Defame More Than One Person. ...................... 34

        2. An Individual May be Inextricably Intertwined With an Entity for Purposes of a Defamation Claim. ......................................... 37

        3. There are Many Examples of Campaign Committees as Plaintiffs or Defendants in Defamation Actions. ....................................... 40

    C. The False, Manufactured Statement is "Of and Concerning" the Trump Campaign. ........................................................................... 43

III.    The Manufactured Statement Was False and Defamatory. ................................ 47

    A. Statement Must be False and Defamatory. ............................................... 49

        1. Statement Must be Capable of a Defamatory Meaning. ..................... 50

        2. A False, Manufactured Statement Misstating What the Plaintiff Said is Actionable Defamation. ............................................. 51

    B. The Manufactured Statement is False and Defamatory Under *Masson*. ............... 53

1. The Manufactured Statement Falsely Depicts Candidate Trump Saying a Statement That He Never Uttered.................................................... 54

   a. The Manufactured Statement is a Quotation/Verbatim Depiction That is False.......................................................................................... 54

      i. The Manufactured Statement............................................... 55

      ii. The Manufactured Statement is False in That Candidate Trump Did Not Say the Sentence in the South Carolina Campaign Speech as Depicted............................................. 57

   b. The "Rational Interpretation" Doctrine Does not Apply to False Attribution Under *Masson*.......................................................... 59

   c. "Substantial Truth" of the Entire PUSA Ads is Not at Issue. ...................... 60

2. Because the Manufactured Statement is Depicted as a Verbatim Statement in Candidate Trump's Own Words, its Falsity is Governed by the *Masson* Test. ............................................................................... 62

   a. The Manufactured Statement is a Material Alteration of Candidate Trump's Statements in the South Carolina Campaign Speech..................... 62

      i. The Manufactured Statement is a Material Alteration of Candidate Trump's Statements. ............................................... 63

      ii. The Falsely Attributed Manufactured Statement is Defamatory of the Trump Campaign. .................................... 66

   b. PUSA Does Not Refute the Allegations of Material Alteration. .................. 68

C. The PUSA Ads Depict Candidate Trump Saying the Manufactured Statement as a Complete Sentence and PUSA's Argument About Audio Quality is a Fact Question That Cannot be Determined on a Motion to Dismiss................................................................................................... 70

D. Defendant's Criticism and Opinion Arguments Are Inapplicable............................. 72

1. The Manufactured Statement Is Not a Statement of Opinion. ............................ 74

2. PUSA's Criticism of President Trump's Handling of the Coronavirus is Not At Issue in this Case and it is Not Asserted to be Defamatory. ................... 75

IV. The Complaint Properly Pleads Actual Malice. .................................................. 77

A. Actual Malice is Established by Knowing Falsity, Here, the Manufactured Statement Not Actually Made by Plaintiff.................................................. 78

B. The Complaint Adequately Pleads Actual Malice.................................................... 83

CONCLUSION.................................................................................................... 87

## <u>INTRODUCTION</u>

Defendant's motion to dismiss must be denied.  Accepting all allegations of the Complaint and the complaint supplement as true and drawing all reasonable inferences therefrom in favor of plaintiff, as this Court must, the Complaint states a claim for defamation against the defendant.  The defamation at issue in this case is a falsified, manufactured statement contained in a television advertisement produced and distributed by defendant.  Such falsified statement was comprised of audio of candidate Trump's own words at a campaign rally, but such words were synthetically altered to form a sentence that candidate Trump never said:

**The coronavirus, this is their new hoax.**

(That statement is referred to herein as the "Manufactured Statement.")

The Manufactured Statement is false and defamatory of the Trump Campaign.  Candidate Trump did not make this statement.  Yet it was intentionally crafted by Priorities USA Action ("PUSA") to deceive viewers of the ad into believing he did.  The opening of the PUSA ads (as defined below) presents audio of candidate Trump purportedly making this statement by stitching together separate audio clips of his voice saying, from multiple sentences and sources: "the coronavirus," immediately followed by "this is their new hoax."  To ensure the deception is complete and to compound the falsity, the text of the Manufactured Statement appears on screen at the same time the stitched-together audio clips are played.  The text shows these words together as a single sentence, with capital "T" in "the," a comma after "The coronavirus," and a period after "new hoax."  Each and every other audio segment in the advertisement is a full sentence accompanied by a textual sentence that matches the audio clips, leading the viewer to believe that at each point in the advertisement, the textual representation is accurate and reflects full and complete sentences.

1

The PUSA ads' Manufactured Statement is false because it presents audio and text of a statement by candidate Trump that he never made. This is admitted by defendants. Defendants do not contend that the Manufactured Statement was uttered by candidate Trump.

The false, Manufactured Statement is a statement of and concerning the Trump Campaign because it is presented as a statement actually made by candidate Trump at a campaign rally of the Trump Campaign in the midst of his re-election campaign. It defamed the Trump Campaign to falsely state that candidate Trump made the Manufactured Statement when he didn't. The false, Manufactured Statement is defamatory of the Trump Campaign because it expresses that candidate Trump proclaimed the coronavirus to be a "hoax." It has a tendency to deter persons from associating with the Trump Campaign. Indeed, the falsified statement has been utilized as a point of attack by opponents of the Trump Campaign and it has a tendency to cause voters to not support or vote for the Trump Campaign's candidate.

The Complaint alleges that defendant Priorities USA Action acted with reckless disregard as to the falsity of the Manufactured Statement in the PUSA ads. The day after the PUSA ads began airing, plaintiff provided WJFW-NBC and other TV stations airing the ads with detailed information demonstrating the falsity of the Manufactured Statement, including multiple determinations of falsity by independent third-party fact checkers. The Trump Campaign sent those TV stations including defendant WJFW-NBC a cease and desist letter specifically detailing that the Manufactured Statement was never said by candidate Trump and it falsely represents a statement that he never made. It provided detailed information establishing that third-party independent fact checkers categorically confirmed that the Manufactured Statement was false. These fact checkers made this analysis weeks before the airing of the initial PUSA ad after pundits inaccurately characterized candidate Trump's words at the campaign rally, in late

February, and after an ad released by Joe Biden on March 3rd including the same false, Manufactured Statement later included in the PUSA ad.

PUSA obtained the Trump Campaign's cease and desist letter concerning the PUSA ads and it sent those TV stations a response letter designed to convince them to continue airing the ads, and PUSA doubled down on the distribution of the false and defamatory Manufactured Statement, expanding the distribution of the PUSA ads.  PUSA's response letter told TV stations that the Manufactured Statement accurately attributed candidate Trump's words stated at a campaign rally.  PUSA knew and intended that the PUSA ads contained the Manufactured Statement by candidate Trump using audio clips of his words and text representing that the statement was made as a sentence.  This was verifiably false and was broadcast with knowledge and reckless disregard of the falsity of the Manufactured Statement.  It was false to represent that candidate Trump actually uttered the Manufactured Statement when, in fact, he did not utter the statement.

Despite overwhelming proof of the falsity, which readily is confirmed by viewing the PUSA ads and the campaign speech from which the audio clips were drawn, PUSA chose to continue airing the ad, purchasing advertising time on TV stations across the country, for example, airing the PUSA ads on WJFW-NBC at least 36 more times after notice of falsity.

To dismiss this action at this juncture would be to endorse false manipulation of the news and intentional deception of the public.  Defendant invokes the First Amendment repeatedly throughout its brief, seeking safe haven there for the admittedly falsified statement.  In fact, defendant will find no solace or protection in the First Amendment.  The First Amendment does not protect known lies, and publishing fabricated statements establishes actual malice.  Indeed, the falsified advertising statement offends the First Amendment, because it deceives and

misleads the public, using technology to create false facts that, through viral distribution, become accepted as true.  The technological tools available at everyone's fingertips today allow all persons – political action committees, professional broadcasters, and at-home bloggers alike – to create and manipulate the news by falsifying audio recordings or manipulating visual images. The danger of falsified audio and video, "deepfakes," is substantial and deepfakes are rapidly polluting our information universe.  *See* "What are deepfakes – and how can you spot them?," The Guardian (Jan. 13, 2020) ("The AI firm Deeptrace found 15,000 deepfake videos online in September 2019, a near doubling over nine months.")*, available at*

https://www.theguardian.com/technology/2020/jan/13/what-are-deepfakes-and-how-can-you-spot-them

For the foregoing reasons, and as more fully discussed below, the Complaint states a claim for defamation against PUSA upon which relief may be granted.  Accordingly, the motion to dismiss must be denied.

## FACTUAL ALLEGATIONS

This case concerns false and defamatory television advertisements produced by intervenor defendant Priorities USA Action ("defendant" or "PUSA")[1] that were broadcast by defendant Northland Television, LLC d/b/a WJFW-NBC ("WJFW-NBC"), thereby causing material harm to plaintiff Donald J. Trump for President, Inc. ("plaintiff" or the "Trump Campaign").  (Doc.1-2: 4-6, 7-8, 16-18, 19, 20, 23-25); (Compl. ¶¶ 1-4, 9-16, 53-59, 67-68, 73-75, Ex. A); (Doc.48: 2-3, 4-8, 20-21, 23-24, 26-27, 28; Doc.48-2; Doc.48-4); (Supp-Compl.[2]

---

[1] WJFW-NBC asserts that the PUSA ads were produced by PUSA.  (Doc.9: 11).
[2] PUSA moved to intervene in this action on May 12, 2020.  (Doc.23).  The Trump Campaign had no objection to that intervention (Doc.47), and on June 18, 2020 it filed a complaint setting forth a claim for defamation against PUSA (Doc.48).  The original complaint only set forth a claim for defamation against WJFW-NBC.  (Doc.1-2: 4-64).  By order dated June 23, 2020, the Court permitted PUSA to intervene in this action as a defendant and the Court indicated that the PUSA complaint (Doc.48) was accepted as a

¶¶ 2-3, 7, 8, 12-20, 26, 29, 75-78, 95-98, 110, 113-114, 121-122, Exs. 2, 4).  The advertisement, entitled "Exponential Threat," and the substantially similar "One Week Later" advertisement (collectively, the "PUSA ads"), "through the use of manufactured and synthetic audio and accompanying subtitles, maliciously puts a false statement into President Trump's mouth:  "*The coronavirus, this is their new hoax.*"  (Doc.1-2: 4-5, 5-6, 9-10, 18); (Compl. ¶¶ 1, 3, 22-30, 61) (emphasis added); (Doc.48: 2-3, 8, 9-11, 20, 25); (Supp-Compl. ¶¶ 2, 3, 25, 31-39, 74, 100) (emphasis added).  The PUSA ads as broadcast by WJFW-NBC and other TV stations falsely pieced together the separate audio clips "The coronavirus" and "this is their new hoax" to create an audio clip of candidate Trump saying those words all together, as one sentence.  (Doc.1-2: 10); (Compl. ¶ 26); (Doc.48: 9); (Supp-Compl. ¶ 34).  The PUSA ads compound this falsity by displaying text representing that these words were said together.  (*Id.*)

The Complaint alleges that PUSA knew that the PUSA ads were produced through the use of technology that depicted a clearly false statement and that the Manufactured Statement is false in that candidate Trump never uttered the words therein.  (Doc.1-2: 4-6, 15-17, 19-20, 59-64); (Compl. ¶¶ 1, 3, 47-57, 69-72, Ex. G); (Doc.48: 2-3, 15-16, 18-19; Doc.48-14); (Supp-Compl. ¶¶ 2, 3, 56-58, 62, 75-77, 80, 95, 96, 100, 102, 104-108, 117-120, Ex. G).  The day after the PUSA ads began airing on WJFW-NBC and TV stations throughout the country, the Trump Campaign sent WJFW-NBC and the other TV stations a cease and desist letter that detailed the false and manufactured stitched-together audio clips in the PUSA ads and demanded the stations to cease broadcasting the ad.  (Doc.1-2: 5-6, 15-18, 18-19); (Compl. ¶¶ 2-3, 47-59, 69-72);

---

"supplement" to the Complaint.  (Doc.51: 3, 4).  This brief cites the original complaint ("Complaint"; cited as "Compl.") (Doc.1-2: 4-64) and the Complaint supplement (cited herein as "Supp-Compl.") (Doc.48).  The Complaint and the Complaint supplement are referred to herein collectively as "the Complaint."

(Doc.48: 3, 4-5, 15-16, 20, 23-24, 26, 27-28; Doc.48-14); (Supp-Compl. ¶¶ 3, 7, 55-58, 62, 75-77, 95, 96, 110, 117-121, Ex. G).

PUSA obtained a copy of the Trump Campaign's cease and desist letters sent to TV stations concerning the PUSA ads.  (Doc.48: 3); (Supp-Compl. ¶ 4).  Notwithstanding the thorough showing of the false and defamatory Manufactured Statement, PUSA doubled down and expanded the distribution of the PUSA ads for broadcast more frequently and on more TV stations.  (*Id.*)  Further, through its counsel, PUSA sent TV stations broadcasting the PUSA ads throughout the country a letter in response to the Trump Campaign's cease and desist letters. (*Id.*)   Those TV stations apparently relied upon the assertions in PUSA's response letter claiming the truth of the Manufactured Statement in the PUSA ads (*id.*), continuing to air the PUSA ads.  PUSA's letter to TV stations in response to the Trump Campaign's cease and desist letters acknowledged the Trump Campaign's claim concerning the false Manufactured Statement in the PUSA ads.  (Doc.48: 4; Doc.48-5: 2); (Supp-Compl. ¶ 5).  It conceded that the PUSA ads splice together audio clips to depict candidate Trump saying the Manufactured Statement:  "The coronavirus, this is their new hoax."  (*Id.*)  The response letter told the TV stations that the Manufactured Statement was said by candidate Trump, as it was comprised of his "words" and that it accurately attributed candidate Trump's words stated at a campaign rally.  (*Id.*)  The TV stations, apparently in reliance on these representations, continued to broadcast the ads after receiving PUSA's response letter.  (Doc.48: 3-4, 16, 17, 18); (Supp-Compl. ¶¶ 5, 61, 62, 64, 68).

A.   **Plaintiff, the Trump Campaign.**

The Trump Campaign is an authorized committee of presidential candidate Donald J. Trump ("candidate Trump") as defined by 11 CFR § 9032.1(a).  (Doc.1-2: 6); (Compl. ¶ 4);

(Doc.48: 5); (Supp-Compl. ¶ 8).  The Trump Campaign has operated President Trump's reelection campaign for the 2020 Presidential election since January 20, 2017.  (*Id.*)

Donald J. Trump is the Trump Campaign's candidate for the 2020 Presidential Election.  (Doc.1-2: 7); (Compl. ¶ 9); (Doc.48: 5); (Supp-Compl. ¶ 12).  Pursuant to 52 U.S.C. § 30102(e)(1) and (3), candidate Trump has established "Donald J. Trump for President, Inc." as his principal campaign committee.  (Doc.1-2: 7); (Compl. ¶ 10); (Doc.48: 6); (Supp-Compl. ¶ 13).  The Trump Campaign is responsible for, among other things, coordinating and organizing political and fundraising appearances, creating and/or purchasing political advertising on behalf of the candidate, collecting contributions for the candidate and reporting them to federal regulators as required by law, and making expenditures on behalf of the candidate, each and all for the sole purpose of re-electing its candidate as President of the United States.  (Doc.1-2: 7); (Compl. ¶ 11); (Doc.48: 6); (Supp-Compl. ¶ 14).

Candidate Trump is one of many people authorized to speak and who does speak on behalf of the Trump Campaign.  (Doc.1-2: 7); (Compl. ¶ 12); (Doc.48: 6); (Supp-Compl. ¶ 15).  The purported statements of any authorized speaker alleged to have been made on behalf of the Trump Campaign impact the Trump Campaign.  (*Id.*)

The Trump Campaign's effort to raise money and acquire votes necessarily rests on its and its candidate's reputation.  (Doc.1-2: 7); (Compl. ¶ 15); (Doc.48: 6); (Supp-Compl. ¶ 19).  The public activities and statements made by the Trump Campaign's candidate while on the campaign trail are a material activity of the Trump Campaign, reflect upon the Trump Campaign, impact the candidate's ability to raise money and his chances for reelection, and thereby directly affect the fundamental trade and profession of the Trump Campaign.  (Doc.1-2: 8); (Compl. ¶ 16); (Doc.48: 7); (Supp-Compl. ¶ 20).  Those communications express to voters information

7

upon which voters may consider and make the determination whether to cast their vote for the Trump Campaign's candidate.  (*Id.*)

  B.    **Defendant PUSA and the Distribution and Broadcast of the PUSA Ads.**

  PUSA is a federal political action committee subject to regulation by the Federal Elections Commission ("FEC").  (Doc.48: 5, 7); (Supp-Compl. ¶¶ 9, 21).  According to PUSA, part of its mission to "[t]o help Democrats defeat Trump in 2020."  *See* PUSA, "Research Priorities" (last visited June 15, 2020) available at https://priorities.org/issue/research-priorities/ (Doc.48: 7); (Supp-Compl. ¶ 22).

  On March 23, 2020, PUSA announced the launch of an initial $6 million television and digital advertising buy which included "Exponential Threat," and, along with "One Week Later," are the PUSA ads at issue here.  (Doc.48: 7); (Supp-Compl. ¶ 23).  The Exponential Threat advertisement was intended to run in Florida, Michigan, Pennsylvania, and Wisconsin.  (Doc.48-1); (Supp-Compl., Ex. 1).[3]  PUSA's March 23, 2020 press release (*id.*) contains a link to the "Exponential Threat" advertisement, at

https://www.youtube.com/watch?v=bkMwvmJLnc0&feature=youtu.be  (last visited June 15, 2020).  (Doc.48: 7); (Supp-Compl. ¶ 24); (Doc.48-1); (Supp-Compl., Ex. 1).

  On March 30, 2020, PUSA released an updated version of the "Exponential Threat" advertisement entitled "One Week Later," which contains the same Manufactured Statement, "The coronavirus, this is their new hoax.", and acknowledged that it was aware of the Trump Campaign's claim that the advertisement was false and misleading.  (Doc.48: 8; Doc.48-3);

---

[3] *See* (Doc.48-1).  PUSA, "Priorities USA Action Launches Initial $6 Million TV & Digital Ad Buy Holding Trump Accountable for Failing Coronavirus Response" (Mar. 23, 2020) available at https://priorities.org/press/priorities-usa-action-launches-initial-6-million-tv-digital-ad-buy-holding-trump-accountable-for-failing-coronavirus-response/.

(Supp-Compl. ¶ 27, Ex. 3).[4]  PUSA's March 30, 2020 press release (*id.*) contains a link to the

"One Week Later" advertisement, at

https://www.youtube.com/watch?v=hl6T2XxNtM0&feature=youtu.be (last visited June 15,

2020).  (Doc.48: 8; Doc.48-3); (Supp-Compl. ¶ 28, Ex. 3).

> The PUSA ads were broadcast on TV stations throughout the country.  (Doc.48: 3-4, 9,

16-17, 18); (Supp-Compl. ¶¶ 4, 30, 61-62, 68).  For example, WJFW-NBC broadcast the PUSA

ads approximately forty-three times between March 24 and April 6, 2020.  (Doc.1-2: 11);

(Compl. ¶ 31); (Doc.48: 9); (Supp-Compl. ¶ 30).

> The PUSA ads, television advertisements created or produced by PUSA, began airing on

WJFW-NBC and other TV stations throughout the country on March 24, 2020.  (Doc.1-2: 9);

(Compl. ¶ 22); (Doc.48: 9); (Supp-Compl. ¶ 30).  The PUSA ads also were distributed by PUSA

via YouTube and other social media outlets and have been continuously made available through

those outlets.  *See* (Doc.48: 2, 7-8, 20; Doc.48-1; Doc.48-3); (Supp-Compl. ¶¶ 2, 23-24, 27-28,

77, Exs. 1, 3).

> C.    **WJFW-NBC.**

> WJFW-NBC is a broadcast television station licensed by the Federal Communications

Commission.  (Doc.1-2: 8); (Compl. ¶ 17).  As a licensed broadcast TV station, under the

Communications Act of 1934, WJFW-NBC has an obligation to operate in the public interest.

(Doc.1-2: 8); (Compl. ¶ 18).  Within this obligation, WJFW-NBC has a responsibility to protect

the public from false, misleading, and deceptive advertising.  (*Id.*)

---

[4] *See* (Doc.48-3).  PUSA, "One Week Later, Priorities USA Action Releases Updated Version of Ad
Trump Tried to Block" (Mar. 30, 2020) available at https://priorities.org/press/one-week-later-priorities-
usa-action-releases-updated-version-of-ad-trump-tried-to-block/.

Unlike the qualified campaign committees of candidates for public office,[5] third parties such as PUSA have no right under the Communications Act to command the use of broadcast facilities to air their advertisements.  (Doc.1-2: 8); (Compl. ¶ 19).  That is, WJFW-NBC may refuse to air the advertising of third parties such as PUSA and it may censor such ads.[6]  (*Id.*)

As a licensed broadcast TV station, WJFW-NBC has the authority—indeed, the obligation—to ensure that advertisements such as the PUSA advertisement are not false, misleading, or deceptive.  (Doc.1-2: 8); (Compl. ¶ 20).  WJFW-NBC is subject to liability under the law for false and defamatory statements contained in advertising aired by persons other than candidates' campaign committees, such as the PUSA advertisement.  (Doc.1-2: 8); (Compl. ¶ 21).

D.      **The PUSA Advertisements.**

PUSA broadcast the PUSA ads, "Exponential Threat," and "One Week Later," on TV stations throughout the country including WJFW-NBC between March 24 and April 6, 2020.  (Doc.48: 3-4, 9, 16-17, 18); (Supp-Compl. ¶¶ 4, 30, 61-62, 68).  The PUSA ads both contain the Manufactured Statement, "The coronavirus, this is their new hoax."  (Doc.48: 2, 7-8, ; Doc.48-2; Doc.48-4); (Supp-Compl. ¶¶ 2, 24-29, Exs. 2, 4).

---

[5] FCC regulations require that licensees "allow reasonable access to or permit purchase of reasonable amounts of time for the use of a broadcasting stations…by a legally qualified *candidate*." 47 U.S.C. § 312(a)(7) (emphasis added).  Further, while not required to provide any airtime to candidates, if a licensee "permit[s] any such candidate to use its facilities, it shall afford equal opportunities to all other candidates for that office to use such facilities."  47 CFR § 73.1941(a).  This does not extend to advertising and other materials to broadcast by non-candidates, such as political action committees (PACs).

[6] *See Felix v. Westinghouse Radio Stations*, 186 F.2d 1, 6 (3d Cir. 1950) ("Since Section 315 applies only to the use of a radio station by a candidate himself and not to such use by his supporters it follows that the section did not prohibit the defendants from censoring Meade's speeches. The defendants are, therefore, not entitled to assert the defense that they are not liable because the speeches could not have been censored without violating Section 315 and that accordingly they were not at fault in permitting the speeches to be broadcast.")

On March 23, 2020, PUSA launched an initial $6 million television and digital advertising buy which included "Exponential Threat," and along with "One Week Later," they are the PUSA ads at issue here.  (Doc.48: 7; Doc.48-1); (Supp-Compl. ¶ 23, Ex. 1).  The "Exponential Threat" advertisement of PUSA takes audio clips of candidate Trump and pieces them together to manufacture a false statement that was not made by the President:  "The coronavirus, this is their new hoax."  (Doc.48: 8); (Supp-Compl. ¶ 25).[7]  (As noted above, that statement is referred to herein as "Manufactured Statement.")  On March 30, 2020, PUSA released an updated version of the "Exponential Threat" advertisement entitled "One Week Later," which contains the same Manufactured Statement, "The coronavirus, this is their new hoax."  (Doc.48: 8; Doc.48-3); (Supp-Compl. ¶ 27, Ex. 3).[8]

The PUSA ads (Exponential Threat and One Week Later) take an audio clip from a speech given by candidate Trump on February 28, 2020 at a campaign rally in Charleston, South Carolina (the "South Carolina Campaign Speech") and stitches it together with other audio of candidate Trump saying the word "The coronavirus" to create the Manufactured Statement.  (Doc.48: 9; Doc.48-5: 2, 3); (Supp-Compl. ¶ 31, Ex. 5);[9] *see also* (Doc.9: 12).

Contrary to the PUSA ads, in the South Carolina Campaign Speech, candidate Trump did not utter the following words:  "The coronavirus, this is their new hoax."  (Doc.48: 9); (Supp-Compl. ¶ 32).  The PUSA ads' Manufactured Statement is verifiably false, as candidate Trump

---

[7] *See* PUSA, "Exponential Threat" available at https://www.youtube.com/watch?v=bkMwvmJLnc0&feature=youtu.be  (last visited June 15, 2020). (Doc.48: 8); (Supp-Compl. ¶ 25).

[8] The "One Week Later" advertisement is available at https://www.youtube.com/watch?v=hl6T2XxNtM0&feature=youtu.be (last visited June 15, 2020). (Doc.48: 8; Doc.48-3); (Supp-Compl. ¶ 28, Ex. 3).

[9] (Doc.48: 9); (Supp-Compl. ¶ 31).  *See* President Donald J. Trump, Remarks at a Campaign Rally, Charleston, SC (Feb. 28, 2020), available at https://www.c-span.org/video/?469663-1/president-trump-campaign-event-north-charleston-south-carolina&start=405.2.  *See* South Carolina Campaign Speech at timestamp 6:05 minutes to 8:11 minutes.

did not actually say those words as a sentence as depicted by the Manufactured Statement.  (*Id.*) The PUSA ads depict candidate Trump saying words, in a sentence (the Manufactured Statement) that he did not in fact say.  (*Id.*)

The Manufactured Statement is materially different than the actual words said by candidate Trump in the South Carolina Campaign Speech.  (Doc.48: 9); (Supp-Compl. ¶ 33). The South Carolina Campaign Speech was approximately 1 hour and 25 minutes in total, and during this speech candidate Trump's remarks covered a number of issues, including the coronavirus pandemic, the vote counting issues at the Iowa Caucus, immigration and healthcare policy, and tactics used by his political opponents to affect his reelection, including the "impeachment hoax."  (*Id.*)  Six minutes and 5 seconds into the speech, candidate Trump says: "Now the Democrats are politicizing the coronavirus . . . ."  (Doc.48: 9-10); (Supp-Compl. ¶ 33). After saying other words, approximately 45 seconds later, candidate Trump then refers to the "impeachment hoax" and about 15 seconds later he refers to his political opponents' characterization of his response to the coronavirus, saying "this is their new hoax."  (Doc.48: 10); (Supp-Compl. ¶ 33).  Accordingly, candidate Trump's actual words in the South Carolina Speech were that the Democrats' politicization of the coronavirus, and criticism of the Trump administration's response to the coronavirus, "this is their new hoax."  (*Id.*)

The Manufactured Statement in the PUSA ads was created by falsely piecing together the separate audio clips "The coronavirus" and "this is their new hoax" to create an audio clip of candidate Trump saying those words all together, as one sentence.  (Doc.48: 10); (Supp-Compl. ¶ 34).  The PUSA ads compound this falsity by displaying text representing that these words were said together.  (*Id.*)  While the PUSA ads play these pieced-together audio clips as a

complete sentence, in the background there is a graphic that appears to show the growth of known cases of COVID-19 in the United States between January and March 2020.  (*Id.*)

While the audio of the Manufactured Statement plays in the PUSA ads, subtitles of text appear across the screen that match with the words in the audio clips.  (Doc.48: 10); (Supp-Compl. ¶ 35).  The PUSA ads both display the following text:  "The coronavirus," then immediately following, display the text:  "this is their new hoax."  (Doc.48: 10); (Supp-Compl. ¶ 36).  In the PUSA ads, the phrase "The coronavirus" begins with a capitalized "T", the "t" in "this" is lowercase, and the word "hoax" is followed by a period.  (*Id.*)  *See* the screenshots of these frames of the PUSA ads, "Exponential Threat" and "One Week Later," Exhibits 2 and 4, respectively.  (Doc.48: 8; Doc.48-2; Doc.48-4); (Supp-Compl. ¶¶ 26, 29, Exs. 2, 4).

As has been described in this case, the PUSA ads are "montage" ads.  (Doc.48: 10); (Supp-Compl. ¶ 37).  There are nine separate sentences in the PUSA ads, consisting of audio clips of each sentence allegedly made by candidate Trump  (*Id.*)  (Doc.48: 11); (Supp-Compl. ¶ 37); (Doc.9: 10 & n.2); (Doc.26: 20 n.7).  As described by defendants, each of these statements purports to be actual audio clips of nine different sentences presented by audio in candidate Trump's own words.  (*Id.*)

The PUSA ads consist of several different audio clip statements with accompanying subtitles, expressing through audio and visual means, nine different sentences purportedly said by candidate Trump.  (Doc.48: 11); (Supp-Compl. ¶ 38).  The Manufactured Statement opens the PUSA ads and is the first audio and visual depiction of a statement by candidate Trump in the ads, followed by audio clip statements and visual depictions of eight other sentences purportedly said by candidate Trump.  (*Id.*)

13

The PUSA ads intentionally create a false message by manufacturing fake audio and using such fake audio to create a false, captioned quotation (the Manufactured Statement), in both cases to make it appear as though candidate Trump said the sentence "The coronavirus, this is their new hoax." (Doc.48: 11); (Supp-Compl. ¶ 39). The pieced-together audio clips and accompanying subtitles thus falsely represent that the candidate stated at a Trump Campaign rally that "The coronavirus, this is their new hoax." (*Id.*) Candidate Trump did not, in fact, make that statement. (*Id.*)

E.  **The Manufactured Statement Concerns the Trump Campaign and it is Defamatory of the Trump Campaign.**

The Manufactured Statement is false and defamatory of the Trump Campaign. The Manufactured Statement could be understood by a listener and/or viewer of the PUSA ads to concern the Trump Campaign. (Doc.1-2: 4-5, 8, 13-14, 15, 16); (Compl. ¶¶ 1, 2, 32, 52-55, 61, 67, 68); (Doc.48: 2-3, 4-5, 20-23, 24, 25, 25-26, 26, 27); (Supp-Compl. ¶¶ 2-3, 6, 7, 76, 78-94, 96, 98, 100, 102-108, 109, 110, 114). The Manufactured Statement is comprised of stitched-together audio clips including a clip of candidate Trump's statement in the South Carolina Campaign Speech saying "this is their new hoax." (Doc.48-5: 2, 3). PUSA told TV stations airing the PUSA ads that the Manufactured Statement consists of audio clips of words from candidate Trump's statements made at the South Carolina Campaign Speech. (Doc.48-5: 2, 3 n.1); (Supp-Compl., Ex. 5). In urging them to continue airing the PUSA ads, PUSA told TV stations that candidate Trump made the "The coronavirus, this is their new hoax." statement at the South Carolina campaign rally. (*Id.*)

1.  **The Manufactured Statement Concerns the Trump Campaign.**

The Manufactured Statement in the PUSA ads is of and concerning the Trump Campaign, in that the ads represent that the Manufactured Statement was made by the candidate for

reelection, the President, and the PUSA ads are intended to affect the outcome of the election. The Trump Campaign's "business" is the reelection of Candidate Trump. (Doc.48: 27); (Supp-Compl. ¶ 114). A viewer or listener of the PUSA ads might reasonably understand that the Manufactured Statement in the PUSA ads concerned or referred to the Trump Campaign and that the Manufactured Statement expresses the position of the Trump Campaign. (Doc.48: 21, 22, 26); (Supp-Compl. ¶¶ 81, 82, 88, 110). Because the Manufactured Statement is represented to be an actual statement made by candidate Trump at a South Carolina campaign rally, an event organized and orchestrated by the Trump Campaign during the presidential re-election campaign, the Manufactured Statement in the PUSA ads may reasonably be understood to concern the Trump Campaign. (Doc.48: 21-22); (Supp-Compl. ¶¶ 79, 83, 87). The Manufactured Statement falsely communicates a statement in the candidate's own words that the candidate did not say. (Doc.48: 22); (Supp-Compl. ¶¶ 85, 86).

2. **The Manufactured Statement Was False and Defamatory.**

The PUSA ads include audio clips of nine separate sentences purportedly said by candidate Trump in his own voice, along with subtitles visually depicting the words in the audio clips, followed by a tag line about needing "a leader we can trust." (Doc.48: 10-11 23); (Supp-Compl. ¶¶ 37, 91). Excluding the closing tag line of the ad, the PUSA ads purport to communicate verbatim statements by candidate Trump. (*Id.*) Because the Manufactured Statement and the other eight sentences in the PUSA ads were comprised of audio clips of candidate Trump's words, accompanied by subtitles communicating the audio sentences, a reasonable viewer or listener of the PUSA ads would conclude that the Manufactured Statement purports to be a verbatim audio and textual representation of a sentence uttered by candidate Trump. (Doc.48: 23); (Supp-Compl. ¶ 92). A reasonable viewer or listener hearing or seeing the

15

PUSA ads would hear and/or see that the candidate Trump said, as a sentence: "The coronavirus, this is their new hoax." (Doc.48: 23); (Supp-Compl. ¶ 93).

The Manufactured Statement in the PUSA ads is false in representing that the Manufactured Statement was said by candidate Trump because he did not in fact utter that statement. (Doc.48: 21, 25); (Supp-Compl. ¶¶ 80, 105). However, PUSA asserted and asserts that the Manufactured Statement was made by candidate Trump at a campaign event. (Doc.48: 25; Doc.48-5: 2, 3); (Supp-Compl. ¶ 103). The PUSA ads knowingly and intentionally misattribute the Manufactured Statement to candidate Trump – a statement that PUSA knows that candidate Trump never said. (Doc.48: 25); (Supp-Compl. ¶ 104).

The false Manufactured Statement in the PUSA ads is defamatory of the Trump Campaign because it falsely depicts the candidate as saying "The coronavirus, this is their new hoax." in a campaign statement, by piecing together audio clips and displaying in text a purported quote from candidate Trump speaking at campaign events. (Doc.48: 21, 26); (Supp-Compl. ¶¶ 70, 109). PUSA continues to make the PUSA ads available and therefore it continues to defame the Trump Campaign. (*Id.*)

The false Manufactured Statement is a material alteration of the actual statements made by candidate Trump in the South Carolina Campaign Speech. (Doc.48: 25-26); (Supp-Compl. ¶¶ 106, 107, 108). In that speech, candidate Trump did not say "the coronavirus, this is their new hoax." In that speech, candidate Trump made a number of different statements concerning the coronavirus and other matters. The Manufactured Statement materially altered the actual words of candidate Trump in the speech. In the South Carolina Campaign Speech, candidate Trump discussed, among other things, the Democrats' politicization of the coronavirus pandemic and Democrats' attack on the Trump administration's response to the coronavirus and the sufficiency

16

and timing of its response.  (Doc.48: 9-10, 25-26); (Supp-Compl. ¶¶ 33, 107).  After describing those tactics, candidate Trump said "[t]hey tried the impeachment hoax.  That was on a perfect conversation.  They tried anything, they tried it over and over, they've been doing it since he got in.  It's all turning, they lost.  It's all turning, think of it, think of it.  And this is their new hoax." (Doc.48: 25-26); (Supp-Compl. ¶ 107).

PUSA knew and knows that the Manufactured Statement was not actually said by candidate Trump as represented and that the Manufactured Statement was materially different than the words actually spoken by candidate Trump at the South Carolina Campaign Speech. (Doc.48: 26); (Supp-Compl. ¶ 108).

The false Manufactured Statement is a material alteration of the actual statements made by candidate Trump in the South Carolina Campaign Speech.  (Doc.48: 25-26); (Supp-Compl. ¶¶ 106, 107, 108).  In that speech, candidate Trump did not say "the coronavirus, this is their new hoax."  In that speech, candidate Trump made a number of different statements concerning the coronavirus and other matters.  The Manufactured Statement materially altered the actual words of candidate Trump in the speech.  In the South Carolina Campaign Speech, candidate Trump discussed, among other things, the Democrats' politicization of the coronavirus pandemic and Democrats' attack on the Trump administration's response to the coronavirus and the sufficiency and timing of its response.  (Doc.48: 9-10, 25-26); (Supp-Compl. ¶¶ 33, 107).  After describing those tactics, candidate Trump said "[t]hey tried the impeachment hoax.  That was on a perfect conversation.  They tried anything, they tried it over and over, they've been doing it since he got in.  It's all turning, they lost.  It's all turning, think of it, think of it.  And this is their new hoax." (Doc.48: 25-26); (Supp-Compl. ¶ 107).

PUSA knew and knows that the Manufactured Statement was not actually said by candidate Trump as represented and that the Manufactured Statement was materially different than the words actually spoken by candidate Trump at the South Carolina Campaign Speech. (Doc.48: 26); (Supp-Compl. ¶ 108).

The PUSA ads defame the Trump Campaign in representing to viewers and listeners of the ads that the false Manufactured Statement was said by candidate Trump and it states the position of the Trump Campaign.  (Doc.48: 23, 26); (Supp-Compl. ¶¶ 90, 110).  The Trump Campaign depends upon support from the public to achieve its purposes and the false Manufactured Statement tends to interfere with the Trump Campaign's activities by prejudicing the Trump Campaign in the estimation of the public and deterring persons from associating or dealing with the Trump Campaign, including causing them to not vote for its candidate for re-election.  (Doc.48: 23-24 26); (Supp-Compl. ¶¶ 94, 95, 96, 111, 113). The Manufactured Statement in the PUSA ads is therefore defamatory of the Trump Campaign.  (*Id.*)

A viewer or listener of the PUSA ads would understand the Manufactured Statement to state the position of the Trump Campaign, that candidate Trump stated, "The coronavirus, this is their new hoax.", and that the Trump Campaign stated that the coronavirus pandemic is a "hoax." (Doc.48: 23); (Supp-Compl. ¶ 95).  The PUSA ads perpetuate the acceptance and repetition of this false information and continued the effort to defame and disparage the Trump Campaign's business of ensuring the reelection of its candidate by the means of the Manufactured Statement. (Doc.48: 24); (Supp-Compl. ¶ 98).

Persons who view and/or hear the Manufactured Statement would be led by viewing and/or hearing the false Manufactured Statement to believe that the Trump Campaign did not and does not believe the coronavirus pandemic is real.  (Doc.48: 24); (Supp-Compl. ¶ 96).  The

18

PUSA ads therefore defame the Trump Campaign because the ads contain the Manufactured Statement falsely represented to be made on behalf of the Trump Campaign.  (*Id.*)  The PUSA ads caused the false Manufactured Statement to continue to be repeated by the public to defame and disparage the Trump Campaign.  (*Id.*)

3. **The Manufactured Statement Caused Damage to the Trump Campaign.**

The PUSA ads contain fraudulently manufactured, false information about the Trump Campaign (*i.e.*, the Manufactured Statement) so that the Manufactured Statement would be accepted as true and continuously repeated.  (Doc.48: 20); (Supp-Compl. ¶ 78).  The PUSA ads, in short, were intended to create, and did create, a "meme," to misattribute a quotation to the Trump Campaign by falsely representing that the candidate made the statement "The coronavirus, this is their new hoax."  (*Id.*)  This false statement has become a meme, repeated and redistributed throughout the United States and the world, such that the Manufactured Statement allegedly by candidate Trump has become accepted as true by numerous persons throughout the U.S. and the world.  (Doc.48: 20-21); (Supp-Compl. ¶ 78).

The false Manufactured Statement in the PUSA ads has forced, and will continue to force, the Trump Campaign to expend substantial funds on corrective advertisements, and to otherwise publicize the fact that candidate Trump did not make the Manufactured Statement, that is, he did not refer to the very real and very serious coronavirus pandemic as a "hoax."  (Doc.48: 24); (Supp-Compl. ¶ 97).

F. **Independent Fact Checkers Reject the Manufactured Statement as False.**

After the South Carolina Campaign Speech, from February 28, 2020 through March 2, 2020, pundits and authors falsely stated that candidate Trump called the coronavirus a "hoax" in the speech.  During that same time, independent fact-checkers and reporters published reports

and articles correcting that error, calling such characterization false.  (Doc. 1-2: 11-12, 27, 29-34, 36-44); (Compl. ¶¶ 32-39, Exs. B-D); (Doc.48: 11-13; Doc.48-9-48-11); (Supp-Compl. ¶¶ 40-47, Exs. B-D).  On March 3, 2020, weeks before the PUSA ads began airing, presidential candidate Joseph Biden tweeted a campaign advertisement that included the false, Manufactured Statement.

Weeks before PUSA first released the PUSA ads, multiple independent fact-checking organizations debunked and proved false the Manufactured Statement in the PUSA ads.  Candidate Trump did not say: "The coronavirus, this is their new hoax."

On February 28, 2020, after candidate Trump's South Carolina Campaign Speech, Slate's Will Saletan explained, tweeting the following: "Trump's use of the word 'hoax' tonight (7:45 in this video) referred to what he said a minute earlier:  'The Democrats are politicizing the coronavirus.  …We did one of the great jobs.'  He was saying the hoax is that he's handled it badly.  Not the virus itself."  (Doc.1-2: 11, 27); (Compl. ¶ 33, Ex. B); (Doc.48: 11-12; Doc.48-9); (Supp-Compl. ¶ 41, Ex. B).[10]

On February 29, 2020, Check Your Fact published an article entitled "Fact Check: Did Trump Call The Coronavirus A 'Hoax' At His South Carolina Rally?"  (Doc.1-2: 11, 29-34); (Compl. ¶ 34, Ex. C); (Doc.48: 12; Doc.48-10); (Supp-Compl. ¶ 42, Ex. C).[11]  The Check Your Fact article analyzed a Politico "article claiming President Donald Trump called the novel coronavirus a 'hoax' at his Feb. 28 campaign rally in South Carolina."  (Doc.1-2: 11, 29-34); (Compl. ¶ 35, Ex. C); (Doc.48: 12; Doc.48-10); (Supp-Compl. ¶ 43, Ex. C).

---

[10]  Tweet from Will Saletan (Feb. 28, 2020), available at https://twitter.com/saletan/status/1233600059025035265.  (Doc.1-2: 11, 27); (Compl. ¶ 33, Ex. B); (Doc.48: 11-12; Doc.48-9); (Supp-Compl. ¶ 41, Ex. B).
[11]  Brad Sylvester, "Fact Check: Did Trump Call the Coronavirus A 'Hoax' At His South Carolina Rally?" ("Check Your Fact") available at https://checkyourfact.com/2020/02/29/fact-check-donald-trump-coronavirus-hoax-south-carolina-rally/ . (Doc.1-2: 11, 29-34); (Compl. ¶ 34, Ex. C); (Doc.48: 12; Doc.48-10); (Supp-Compl. ¶ 42, Ex. C).

The quote from the Politico article was: "President Trump on Friday night tried to cast the global outbreak of the coronavirus as a liberal conspiracy intended to undermine his first term, lumping it alongside impeachment and the Mueller investigation."  (Doc.1-2: 12, 29-34); (Compl. ¶ 36, Ex. C); (Doc.48: 12; Doc.48-10); (Supp-Compl. ¶ 44, Ex. C).  The Check Your Fact article determined that the claim made by the Politico article was "False."  (Doc.1-2: 12, 29-34); (Compl. ¶ 37, Ex. C); (Doc.48: 12; Doc.48-10); (Supp-Compl. ¶ 45, Ex. C).

On March 1, 2020, in response to former Democratic presidential candidate Mike Bloomberg's comment that he "find[s] it incomprehensible that the President would do something as inane as calling it a hoax, which he did last night in South Carolina," CBS News' Scott Pelley replied, "[h]e said the—the Democrats making so much of it is a Democratic hoax, not that the virus was a hoax."  (Doc.1-2: 12); (Compl. ¶ 38); (Doc.48: 12); (Supp-Compl. ¶ 46).[12]  On March 2, 2020, Snopes, the popular, self-described "definitive fact-checking resource," published an article finding: "Trump did not say in the passage above that the virus itself was a hoax."  (Doc.1-2: 12, 36-44); (Compl. ¶ 39, Ex. D); (Doc.48: 12-13; Doc.48-11); (Supp-Compl. ¶ 47, Ex. D).[13]

The Biden advertisement, which contained the same Manufactured Statement, was evaluated by fact checkers and concluded to be false.  The Manufactured Statement was included in an advertisement tweeted on March 3 by the Biden campaign, and the statement was comprised of audio clips stitched together to provide audio of candidate Trump saying the following words together: "The coronavirus, this is their new hoax."  (Doc.1-2: 12); (Compl. ¶ 40, Ex. E); (Doc.48: 13; Doc.48-12); (Supp-Compl. ¶ 48, Ex. E).  That was the same false,

---

[12] Scott Pelley, *CBS Face the Nation*, available at https://www.cbsnews.com/news/full-transcript-of-face-the-nation-on-march-1-2020/.  (Doc.1-2: 12); (Compl. ¶ 38); (Doc.48: 12); (Supp-Compl. ¶ 46).

[13] Bethania Palma, "Did President Trump Refer to the Coronavirus as a 'Hoax'?" (Mar. 2, 2020) available at https://www.snopes.com/fact-check/trump-coronavirus-rally-remark/.  (Doc.1-2: 12, 36-44); (Compl. ¶ 39, Ex. D); ; (Doc.48: 12-13; Doc.48-11); (Supp-Compl. ¶ 47, Ex. D).

manufactured audio clip of candidate Trump saying the coronavirus-hoax statement as the Manufactured Statement contained in the PUSA ad.  (Doc.1-2: 13); (Compl. ¶ 41); (Doc.48: 13; Doc.48-12); (Supp-Compl. ¶ 49, Ex. E).

On March 13, 2020, the Washington Post published an article entitled "Biden ad *manipulates video* to slam Trump."  Meg Kelly, "Biden ad manipulates video to slam Trump," *The Washington Post* (Mar. 13, 2020) (emphasis added) ("Washington Post Article").  (Doc.1-2: 12, 45-51); (Compl. ¶ 40, Ex. E); (Doc.48: 13; Doc.48-12); (Supp-Compl. ¶ 48, Ex. E).  The Washington Post Article analyzed the Biden ad posted in a March 3rd tweet by the Biden campaign, including the false, manufactured audio clip of candidate Trump saying the coronavirus-hoax statement (the same Manufactured Statement contained in the PUSA ads).  *See* (*id.*)

The Washington Post Article found the Manufactured Statement to be false.  According to the fact-checker from the Washington Post:  "The full quote shows Trump is criticizing Democratic talking points and the media's coverage of his administration's response to coronavirus.  He never says that the virus itself is a hoax, and although the Biden camp included the word 'their,' the edit does not make clear to whom or what Trump is referring."  (Doc.1-2: 13, 45-51); (Compl. ¶ 42, Ex. E); (Doc.48: 13; Doc.48-12: 4); (Supp-Compl. ¶ 50, Ex. E).  The Washington Post gave the Biden ad "Four Pinocchios," which is its highest rating for false information.  (Doc.1-2: 13, 45-51); (Compl. ¶ 43, Ex. E); (Doc.48: 13; Doc.48-12: 7); (Supp-Compl. ¶ 51, Ex. E).

PolitiFact, a popular fact-checking website, also rated as "False" the Biden ad including the false, manufactured coronavirus-hoax audio clip (the Manufactured Statement later included in the PUSA ads).  (Doc.1-2: 13, 52-57); (Compl. ¶ 44, Ex. F); (Doc.48: 13-14; Doc.48-13);

(Supp-Compl. ¶ 52, Ex. F).[14]  PolitiFact concluded that the Biden ad was a "deceptively edited ad," explaining that "Biden's video is inaccurate.  We rate it False."  The Biden ad was rated "False" because it included the false and manufactured "hoax" audio clip statement (the Manufactured Statement in the PUSA ads).  (*Id.*)  The manufactured, false audio clip of the "hoax" statement in the Biden ad is "an example of what the Washington Post calls 'splicing,' or 'editing together disparate videos' that 'fundamentally alters the story that is being told.' "  (*Id.*)

      G.    **The Trump Campaign Cease and Desist Letters.**

Despite the overwhelming information in the public domain calling out the Manufactured Statement as false in the March 3rd Biden advertisement and refuting the suggestion that candidate Trump called the coronavirus a hoax in the South Carolina Campaign Speech, PUSA nevertheless created the PUSA ads containing the false Manufactured Statement.  WJFW-NBC and other TV stations accepted PUSA's purchase of advertising time and they chose to broadcast the PUSA ads.  The PUSA ads were first broadcast on WJFW-NBC on March 24, 2020.  (Doc.1-2: 11); (Compl. ¶ 11); (Doc.48: 9); (Supp-Compl. ¶ 30).

Since defendants were not deterred by the overwhelming proof of falsity of the PUSA ads' opening statement, the Trump Campaign was forced to contact WJFW-NBC and other TV stations to demand that they cease airing the ad.  The next day, March 25, 2020, the Trump Campaign sent the Cease and Desist Letter to the General Manager of WJFW-NBC, informing him that the Manufactured Statement in the PUSA ads is "false, misleading and deceptive."  (Doc.1-2: 15, 59-64); (Compl. ¶ 47, Ex. G); (Doc.48: 15; Doc.48-14); (Supp-Compl. ¶ 56, Ex. G).  The Cease and Desist Letter explained, in relevant part, that the Manufactured Statement in

---

[14] The PolitiFact article was authored by Daniel Funke and is entitled "Ad Watch:  Biden video twists Trump's words on coronavirus," (Mar. 15, 2020) available at https://www.politifact.com/factchecks/2020/mar/15/joe-biden/ad-watch-biden-video-twists-trumps-words-coronavir/.  (Doc.1-2: 13, 52-57); (Compl. ¶ 44, Ex. F); (Doc.48: 13-14; Doc.48-13); (Supp-Compl. ¶ 52, Ex. F).

the PUSA ad stitched-together audio clips from candidate Trump's statements to fraudulently

represent that he called the coronavirus pandemic a "hoax."  (Doc.1-2: 15, 59-64); (Compl. ¶ 48,

Ex. G); (Doc.48: 15-16; Doc.48-14); (Supp-Compl. ¶¶ 56-58.  The Cease and Desist Letter

referenced and attached source material from "multiple independent fact-checking organizations

[that] have debunked the core claim of the PUSA ad."  (Doc.1-2: 15, 59-64); (Compl. ¶ 49, Ex.

G); (Doc.48: 15; Doc.48-14); (Supp-Compl. ¶ 56, Ex. G).

The Cease and Desist Letter was sent by Federal Express and e-mail on March 25.

(Doc.1-2: 15, 59-64); (Compl. ¶ 50, Ex. G).  That same day, the Trump Campaign received a

response to the e-mail from WJFW-NBC's General Manager, who confirmed receipt of the letter

and stated that the station "is consulting with legal."  (*Id.*)  WJFW-NBC did not correspond

further with the Trump Campaign beyond that response.  (Doc.1-2: 15, 59-64); (Compl. ¶ 51, Ex.

G).  WJFW-NBC continued to run the PUSA ad, broadcasting the PUSA ads thirty-six more

times from March 26, 2020 through April 6, 2020.  (*Id.*); (Doc.48: 16); (Supp-Compl. ¶ 62).  For

example, WJFW-NBC broadcast the PUSA ads ten times on April 6, 2020.  (*Id.*)

H.    **PUSA's Letter Response.**

PUSA obtained a copy of the Cease and Desist Letters sent to TV stations and sent the

stations a response letter on March 26, 2020 ("Letter Response").  (Doc.48: 3-5, 16-18, ; Doc.48-

5); (Supp-Compl. ¶¶ 4, 5, 59-68, Ex. 5).

The TV stations that had been airing the PUSA ads, including WJFW-NBC, are subject

to liability for broadcasting false and defamatory advertisements by third parties such as PUSA

and such stations may refuse to broadcast such ads.  (Doc.48: 16); (Supp-Compl. ¶ 61).  PUSA

sent the Letter Response to TV stations including WJFW-NBC to persuade them not to retract or

refuse the airing of the PUSA ads and to continue broadcasting the PUSA ads.  (*Id.*)

24

Those TV stations including WJFW-NBC presumably relied upon the representations in PUSA's Letter Response in making the decision to not retract or refuse to air the PUSA ads and to continue broadcasting those ads.  (Doc.48: 16); (Supp-Compl. ¶ 62).  For example, WJFW-NBC continued to run the PUSA ads, broadcasting the PUSA ads thirty-six more times from March 26, 2020 through April 6, 2020.  (*Id.*)  WJFW-NBC broadcast the PUSA ads ten times on April 6, 2020.  (*Id.*)

In its Letter Response, PUSA acknowledged the Trump Campaign's claim that the PUSA ads were "false, misleading, and deceptive" due to the Manufactured Statement.  (Doc.48: 17; Doc.48-5: 2); (Supp-Compl. ¶ 63, Ex. 5).  The Letter Response concedes that the Trump Campaign's complaint about the PUSA ads "correctly states that the ad splices together audio clips" to depict candidate Trump saying the Manufactured Statement: "The coronavirus, this is their new hoax."  (*Id.*)

PUSA's Letter Response asserts that the PUSA ads "do[] not manipulate clips to make it seem like Mr. Trump said these words—he did, just like he said every other word in the ad." (Doc.48: 17; Doc.48-5: 2); (Supp-Compl. ¶ 64, Ex. 5).  PUSA therefore told the TV stations and others that candidate Trump in fact made the Manufactured Statement.  (*Id.*)  PUSA made this knowingly false statement in order to persuade TV stations to continue broadcasting the PUSA ads and to assert that the Manufactured Statement is not false and defamatory as claimed by the Trump Campaign.  (*Id.*)

Indeed, PUSA's assertions apparently convinced WJFW-NBC that candidate Trump actually made the Manufactured Statement, because in this case, WJFW-NBC has asserted:

- "The President's 'hoax' statement, included in the montage [*i.e.*, PUSA's ad], came from his address to a South Carolina rally …"  (Doc.9: 10);

- "[T]he President 'made the 'hoax' comment at a campaign rally in Charleston, South Carolina." (Doc.9: 11-12); and

- "The text of these words [the Manufactured Statement] appears on the screen" during the PUSA ads, and the words in the Manufactured Statement "are the President's actual words." (Doc.9: 11).

(Doc.48: 17); (Supp-Compl. ¶ 65).

PUSA asserted in the Letter Response that candidate Trump actually said the words contained in the Manufactured Statement. (Doc.48: 17; Doc.48-5: 2); (Supp-Compl. ¶ 66, Ex. 5). However, PUSA also asserted that the PUSA ads "do[] not assert that Mr. Trump said the precise sentence, 'The coronavirus, this is their new hoax.' " (Doc.48: 17-18; Doc.48-5: 2); (Supp-Compl. ¶ 66, Ex. 5). However, the opening line in the PUSA ads has audio of candidate Trump saying those words together, as a sentence. (Doc.48: 18); (Supp-Compl. ¶ 66). This is confirmed by the text running on the screen putting those words together, as a sentence. (*Id.*) PUSA's Letter Response omits that fact in describing the PUSA ads to TV stations. (*Id.*)

PUSA told TV stations that the Manufactured Statement consisted of "words" said by candidate Trump, and that those words were stated at different times in the South Carolina Campaign Speech. (Doc.48: 18; Doc.48-5: 2, 3); (Supp-Compl. ¶ 67, Ex. 5). PUSA admitted that the Manufactured Statement in the PUSA ads consisted of "multiple" audio clips that are "distinct audio clips." (*Id.*) PUSA asserted that "[v]iewers" of the PUSA ads would know that "the ad compiles multiple clips" because the candidate's "tone of voice discernibly changes." (*Id.*)

PUSA widely distributed its Letter Response to TV stations broadcasting the PUSA ads. (Doc.48: 18; Doc.48-5); (Supp-Compl. ¶ 68, Ex. 5). Defendant WJFW-NBC and other TV

26

stations nationwide continued to broadcast the PUSA ads and accepted PUSA's purchase of advertising air time to broadcast the ads.  (*Id.*)

## MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to set forth "a short and plain statement of the claim showing that [he or she] is entitled to relief."  While it need not contain all relevant specific factual allegations and legal arguments, at minimum, a complaint must include allegations that " 'state a claim for relief that is plausible on its face.' "  *Justice v. Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In reviewing the Complaint, the Court must accept as true the facts as pled by the plaintiff and will "draw all reasonable inferences in favor of the plaintiff." *Palka v. Shelton*, 623 F.3d 447, 452 (7th Cir. 2010).  "'It is not necessary for plaintiff to plead specific facts but plaintiff must give defendants fair notice of the claims against them and the grounds supporting her claims.'"  *More v. Callahan*, 2013 WL 4718333, at *3 (W.D. Wis. Sept. 3, 2013) (quoting *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011) (citations omitted)).

The U.S. Supreme Court has explained that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556), and the factual allegations in the complaint must be "enough 'to raise a right to relief above the speculative level.' "  *DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 589 F. Supp. 2d 1026, 1029 (E.D. Wis. 2008) (quoting *Twombly*, 550 U.S. at 555).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Allen-Noll v. Madison Area Tech. Coll.*, 2018 WL 6834477, at *4 (W.D.

Wis. Dec. 28, 2018).[15]  "Motions to dismiss are construed in the light most favorable to the

plaintiff."  *Hamus v. Bank of New York Mellon*, 2011 WL 13266806, at *4 (W.D. Wis. May 13,

2011).

These principles apply equally in this case.  Plaintiff is entitled to the same favorable

inferences for its Complaint in this defamation action, as this Court explained in denying a

motion to dismiss a defamation complaint:

> "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges
> the sufficiency of the complaint for failure to state a claim upon which relief can
> be granted."  *Diamond Ctr., Inc. v. Leslie's Jewelry Mfg. Corp.*, 562 F. Supp. 2d
> 1009, 1013 (W.D. Wis. 2008).  In "[e]valuating the sufficiency of the complaint,
> [the court] construes it in the light most favorable to the nonmoving party,
> accept[s] well-[pleaded] facts as true, and draw[s] all inferences in her favor."
> *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013).  A plaintiff
> need not provide detailed factual allegations, but must provide enough facts to
> state a claim that is plausible on its face and allow the "court to infer more than
> the mere possibility of misconduct."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.
> Ct. 1937, 173 L.Ed.2d 868 (2009).

*Amoroso v. Schuh*, 278 F. Supp. 3d 1106, 1111 (W.D. Wis. 2017).

Accepting as true all facts alleged in the Complaint and all reasonable inferences

therefrom, the Complaint states a claim for defamation upon which relief can be granted against

PUSA.  It sets forth in detail allegations establishing the elements of a defamation claim.  It does

not rely upon mere "recitals of the elements of a cause of action, supported by mere conclusory

statements."  *Iqbal*, 556 U.S. at 678.  Although it is "not bound to accept as true a legal

conclusion couched as a factual allegation[,]" the court is required to accept all factual

allegations as true.  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

---

[15] "A failure to identify a proper legal theory does not necessarily require dismissal of the complaint.
*Hatmaker v. Memorial Medical Center*, 619 F.3d 741, 743 (7th Cir. 2010); However, the facts alleged in
the complaint must support a claim under some legal theory.  *Bartholet v. Reishauer A.G. (Zurich)*, 953
F.2d 1073, 1078 (7th Cir.1992)."  *Brodzki v. Wisconsin*, 2011 WL 1576388, at *1 (W.D. Wis. Apr. 26,
2011).

<u>**ARGUMENT**</u>

I.      <u>**The First Amendment Does Not Protect Known Lies.**</u>

Like WJFW-NBC's dismissal brief, defendant PUSA's dismissal brief leans heavily upon the First Amendment, arguing that speech concerning the performance of public officials in public office and statements in election campaigns are core political speech.  (Doc.26: 7-8, 12, 16-17, 27-28); *see also* (Doc.9: 8, 18, 26-27, 30).  The First Amendment is indeed aimed at ensuring that public debate is wide-open and robust.  Defendant argues that this action is an attempt to "chill" speech or discourage criticism and is a defamation action designed to punish speech that is legitimate criticism in an election campaign.  (Doc.26: 7, 8, 9).  That is not true.  This case is not based on public debate protected by the First Amendment.  It is based upon a PAC's knowing and intentional distribution and broadcast of a false, Manufactured Statement.  Broadcast of known falsity finds no haven in the First Amendment.

The actual malice standard is generally applied to defamation of public officials and public figures given the country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

However, this case does not involve statements critical of a political candidate implicating these core First Amendment values.  Rather, the false statement in this case was a manufactured, false statement that PUSA, the producer, knowingly manufactured to literally put words in the candidate's mouth, to deceive the public into believing that the candidate said "The coronavirus, this is their new hoax." – combining disparate audio clips to represent that the statement was made by the candidate when it was not.

29

Indeed, in these times, the dangers of falsified news and manufactured and manipulated audio and video are extreme, and ever increasing.  The Supreme Court in 1964 could not have even imagined how polluted and even dangerous the national and worldwide information ecosystem would become.  "Deepfakes" are "[a] devastating new tool in the disinformation wars [and are] poised to be deployed on a large scale that may soon supplant memes and fake news as industry standards for perverting truth and accuracy in the age of digital confrontation." "Deepfakes Are Very Real --  And Very Dangerous," Forbes (Oct. 16, 2019), available at https://www.forbes.com/sites/theyec/2019/10/16/deepfakes-are-very-real-and-very-dangerous/#2b5139c9493f

Supreme Court justices may not have been technological futurists in 1964, but as is often the case, the Court's First Amendment jurisprudence was prescient.  The Court always cautioned of the price of free speech, and clearly stated that the First Amendment provides no haven for knowing lies such as the false Manufactured Statement in the PUSA ads comprised of stitched-together false audio and textual subtitles.  Such knowing falsity is not protected by the First Amendment and it finds no safe harbor in the actual malice standard.  As the U.S. Supreme Court held in *Gertz v. Welch, Inc.*, 418 U.S. 323, 340 (1974): "[T]here is no constitutional value in false statements of fact.  Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues."

Known lies are a danger to democracy and thus they are not protected by the First Amendment, as one court explained:

> The First Amendment, however, does not afford defamatory political speech absolute immunity.  *See id.* at 455, 548 S.E.2d at 876;  *Stevens v. Sun Publ'g Co.*, 270 S.C. 65, 71, 240 S.E.2d 812, 815 (1978) ("An individual's status as a public figure does not immunize a publisher from liability when it prints defamatory articles with malice.");  *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 105 L.Ed.2d 562 (1989) ("We have not gone so

far ... as to accord the press absolute immunity in its coverage of public figures or elections.").

As the Supreme Court has stated:

> That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. <u>For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas ...." Hence the knowingly false statement and the false statement made with reckless disregard of the truth [ ] do not enjoy constitutional protection.</u>

*Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S. Ct. 209, 13 L.Ed.2d 125 (1964) (citation omitted); *see Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 150, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967) ("[T]hat dissemination of information and opinion on questions of public concern is ordinarily a legitimate, protected and indeed cherished activity does not mean ... that one may in all respects carry on that activity exempt from sanctions designed to safeguard the legitimate interests of others.").

*Anderson v. The Augusta Chronicle*, 585 S.E.2d 506, 513 (S.C. Ct. App. 2003) (emphasis added).

" '[T]he actual-malice standard is not an impenetrable shield for the benefit of those who engage in false speech about public figures.' " *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893, 901 (N.C. Ct. App. 2002), *writ denied, review denied, appeal dismissed*, 580 S.E.2d 361 (N.C. 2003) (quoting *McKimm v. Ohio Elections Comm.*, 729 N.E.2d 364, 373 (Ohio 2000)) (emphasis added); *see also Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex. 2000) ("This rule stems from the actual malice standard's purpose of protecting innocent but erroneous speech on public issues, while deterring 'calculated falsehoods.' A publisher's presentation of facts may be misleading, even negligently so, but is not a 'calculated falsehood' unless the publisher knows or strongly suspects that it is misleading.") (citation omitted).

II.    **The Trump Campaign Has Standing to Assert the Defamation Claim and The Manufactured Statement Was "Of and Concerning" the Campaign.**

A.    **Article III Standing.**

PUSA questions whether the Trump Campaign has Article III standing to assert the defamation claim in this case.  (Doc.26: 5, 6-8, 11).  A plaintiff must show that it suffered an actual and concrete injury in fact, there is a causal connection between the injury and the conduct complained of, and it is likely to be redressable by a favorable decision.  (Doc.26: 11).  Article III standing is established if plaintiff has alleged an actual and concrete injury caused by the conduct complained of.  *See Wittman v. Personhuballah*, 136 S. Ct. 1732, 1736 (2016).

PUSA acknowledges that the Trump Campaign has standing to bring a defamation if it has a separate and distinct injury of its own.  (Doc.26: 14).  PUSA raises Article III standing, but it does not make a showing of lack of standing separate from its argument under defamation law. *See* (Doc.26: 13, 15).  If the Trump Campaign has alleged a claim for defamation of and concerning the Trump Campaign, then it has established Article III standing.

As shown below, the Trump Campaign has properly pleaded that it suffered an actual and concrete injury that was caused by the false and defamatory Manufactured Statement in the PUSA ads.  The Trump Campaign has established this, as it alleges that the false and defamatory Manufactured Statement in the PUSA ads was false and defamatory of the Trump Campaign and that it suffered injury as a result.  *See* pages 15 to 19, above.  As a matter of law, the Complaint has stated a claim upon which relief can be granted for defamation.  Therefore, Article III standing is established.

B.    **The Manufactured Statement is Of and Concerning the Trump Campaign.**

On a motion to dismiss, the factual allegations of the Complaint are accepted as true and all reasonable inferences must be drawn from those allegations.  The Court must determine if a

plausible claim for defamation has been stated by those allegations.  The elements of a claim for defamation under Wisconsin law are:  (1) a false statement; (2) communicated by speech, conduct, or in writing to a person other than the one defamed; and (3) the communication tends to harm one's reputation, lowering him or her in the estimation of the community or deterring third persons from associating or dealing with him or her.  *Ladd v. Uecker*, 2010 WI App 28 ¶ 8, 323 Wis. 2d 798, 779 N.W.2d 723 (citing *Torgerson v. Journal/Sentinel, Inc.*, 201 Wis. 2d 524, 534, 536 N.W.2d 472 (1997)).  Additionally, the plaintiff must allege that defendant communicated the false statement with actual malice, that is, knowledge of falsity or reckless disregard for the falsity of the statement.  *Storms v. Action Wisconsin Inc.*, 2008 WI 56, ¶¶ 38-39, 309 Wis. 2d 704, 750 N.W.2d 739.

The defamatory communication must be "of and concerning" the plaintiff, meaning that a recipient of the statement might reasonably understand that it was intended to refer to plaintiff.  Restatement (Second) of Torts § 564.  This element is established on a motion to dismiss if a reasonable person could believe that the published statement referred to the plaintiff.  3 Dobbs, et. al, The Law of Torts § 527, at 199 (2d Ed. 2011).  It is not necessary that *all* recipients understood it that way, just that *one* recipient could have so understood it.  Restatement § 564, Comment b.[16]  It is an issue of fact for the jury to determine whether the statement was in fact understood by at least one person to refer to the plaintiff.  3 Dobbs, et. al, The Law of Torts § 527, at 199 (2d Ed. 2011).  Thus, in order to satisfy this element, the jury need only determine that a single person believed the statement referred to the plaintiff.  (*Id.*)

---

[16] *See also* § 6:9.Who may sue for defamation—The "of and concerning" requirement, 1 Rights and Liabilities in Media Content § 6:9 (2d ed.)  ("It is not necessary that every recipient of the communication identify the plaintiff as long as there are at least some who reasonably do.")

33

PUSA contends that the Complaint must be dismissed, asserting that the false, Manufactured Statement was not "of and concerning" the Trump Campaign. It argues that the statement is "of and concerning" President Trump, not the Trump Campaign. (Doc.26: 14, 15).

This argument fails for several reasons. First, defamation need not mention the plaintiff by name to be "of and concerning" the plaintiff. Second, a statement may be defamatory of different persons at the same time; just because it arguably concerns one person does not mean it does not also concern another person. Third, the "of and concerning" element is established here because a reasonable viewer of the PUSA ads would understand that the Manufactured Statement concerns the Trump Campaign. The falsified statement was made stitching together disparate audio clips of words said by candidate Trump at a campaign rally in South Carolina. *See* pages 11-12, 14, above; *see also* (Doc.9: 10, 11-12). The purported words or actions of a campaign's candidate are on behalf of the campaign and the campaign and candidate are inextricably intertwined for purposes of campaign statements by the candidate. A listener or viewer of a false communication utilizing audio clips of the candidate from a campaign speech would reasonably believe that the communication concerned the campaign.

1. **A Defamatory Communication Need Not Mention the Plaintiff By Name and It Can Defame More Than One Person.**

PUSA argues that the false, Manufactured Statement was not "of and concerning" the Trump Campaign because it did not mention the campaign by name. (Doc.26: 7, 13, 14, 15). That, however, is not the law. It is well established that a defamatory statement need not mention plaintiff by name to be of and concerning plaintiff.[17]  *See Amoroso v. Schuh*, 278 F.

---

[17] *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 189 (3d Cir. 1998) (defamatory statement need not explicitly name plaintiff so long as it was reasonably understood by one third party to refer to plaintiff); *Church of Scientology of California v. Flynn*, 744 F.2d 694, 697 (9th Cir. 1984) ("[t]here is no requirement that the person defamed be mentioned by name.... It is sufficient if from the evidence the jury can infer that the defamatory statement applies to the plaintiff ... [or] if the publication points to the

Supp. 3d 1106, 1112–13 (W.D. Wis. 2017); *see also* § 4:40.Identity: the "of and concerning the

plaintiff" requirement—Reference need not be by name—Colloquium, 1 Law of Defamation

§ 4:40 (2d ed.) ("The plaintiff need not be cited by name for the defamation to be 'of and

concerning' him.  If there is no explicitly literal reference, the plaintiff must sustain the burden of

pleading and proof, by way of 'colloquium,' that the defamatory statement refers to him.");

*Advanced Tech. Corp. v. Instron, Inc.*, 66 F. Supp. 3d 263, 272 (D. Mass. 2014) ("[T]he law does

not require a direct reference to the plaintiff."  Holding that defamation plaintiff "provided

sufficient evidence for summary judgment purposes showing that the article made statements 'of

and concerning' the plaintiff because it can demonstrate that [defendant] intended the words to

refer to [plaintiff], and that the words were understood to refer to [plaintiff].")

A communication may be published under such circumstances as to be defamatory of a

person not named or described.  Restatement § 564, Comment e.  It is not necessary that the

plaintiff be referenced by name in the communication, it is enough that at least one person who

heard or read it reasonably understood it to concern the plaintiff.  Restatement § 564, Comment

b; *see Ogren v. Employers Reinsurance Corp.*, 119 Wis. 2d 379, 383, 350 N.W.2d 725 (Ct. App.

1984) (an article referring to an individual's "family" could "therefore be reasonably understood

to refer to [his] mother and sister"); *see also Doe v. Hagar*, 765 F.3d 855, 862–63 (8th Cir. 2014)

("[T]he plaintiff need not be named if the alleged libel contains matters of description or other

---

plaintiff by description or circumstance tending to identify him."); *Keohane v. Stewart*, 882 P.2d 1293,
1300 n.10 (Colo. 1994) ("While the letter does not refer to [plaintiff] by name, the evidence at trial
established that the letter was widely understood as referring to [plaintiff . . . .");  *Croixland Properties
Ltd. P'ship v. Corcoran*, 174 F.3d 213, 216–17 (D.C. Cir. 1999) ("To satisfy the 'of and concerning'
element, it suffices that the statements at issue lead the listener to conclude that the speaker is referring to
the plaintiff by description, even if the plaintiff is never named or is misnamed."); *Caudle v. Thomason*,
942 F. Supp. 635, 638 (D.D.C. 1996) ("Even though the statements do not explicitly refer to Caudle,
Caudle may prevail if a listener would reasonably believe that the statements referred to him."); *Gosden v.
Louis*, 687 N.E.2d 481, 495 (Ohio Ct. App. 1996) ("A plaintiff need not have been specifically named in
a libelous statement to have been defamed.").

references therein, or the extraneous facts and circumstances show that plaintiff was intended to

be the object of the alleged libel, and was so understood by others."); *Hanks v. Wavy Broad.,

LLC*, 2012 WL 405065, at *6 (E.D. Va. Feb. 8, 2012) ("The plaintiff does not have to be

mentioned by name in the publication.  Rather, the 'of or concerning' test is satisfied if the

plaintiff shows that 'the publication was intended to refer to him and would be so understood by

persons reading it who knew him.' ';  if the publication on its face does not show that it applies

to plaintiff, 'the allegations and supporting contemporaneous facts connect the libelous words to

the plaintiff.'") (citations omitted); *Perkins v. Littleton*, 270 So. 3d 208, 214 (Miss. Ct. App.

2018) ("We agree with [plaintiff] that a statement may be clearly directed toward the plaintiff

even if it does not designate the plaintiff by name.  As the Mississippi Supreme Court has

explained, 'Extrinsic facts may make it clear that a statement refers to a particular individual

although the language used appears to defame nobody. It is not necessary that everyone

recognize the [plaintiff] as the person intended; it is enough that any recipient of the

communication reasonably so understands it.' ").

   Additionally, PUSA asserts that the false, Manufactured Statement concerns President

Trump and, therefore, it cannot also be "of and concerning" the Trump Campaign or the

candidate.  Again, this misapplies the law.  A defamatory statement can defame more than one

person.  A defamatory communication may concern more than one person.[18]  A communication

referring to one person can refer to another person as well, if a reasonable recipient of the

---

[18] *Peagler v. Phoenix Newspapers, Inc.*, 560 P.2d 1216, 1222–23 (Ariz. 1977) (article held to refer to corporation and the owner); *Schiavone Const. Co. v. Time, Inc.*, 619 F. Supp. 684, 697 (D.N.J. 1985) (statements concerning company also could be of and concerning the chief executive officer; corporation bore CEO's last name); *Klentzman v. Brady*, 456 S.W.3d 239, 254–55 (Tex. App. 2014) (article was defamatory of both chief sheriff's deputy and his son), *aff'd*, 515 S.W.3d 878 (Tex. 2017); *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 66–67 (D.D.C. 2018) (Store team leaders for various Whole Foods grocery stores in the Washington, D.C., metropolitan area stated a claim for defamation against Whole Foods for defamation although statements did not name plaintiffs and there were more than 20 Whole Foods stores in the region).

publication can and does interpret the communication as being in substance about plaintiff.  3

Dobbs, et. al, The Law of Torts § 530, at 206 (2d Ed. 2011); *see also Writers Guild of Am., W.,*

*Inc. v. Superior Court for Los Angeles Cty.*, 78 Cal. Rptr. 520, 524 (Cal. Ct. App. 1969) ("The

general rule is that when two or more persons are affected by the same defamatory matter, the

defamation is deemed several as to each of them, and each may therefore sue for it independently

of the other."); *Rosenthal v. R. W. Smith Co.*, 260 F. Supp. 3d 588, 596 (W.D. Va. 2017) (The

alleged defamatory "communications demonstrate that there is a nexus between Rosenthal and

MEP such that allegations of MEP's wrongdoing could amount to allegations of Rosenthal's

personal wrongdoing.  Therefore, at this stage of the litigation, the Court will conclude that the

alleged defamation was sufficiently 'of and concerning' Rosenthal to allow his claim to

proceed.").

2. **An Individual May be Inextricably Intertwined With an Entity for Purposes of a Defamation Claim.**

PUSA argues that statements about officers of a corporation are generally held to not be

"of and concerning" the corporation itself.  (Doc.26: 13, 14).  That is not a rule; the

determination depends upon the allegations of the complaint.  Courts have held that a corporate

executive may sue for defamation based upon statements about the corporation.  *Palm Springs*

*Tennis Club v. Rangel*, 73 Cal. App. 4th 1, 6, 86 Cal. Rptr. 2d 73, 77 (1999), cited by PUSA

(Doc.26: 14), recognizes that a corporate entity may, in appropriate circumstances, bring an

action for defamation where assertions about a corporate officer could be interpreted as

reflecting upon the performance of duties for the corporation, so as to have a natural tendency

"to affect the corporation disadvantageously in its business."  As the court explained, "words

written about a corporate officer might give a right of action to the corporation if "spoken or

written in direct relation to the trade or business of the corporation."

For example, in *Caudle v. Thomason*, the court held that Caudle, the chief executive officer and president of a corporation, AOA, stated a claim for defamation for statements that accused the corporation of fraud and corrupt practices but did not explicitly refer to Caudle. 942 F. Supp. 635, 638 (D.D.C. 1996). The complaint alleged that Caudle "'made all business decisions regarding corporate actions which are the subject matter of [the] lawsuit.'" (*Id.* at 638.) The court was therefore "unable to say that a reasonable listener . . . would not infer that [the plaintiff] was responsible for or involved with the alleged wrongdoings." (*Id.*) The allegations of fraud and corruption were, in other words, not only about the plaintiff's company, but also about the individual plaintiff. *See also Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (Statements defamatory of corporate officers generally do not defame their corporations, and vice versa; "This principle is not absolute, of course. If, for example, one person is solely in charge of corporate decision making, an attack on a corporation would vicariously attack the decision maker."); *Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 632 (E.D.N.Y. 2018) (Denying dismissal of defamation action by corporate owners where statement named the corporation only; individual plaintiffs were the only principals of the corporation and as the owners their "personal reputations [were] inseparably intertwined" with the corporation).

Moreover, even if statements about corporate officers are generally not considered "of and concerning" the corporation, that is particular to business (for profit) corporations. A different analysis applies to nonprofit corporations, as recognized by the Restatement (Second) of Torts.

Where a statement concerns an individual, who is inextricably intertwined with a non-profit or other organization lead by the individual, courts have held that a defamatory statement

38

concerning the individual may be "of and concerning" the entity for purposes of a defamation claim.  The Restatement recognizes that a non-profit corporation may bring a defamation action for statements that prejudice the corporation in the estimation of the public.  Restatement (Second) of Torts § 561 ("A communication can be defamatory concerning a nonprofit corporation where it depends upon support from the public and the defamatory matter tends to interfere with its activities by prejudicing it in the public's estimation.")

For example, in *Gorman v. Swaggart*, 524 So. 2d 915 (La. Ct. App. 1988), a religious non-profit corporation and its minister brought an action for defamation against defendants, Jimmy Swaggart and other leaders and entities in the Assemblies of God organization.  The defamation action arose out of actions and events leading up to and following the dismissal and/or resignation of Pastor Marvin Gorman from his position as a minister of the Assemblies of God.  (*Id.* at 917.)  Gorman was pastor of the First Assembly of God Church in New Orleans and a member of the national governing body of the Assemblies of God.  (*Id.*)  Gorman was also president and founder of Marvin Gorman Ministries, Inc. ("MGM"), a non-profit religious corporation which used television as a means to raise money and carry the corporation's message to the public.  (*Id.*)  Defendant Swaggart and others publicly accused Gorman of committing immoral acts over a period of years.  (*Id.*)

Defendants moved to dismiss MGM's defamation claims, arguing that "MGM could not bring suit based upon allegedly defamatory statements made about Gorman but not about MGM."  (*Id.* at 919.)  The court rejected that argument, holding that the reputation of MGM, Gorman's ministry, was "inextricably tied to his personal reputation" and thus statements defamatory of Gorman were defamatory of MGM, his ministry.  As the court explained:

> This case is not like that of a business corporation seeking damages for
> statements made about the personal morality of one of its officers or a member of

39

its board of directors in matters unrelated to business.  Gorman's personal reputation was one of MGM's primary assets.  By questioning *his* moral integrity, the integrity of the corporation itself was called into question.  <u>In many ways, defamation of Gorman was defamation of his ministry.  He was its principal spokesman. It was with him that the public identified.  His reputation for spiritual and moral integrity was the cornerstone on which the ministry was built.</u>  Attacks on Gorman, which included allegations that he embezzled MGM funds, could (and allegedly did) decrease contributions to MGM and lessen the confidence of lenders in the stability and integrity of the ministry.  <u>Under these circumstances, we believe it was possible for MGM to be defamed by statements about Gorman even if MGM was not mentioned by name in those statements.</u>  For a discussion of this type of defamation see generally, W. Prosser, Handbook of the Law of Torts, Sec. 111, p.745 (4th ed. 1971) and Restatement of Torts 2d, Sec. 564, comment (e).

In our opinion, the reputation of Gorman's ministry was inextricably tied to his personal reputation.  . . .

(*Id.* at 919) (italics emphasis in original; underlining emphasis added).

3.   **There are Many Examples of Campaign Committees as Plaintiffs or Defendants in Defamation Actions.**

PUSA argues that the Trump Campaign should not be permitted to pursue this defamation action because that means "any campaign committee" could sue for defamation "any time" a candidate is criticized for actions taken in "an official elected capacity."  (Doc.26: 7).  This does not refute the "of and concerning" element for the Manufactured Statement in this case.  Here, the statement is purported to be the candidate's own words stated in a campaign speech at a campaign rally, an event organized and orchestrated by the campaign.  *See* pages 11-12, 14,  above.  Further, this action does not complain of *criticism* of candidate Trump – the Trump Campaign does not claim defamation for criticism.[19]  Rather, the Trump Campaign has

---

[19] PUSA misunderstands the claim of defamation in this case.  The Trump Campaign is not suing because the PUSA ads might be understood to criticize candidate Trump or the Trump administration.  Nor does the Trump Campaign assert defamation based upon the PUSA ads' representations or suggestions concerning the adequacy of the response to the pandemic.  The adequacy of the Trump administration's response to the coronavirus is not placed at issue by this case.  *See*

only sued for the Manufactured Statement.  That statement is asserted to be an accurate statement

of candidate Trump made at a Trump Campaign rally in South Carolina.  Because it falsely

represents that candidate Trump made the Manufactured Statement, a statement that defendants

contend was made at a Trump Campaign rally, that statement necessarily concerns the Trump

Campaign.  Statements made by the candidate at Trump Campaign rallies necessary concern the

Trump Campaign.

There are numerous examples of defamation actions and matters in other contexts in

which a candidate's campaign committee is a plaintiff or defendant in a case involving

statements by or about the candidate or the campaign.  Candidates' personal campaign

committees have filed defamation actions as plaintiffs,[20] and have been sued as defendant in

defamation actions or other election related actions.[21]  Also, state election authorities will bring

election violation charges against campaign committees along with their candidates.[22]  Campaign

committees have been appropriate plaintiffs in other contexts as well.[23]

---

below.  Criticism is to be expected in matters of such important public policy, particularly on novel and
compelling issues such as the coronavirus and the COVID-19 pandemic.  This action was not filed to chill
or discourage such criticism, contrary to PUSA's argument.  (Doc.26: 8).

[20] *See Valento v. Ulrich*, 402 N.W.2d 809, 812 (Minn. Ct. App. 1987) ("[T]o the extent that the committee
is a proper party plaintiff, we treat it as a public figure."); *Goodson v. Republican State Leadership
Comm. - Judicial Fairness Initiative*, 2018 WL 6430825 (E.D. Ark. Nov. 1, 2018) (Candidate and
candidate's campaign committee plaintiffs in a defamation action for advertisement broadcast during an
election.)

[21] *See Boyce & Isley, PLLC v. Cooper*, 673 S.E.2d 694, 696 (N.C. Ct. App. 2009) (A candidate and
committee both were defendants for the same act of the candidate); *Boyce & Isley, PLLC v. Cooper,* 568
S.E.2d 893 (N.C. Ct. App. 2002); *Schatz v. Republican State Leadership Comm.,* 669 F.3d 50, 53 (1st Cir.
2012); *Vander Linden v. Wilbanks,* 128 F. Supp. 2d 900, 902 (D.S.C. 2000); *Pub. Office Corp. v. Clinton
for President Comm.,* 194 F.3d 139, 142 (D.C. Cir. 1999) (Committee was proper defendant for alleged
defamatory comments by the committee in a response to the Federal Elections Commission).

[22] *See The Team Working for You v. Ohio Elections Comm.,* 754 N.E.2d 273, 281 (Ohio Ct App. 2001)
(finding that individual members of a committee and the committee itself could be liable for the same
act); *Dewine v. Ohio Elections Comm'n*, 399 N.E.2d 99, 101 (Ohio Ct. App. 1978) ("The minutes further
indicate that the defendant commission found no violation with respect to two other complaints made
against either plaintiff or his committee.")

[23] *Miller v. F.C.C.,* 66 F.3d 1140, 1145 (11th Cir. 1995) (Candidate campaign committees have been
proper plaintiffs in cases against regulatory agencies where they have alleged a harm of restriction of "the

For example, one court found that a candidate's claim in a defamation case was so intertwined with his campaign committee that expenditures for legal fees in a defamation action brought by a candidate must be reported as campaign expenditures. *Thirteen Comm. v. Weinreb*, 214 Cal. Rptr. 297, 299 (Cal. Ct. App. 1985) ("In light of the findings that the primary objective of the lawsuit was to vindicate her personal reputation in furthering her quest for the elective office, the trial court's determination that the attorney fees were incurred and expended for a *political* purpose must be upheld") (emphasis in original).

As another example, in *Palin v. New York Times Co.*, 940 F.3d 804, 807, 816 (2d Cir. 2019), Sarah Palin sued for defamation for false statements in a news article referring to a publication circulated by her political action committee "SarahPAC."  On a motion to dismiss, the Court held that Palin's complaint plausibly alleged that statements regarding SarahPAC were "of and concerning" Sarah Palin individually.  As it explained:  "The legal designation of a political action committee under federal law notwithstanding, Palin has plausibly pleaded that a reader would identify her as the subject of the statements."  (*Id.* at 816).

PUSA joins WJFW-NBC's argument that in other circumstances the Trump Campaign has distinguished itself from Donald Trump in his personal capacity.  (Doc.26: 13 n.5); *see* (Doc.9: 11).  That is not relevant to whether the false, Manufactured Statement is "of and concerning" the Trump Campaign.  Moreover, the cited material merely shows that the candidate

---

goal of increased candidate access to the broadcast media."  Plaintiffs' claims were denied on other grounds.); *See generally  Republican Party of Minnesota v. White*, 536 U.S. 765, 777 (2002) (Political committees had standing to bring First Amendment challenges.); *Nat'l Right To Life Political Action Comm. v. Friends of Bryan*, 741 F. Supp. 807, 811 (D. Nev. 1990) (Finding that the "Plaintiff is sufficiently distinguishable from the corporation, National Right to Life Committee, Inc., so as to maintain this suit as a party plaintiff."); *Friends of Phil Gramm v. Americans for Phil Gramm in '84*, 587 F. Supp. 769, 778 (E.D. Va. 1984) (Plaintiff, a personal campaign committee, had standing to allege harm to its candidate and the ability to solicit funds and other First Amendment claims.)

and his campaign committee are distinct from Donald Trump acting in his capacity as President. In the FEC matter defendant references (Doc.9: 11); (Doc.12-4: 2 n.1), the Trump Campaign reiterates that Donald Trump in his "capacity as a candidate" is intertwined with the Trump Campaign, and again, that there is a "very clear distinction between being 'President' and being 'a candidate in a campaign.'"   (Doc.9: 12); (Doc.12-5: 7).  This is consistent with the fact that the Trump Campaign and the candidate, when he is acting in his capacity as candidate – for example, speaking as the candidate at a campaign rally – are inextricably intertwined.[24]

C.   **The False, Manufactured Statement is "Of and Concerning" the Trump Campaign.**

The false, Manufactured Statement in the PUSA ads was "of and concerning" the Trump Campaign.  Donald J. Trump is of course the Trump Campaign's candidate for the 2020 Presidential Election.  *See* pages 6 to 8, above.  The Trump Campaign is responsible for, among other things, coordinating and organizing political and fundraising appearances, creating and/or purchasing political advertising on behalf of the candidate, collecting contributions for the candidate and reporting them to federal regulators as required by law, and making expenditures on behalf of the candidate, each and all for the sole purpose of re-electing its candidate as President of the United States.  *See* (*id.*).

Candidate Trump is one of many people authorized to speak, and who does speak, on behalf of the Trump Campaign.  *See* (*id.*).  The purported statements of any authorized speaker alleged to have been made on behalf of the Trump Campaign impact the Trump Campaign.  (*Id.*)

Statements represented as made by candidate Trump at campaign appearances and speeches of course reflect upon and concern the Trump Campaign.  Likewise, statements

---

[24] In this case, the only plaintiff is the Trump Campaign.  Candidate Trump has chosen not to join the action as a plaintiff, which is his right.  This action asserts a defamation claim by the Trump Campaign and seeks to recover its damages from the defamation.  Contrary to PUSA's argument (Doc.26: 15), the Trump Campaign is a "proper plaintiff" to bring the defamation claim in this case.

concerning Trump Campaign speeches, or purporting to excerpt statements from such speeches, concern the Trump Campaign.  The false statement depicted in the PUSA ads as being made by candidate Trump concern and reflect upon the Trump Campaign since it was purportedly a statement made by the Trump Campaign's candidate at a campaign rally.  *See* pages 15 to 16 above.  Indeed, in its Letter Response, PUSA assured TV stations that the Manufactured Statement is comprised of candidate Trump's "words" stated at the February 28, 2020 South Carolina campaign rally, an event organized and orchestrated by the Trump Campaign.  *See* page 1-12, 14 above; (Doc.48-5: 2-3).  *See also* (Doc.9: 10, 11-12) (Asserting that "The President's 'hoax' statement, included in the montage, came from his address to a South Carolina rally" and arguing that candidate Trump "made the 'hoax' comment at a campaign rally in Charleston, South Carolina on February 28, 2020.").  Thus, PUSA's own arguments and assurances to TV stations of the accuracy of the Manufactured Statement and its continued airing of the PUSA ads refute PUSA's current assertions that the PUSA ads "in no way implicate[] the activity of the Campaign itself," that they do not "refer to any conduct undertaken by the Campaign at all," and that the PUSA ads do not implicate "actions undertaken, attributable to, or even 'authorized' by the [Trump] Campaign."  (Doc.26: 14, 15).

As WJFW-NBC notes, the PUSA ads were broadcast "just months before a presidential election."  (Doc.9: 8).  A recipient/viewer of the PUSA ads would reasonably understand the false communication to refer to the Trump Campaign.  The Manufactured Statement took audio clips of separate words said by candidate Trump at a campaign rally, taking audio of the candidate's words "The coronavirus" from earlier in the speech, and stitching them together with words said later in the speech:  "this is their new hoax."   *See* pages 12 to 14, above.

The PUSA ads communicate the false, Manufactured Statement of the candidate, which he did not make.  It manufactures an audio clip statement by stitching together audio clips, putting them together and representing it textually as one sentence: "The coronavirus, this is their new hoax."  *See* (*id.*)

This statement is of and concerning the Trump Campaign because it falsely communicates a statement in the candidate's own words at a Trump Campaign event that the candidate did not say.  Portions of the audio clips were made at a campaign rally.  As noted at pages 20 to 23, above, between February 28, 2020 and March 13, 2020, there was widely distributed discussion of candidate Trump's statements at the South Carolina campaign rally and particularly his various remarks about the coronavirus and the Democrats' politicization of various matter.  Thus, persons involved in or aware of these discussions would connect the Manufactured Statement in the PUSA ads to candidate Trump's statements at the campaign rally.  After seeing the PUSA ad, if a viewer searched for the South Carolina Campaign Speech, he or she would see the candidate speaking at a campaign rally.  (Doc.1-2:9, 10, 11, 28); (Compl. ¶¶ 24, 30, 34, 35, Ex. C); (Supp-Compl., Ex. C).  Indeed, articles published after the rally identified the false, Manufactured Statement as utilizing audio clips pulled from the rally, purporting to represent the candidate's words stated at the rally, and concluding that the Manufactured Statement was false and did not accurately state candidate Trump's statements at the rally.  *See* pages 20 to 23, above.  (Doc.1-2: 12-13, 46-51, 53-57); (Compl. ¶¶ 40-44, Exs. E, F) ; (Doc.48-12; Doc.48-13); (Supp-Compl., Exs. E, F).  By manufacturing a false statement purportedly made by the candidate at a campaign rally that he did not make, defendant made a false communication of and concerning the Trump Campaign.

The Trump Campaign is a nonprofit corporation that depends upon support from the public, and the false, Manufactured Statement tends to interfere with its activities by prejudicing it in the public's estimation.  *See* pages 6 to 8, 15-16; *see also* Restatement (Second) of Torts § 561.  The Trump Campaign's effort to acquire votes necessarily rests upon its and its candidate's reputation.  *See* (*id.*).  The PUSA ads were created in order to affect voting behavior of members of the voting public and influence the 2020 presidential election.  *See* page (*id.*)

Further, the false, Manufactured Statement, "The coronavirus, this is their new hoax." was communicated by presidential candidate Joe Biden in a campaign advertisement distributed on March 3, 2020.  *See* pages 2-3, 20, 22, 23, above.  Similarly, in an interview, former presidential candidate Mike Bloomberg accused candidate Trump of calling the coronavirus a "hoax" at the South Carolina campaign rally.  *See* page 21, above.  That statement was immediately corrected as being wrong by CBS reporter Scott Pelley.  (*Id.*)

Because the false, Manufactured Statement was represented to be an actual statement made by candidate Trump at the South Carolina rally, an event of the Trump Campaign, made by the candidate Trump, a viewer or listener of the PUSA ads would reasonably understand the Manufactured Statement to concern the Trump Campaign.  Indeed, PUSA argued to TV stations that the Manufactured Statement accurately sets forth the "words" of candidate Trump stated in the South Carolina Campaign Speech.  *See* pages 24 to 26, above.  (Doc.48-5: 2, 3).  PUSA cited this point among others to persuade TV stations including WJFW-NBC to continue broadcasting the PUSA ads and to not retract them.  (*Id.*)

A viewer or listener would understand the Manufactured Statement to concern the Trump Campaign also because the last sentence of the PUSA ads demonstrates they are about the presidential campaign, saying at the closing: "America needs a leader we can trust."  The PUSA

ads are aired for the *purpose* of influencing the presidential election, and to directly impede and thwart the "business" of the Trump Campaign, which is to obtain the re-election of President Trump.  The PUSA ads advocate for a change in leadership, that is, suggesting that President Trump is not a leader that "we can trust," and thus he should not be re-elected.  The PUSA ads are designed to discourage the re-election of candidate Trump.  *See* pages 75 to 77, below. Therefore, the Manufactured Statement in the PUSA ads is "of and concerning" the Trump Campaign.

Accordingly, the Complaint states a claim for defamation "of and concerning" the Trump Campaign and it has standing to assert the defamation claim in this case.

III.   **The Manufactured Statement Was False and Defamatory.**

PUSA misunderstands or intentionally mischaracterizes the defamation claim in this case, misquoting the Manufactured Statement to omit pertinent capitalization and punctuation, and it erroneously suggests that the claim of defamation is premised upon statements concerning the Trump administration's response to the coronavirus, and claims falsity based upon "criticism" of President Trump.  (Doc.26: 7, 8, 15, 27, 28).  This is not true.  *See* page 40 n.19, above, and page 75, below.

In its Complaint, the Trump Campaign asserts that the following statement – the opening statement – in the PUSA ads is false and defamatory of the Trump Campaign:

**The coronavirus, this is their new hoax.**

This action does not claim defamation for all statements in the PUSA ads.  As described by WJFW-NBC, the PUSA ads consist of a "montage" of statements purporting to be statements made by candidate Trump.  (Doc.9: 9, 10 & n.2).  Those nine separate statements are depicted through both audio clips and a visual representation of the same statement in text, appearing on

47

the screen at the same time as the corresponding audio clips.  *See* pages 12 to 14, above.  PUSA asserts that these statements were made at different times, in different speeches or press conferences.  (Doc.26: 20 n.7); *see also* (Doc.9: 9-10 n.2).

The PUSA ads begins with the statement consisting of stitched-together audio representing in the manufactured audio clips and the textual representation that candidate Trump made the following statement, as a sentence:  "The coronavirus, this is their new hoax."  That statement is false and defamatory of the Trump Campaign.

If the false representation that candidate Trump made that statement is susceptible to a defamatory meaning by some number of persons (even a minority), then the Complaint states a claim for defamation as a matter of law and the motion to dismiss must be denied.  The Trump Campaign sues based upon one single false statement, which is defamatory of the Trump Campaign – the Manufactured Statement.  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 509–10 (1991) (" '[T]he test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text,' though the California courts recognize that '[w]hile a drop of poison may be lethal, weaker poisons are sometimes diluted to the point of impotency.' ") (quoting *Washburn v. Wright*, 68 Cal. Rptr. 224, 228 (Cal. Ct. App. 1968).)

PUSA argues that the Manufactured Statement can be determined to be true as a matter of law on this motion to dismiss.  That is not the case.  PUSA also argues that the PUSA ads as a *whole* are "substantially true" and that the nine sentences in the PUSA ads accurately set forth candidate Trump's own statements via audio clips and textual subtitles. However, that is not the issued raised by this action and it does not establish truth of the Manufactured Statement as a matter of law.

PUSA is simply wrong in suggesting that the false and defamatory nature of the Manufactured Statement can be minimized or eliminated by placing it first in a "montage" of different statements made by candidate Trump or by the President at press conferences or other appearances.  *See Amoroso v. Schuh*, 278 F. Supp. 3d 1106, 1113 (W.D. Wis. 2017) ("[O]therwise defamatory statements cannot be rendered non-actionable simply because they are incorporated into a larger communication having a proper purpose.").  Moreover, the false Manufactured Statement is the opening sentence of a 30-second attack ad.  Since the statement opens the PUSA ads and the ads are so brief, the false statement is not "diluted to the point of impotency" by being included in the montage ad.

The Complaint properly pleads that the Manufactured Statement is false in that it was never made by candidate Trump and it is falsely represented to be a sentence uttered by him. Further, the defamation is the representation that the false statement was said by candidate Trump.  The representation that the Manufactured Statement was said is defamatory because it has a tendency to deter persons from supporting the Trump Campaign and it is used to attack the campaign and its candidate.

A.    <u>**Statement Must be False and Defamatory.**</u>

The elements of a defamation claim are: (1) a false statement, (2) communicated by speech, conduct, or in writing to a person other than the person defamed, and (3) the communication is unprivileged and is defamatory, that is, tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.  *Hart v. Bennet*, 2003 WI App 231, ¶ 21, 267 Wis. 2d 919, 672 N.W.2d 306; *see also Next Techs., Inc. v. Beyond the Office Door LLC*, No. 19-CV-217-WMC, 2020 WL 3077052, at *8 n.5 (W.D. Wis. June 10, 2020) (defamation may be established by words

lowering one in the estimation of the community or deterring others from dealing with him; also, words suggesting dishonorable, unethical, unlawful, or unprofessional conduct also are capable of a defamatory meaning, although such finding is not required to establish defamation).

1.    **Statement Must be Capable of a Defamatory Meaning.**

Whether a particular communication is capable of a defamatory meaning is a question of law. *Uebelacker v. Paula Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 800 (W.D. Wis. 2006). "'The legal standard for determining whether a statement or implication is capable of conveying a defamatory meaning is whether it is reasonably capable of conveying a defamatory meaning to an ordinary mind and whether the meaning ascribed by the plaintiff is a natural and proper one.'" (*Id.*) (citation omitted).

If the asserted statement is "capable of a conveying a defamatory implication about plaintiff," the motion to dismiss must be denied.  (*Id.*)  Whether viewers or listeners "actually ascribed a defamatory meaning to the error cannot be determined on a motion to dismiss."  (*Id.*) "At this stage of the pleadings, however, it is sufficient that the error is capable of a conveying a defamatory implication about plaintiff."  (*Id.*)

If the alleged defamation is capable of both a defamatory and non-defamatory meaning, the motion to dismiss must be denied.  *See Liberty Mut. Fire Ins. Co. v. O'Keefe*, 205 Wis. 2d 524, 527, 556 N.W.2d 133 (Ct. App. 1996) ("If we conclude that statements are capable of both a defamatory and a non-defamatory meaning, we must reverse and remand for trial, for in that instance, the ultimate determination is for the jury."); *Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 462, 113 N.W.2d 135 (1962) ("If the court determines the communication is capable of an innocent meaning as well as a defamatory meaning, it is then for the jury to determine whether the communication capable of a defamatory meaning was so understood by its

recipient."); *see also Starobin v. Northridge Lakes Dev. Co.*, 94 Wis. 2d 1, 10, 287 N.W.2d 747, 751 (1980) ("If the communication is capable of a defamatory as well as a non-defamatory meaning then a jury question is presented. Only if the communication cannot reasonably be understood as defamatory can the motion to dismiss be granted.").

> 2.  **A False, Manufactured Statement Misstating What the Plaintiff Said is Actionable Defamation.**

PUSA desperately seeks to avoid the actual claim asserted in this case, wrongly assuming that this action sues for the PUSA ads as a whole and that it claims that all of the ads' statements are false and defamatory. That is not the case. This action alleges that the lead-off statement in the PUSA ads (the Manufactured Statement) is false and defamatory of the Trump Campaign because it stitches together audio clips to represent that candidate Trump made a statement he did not make: "The coronavirus, this is their new hoax." The PUSA ad, by stitching together the audio clips and representing it by text as a single sentence, represents that the candidate made that statement. On this motion to dismiss, it must be assumed as true the candidate did not make that statement. As seen by the remarks at the South Carolina campaign rally, the candidate did not say that sentence as represented. *See* pages 11 to 12, 14.

By taking disparate audio clips of the candidate said at different times and putting them together as a single sentence, the Manufactured Statement presents audio of a sentence never uttered by the candidate. This is analogous – though far worse – to an article of an interview with a person, purporting to include the person's own words, verbatim, by placing them in quotes, but intentionally altering the person's words in a manner that changes their meaning. In *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991), the New Yorker published an article and Alfred A. Knopf published a book about Jeffrey Masson, a noted psychoanalyst. The article

and book were published including passages purporting to include verbatim quotes of Masson's own words.  Masson's actual statements were captured in audio recordings of the interviews.

In *Masson*, the U.S. Supreme Court held that a claim for defamation is established by showing that purported quotations of the plaintiff, which were substantively altered in a manner that negatively affects the plaintiff's reputation.  The Supreme Court explained:

> Deliberate or reckless falsification that comprises actual malice turns upon words and punctuation only because words and punctuation express meaning. Meaning is the life of language.  <u>And, for the reasons we have given, quotations may be a devastating instrument for conveying false meaning.</u>  In the case under consideration, readers of In the Freud Archives may have found Malcolm's portrait of petitioner especially damning because so much of it appeared to be a self-portrait, told by petitioner in his own words.  <u>And if the alterations of petitioner's words gave a different meaning to the statements, bearing upon their defamatory character, then the device of quotations might well be critical in finding the words actionable.</u>

*Masson*, 501 U.S. at 517-18 (emphasis added).

The use of statements in quotation marks, which a reasonable reader would conclude purports to be a verbatim statement by the speaker, represent the speaker's own words and not the article author's own interpretation of the speaker's intended meaning.  As the Supreme Court explained:

> <u>Where . . . a writer uses a quotation, and where a reasonable reader would conclude that the quotation purports to be a verbatim repetition of a statement by the speaker, the quotation marks indicate that the author is not involved in an interpretation of the speaker's ambiguous statement, but attempting to convey what the speaker said.</u>  This orthodox use of a quotation is the quintessential "direct account of events that speak for themselves."  *Time, Inc. v. Pape*, supra, 401 U.S., at 285, 91 S. Ct., at 637. More accurately, the quotation allows the subject to speak for himself.

*Masson*, 501 U.S. at 519 (emphasis added).

The Court reasoned that a "fabricated quotation may injure reputation" by attributing "an untrue factual assertion to the speaker," which is harmful to the speaker's reputation.  (*Id.* at

511.)[25]   Alternatively, beyond a factual assertion, a fabricated quotation "may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold."  (*Id.*)  Thus, a falsified statement of opinion by the plaintiff may be defamatory.  In *Masson*, the Court cited as an example a controversial statement such as John Lennon's purported statement about the Beatles:  "We're more popular than Jesus Christ now."  Assuming Lennon did not in fact say that, the Court reasoned that the misattribution would be defamatory of John Lennon because it quotes him as expressing a view by a statement he did not actually make.  (*Id.* at 511-12).

Given a statement falsely quoting a speaker as making a statement he did not say, and/or altering the speaker's words, the Supreme Court explained that it must determine whether the published statement differs "materially in meaning from the" speaker's actual words, so as to create an issue of fact regarding falsity and to establish defamation.  (*Id.* at 521-22).  In *Masson*, the Court considered each altered quote separately, to determine whether the difference was material and the altered quote was injurious to the speaker's reputation.  (*Id.* at 523-24).  The elements of falsity and defamation were established where the actual words and falsely attributed quotations materially differed in a manner such that the altered quote reflected poorly on the plaintiff.  (*Id.*)

B.    <u>**The Manufactured Statement is False and Defamatory Under *Masson*.**</u>

*Masson* is controlling authority in this case.  PUSA does not correctly apply the *Masson* test, which separately considers the false statement attributed to the plaintiff to determine

---

[25] *Kerby v. Hal Roach Studios*, 53 Cal. App. 2d 207, 213–14, 127 P.2d 577, 581 (1942) (Defamation "may as well be accomplished by falsely putting words into the mouth or attaching them to the pen of the person defamed and thus imputing to such person a willingness to use them, where the mere fact of having uttered or used the words would" harm the plaintiff's reputation); *Levesque v. Doocy*, 560 F.3d 82, 89–90 (1st Cir. 2009) (repeating false quotes attributed to plaintiff school superintendent on Fox & Friends news show such as "ham is not a toy" defamed plaintiff because they made him look ridiculous and tended to harm his reputation; there was thus "a genuine issue of material fact exists as to whether the statements were defamatory.").

whether alterations in the speaker's actual words are material and defamatory.  PUSA wrongly argues for application of "substantial truth," asserting that the Court should consider all the separate statements in the PUSA ads to determine whether the ads as a whole are more true than false.  (Doc.26: 16, 19, 20, 23).  That analysis has no application here because only a single statement in the "montage" advertisement is alleged to be defamatory.  Defendant wrongly argues, contrary to *Masson*, that the Manufactured Statement must be considered in the context of the other statements in the PUSA ad.

Under *Masson*, the Court must determine:  (1) the statement at issue; (2) whether the statement is represented to be a quotation or verbatim depiction of the speaker's statement; and (3) whether the quotation or depiction accurately set forth the actual words of the speaker.  If the quotation or depiction does not accurately set forth the speaker's actual words, then the Court must determine (4) whether the inaccurate quotation/depiction is a "material" alteration of the speaker's actual words.  Under this analysis, the Manufactured Statement is false and defamatory because it falsely depicts candidate Trump saying a sentence he did not utter, through audio and visual/textual means.

### 1.   The Manufactured Statement Falsely Depicts Candidate Trump Saying a Statement That He Never Uttered.

The PUSA ads represent, through the audio and visual means, that the Manufactured Statement was uttered by candidate Trump as a complete sentence.  The Manufactured Statement was not said as a sentence in the South Carolina Campaign Speech.  Therefore, falsity has been established for purposes of the motion to dismiss.

### a.   The Manufactured Statement is a Quotation/Verbatim Depiction That is False.

The PUSA ads depict candidate Trump as saying the Manufactured Statement: "The

coronavirus, this is their new hoax."  The Manufactured Statement is false and defamatory because the PUSA ads convey, through audio clips and textual subtitles, that candidate Trump said that statement as a sentence.  Because the PUSA ads falsely attribute a statement to candidate Trump that he never said, the issue of what he "meant" by the Manufactured Statement is not at play.  (Doc.26: 16).  That is a false issue that is not raised by this case.

The PUSA ads depict through audio clips and textual subtitles that candidate Trump said the Manufactured Statement, as a complete sentence: "The coronavirus, this is their new hoax."  That sentence was not uttered by candidate Trump at the South Carolina campaign speech.  It is a false quotation.  Compared to the extensive statements in the campaign speech, the Manufactured Statement is a material alteration of the statements said in the speech.  *See* pages 11 to 14, 17 to 18, below.  Accordingly, falsity has been adequately pleaded and PUSA has failed to establish truth of the statement as a matter of law.

### i.    **The Manufactured Statement.**

The PUSA ads, "Exponential Threat" (and the substantially similar "One Week Later"), consist of audio clips of nine sentences purportedly stated by candidate Trump, which were accompanied by subtitles setting forth the sentence in text on the screen as the audio runs.  Each of the nine sentences was represented to be a sentence stated by candidate Trump, with capitalization and punctuation representing it to be a complete sentence uttered by candidate Trump.  *See* (*id.*)

The PUSA ads represent through audio clips of candidate Trump's own voice and textual subtitles that he stated the following as a complete sentence, as the opening line of the ads:

> "The coronavirus, this is their new hoax."

*See* (*id.*).

As represented in the textual subtitles in the PUSA ads, the Manufactured Statement is depicted as a single sentence, beginning with capital "T" and ending with a period.  *See* pages 12 to 14, above.  It is depicted as a complete sentence, beginning with capital "T" and ending with "new hoax."  The capitalization and punctuation in the PUSA ads confirm, along with the audio clip, that it is depicting candidate Trump as making that statement, as a complete sentence.

On its motion to dismiss, PUSA cannot refute that the PUSA ads contain the Manufactured Statement as the opening sentence and that it is depicted by audio clips and textual subtitles to be an actual sentence said by candidate Trump.  Tellingly, PUSA's argument nearly entirely avoids the actual words of the Manufactured Statement and it runs away from the grammatical presentation of the statement as a sentence uttered by candidate Trump in the PUSA ads.

PUSA's argument nearly entirely omits the capital "T" in "The coronavirus" and the period after "new hoax."  Its argument avoids the actual statement, to evade the fact that it is depicted as a complete sentence: "The coronavirus, this is their new hoax."  PUSA's argument must be rejected because it does not address the actual statement at issue.

PUSA argues that the Manufactured Statement was not represented as a single statement. (Doc.26: 8).  PUSA argues the Manufactured Statement takes the "quotes out of context." (Doc.26: 8).  As shown above at pages 11 to 14, that is plainly wrong.  The Complaint accurately sets forth the Manufactured Statement as depicted in the PUSA ads.  It is represented to be a sentence through the audio clips, which is confirmed by the textual subtitles that run at the same time as the audio.  This is consistent with the rest of the PUSA ads, which likewise represent the other eight statements to be complete sentences spoken by candidate Trump, via audio clips and

textual subtitles with capitalization at the beginning of the sentence and a period at the end.  *See* pages 12 to 14, above.

Throughout its brief, PUSA misstates the Manufactured Statement, omitting the capitalization and punctuation from the actual statement as depicted in the audio clips and textual subtitles.  (Doc.26: 9, 19).  For example, in a block quote setting forth the nine sentences in the Exponential Threat ad, PUSA misstates the Manufactured Statement, omitting the period at the end of the statement.  *See* (Doc.26: 3).  However, it does include the period at the end of each of the other eight sentences.  (*Id.*)  PUSA again omits the period in the Manufactured Statement again several times later in the brief.[26]

PUSA misstates the Complaint's allegations in its explanation of the claim:

> The Complaint is focused entirely on the first two quotes in the advertisement— "the coronavirus," and "this is their new hoax."  Compl. ¶ 48.

(Doc.26: 19).  PUSA omits the capital "T" in "The."

Sometimes PUSA omits both the capital "T" and the period at the end of the Manufactured Statement.  PUSA fails to include the period from the Manufactured Statement, and asserts that a "phrase" in the PUSA ads is the alleged defamation:  " 'the phrase 'The coronavirus, this is their new hoax' "  (*id.* ¶ 30)."  Thus, PUSA again misquotes the PUSA ads, which have a period after "hoax" and it misquotes the Complaint, which includes the period.

ii.   **The Manufactured Statement is False in That Candidate Trump Did Not Say the Sentence in the South Carolina Campaign Speech as Depicted.**

The opening audio and text of the PUSA ads (the Manufactured Statement) falsely represents candidate Trump as saying:  "The coronavirus, this is their new hoax."  These words

---

[26] *See* (Doc.26: 9).  Again, PUSA misquotes the Manufactured Statement, describing the claimed defamation as "the two challenged phrases, with the first, 'the coronavirus,'" and "the second, 'this is their new hoax,'".  (Doc.26: 20 n.7).

were not uttered by the candidate.  The Manufactured Statement falsely represents that the candidate said these words together, in a sentence, when he did not make that statement.

The Manufactured Statement is claimed by defendants to have been said by candidate Trump in the South Carolina Campaign Speech.  However, the Manufactured Statement was not uttered by candidate Trump at the South Carolina campaign speech as represented by the PUSA ads.  In that speech, candidate Trump did not say: "The coronavirus, this is their new hoax."  The Manufactured Statement is false because the sentence was not said as represented.  The candidate did not say the sentence as represented in the speech.  He did not say: "The coronavirus, this is their new hoax."  That statement is found nowhere in the South Carolina Campaign Speech.

PUSA does not claim that the Manufactured Statement was in fact said in the South Carolina Campaign Speech.  PUSA argues that words in the Manufactured Statement can be found at different points in the speech, in that at one point, candidate Trump said, "the coronavirus," and more than a minute and many sentences later, he said, "this is their new hoax." Those words were not said as a sentence in the speech as represented by the PUSA ads.  The Manufactured Statement therefore is a falsely-attributed quotation/depiction of a statement that was not made in the speech.  Accordingly, under *Masson*, the next issue is whether the Manufactured Statement is a material alteration of the actual words of the South Carolina Campaign Speech.  As shown below, it is.

The fact that a falsely-attributed quote was not said establishes falsity.  For example, in *Tharpe v. Saunders*, 285 Va. 476, 737 S.E.2d 890, 893 (2013), the false and defamatory statement was a false quote attributed  to plaintiff, that "Tharpe told me that Tharpe was going to screw the Authority like he did Fort Pickett."  "Whether the plaintiff said those words is

indisputably capable of being proven true or false." (*Id.*) The court reasoned that the alleged defamation was the assertion that statement *was made*, not the falsity of the of the assertion contained within that alleged statement. (*Id.* at 893-894.)[27]

b.    **The "Rational Interpretation" Doctrine Does not Apply to False Attribution Under *Masson*.**

PUSA argues that the falsity of the Manufactured Statement depends upon how persons might interpret the meaning of candidate Trump's statements at the South Carolina Campaign Speech. (Doc.26: 16, 17). PUSA argues that different persons had different take-aways as to the intended meaning of candidate Trump's comments in that speech. (Doc.26: 17). However, the understood meaning of the words of the speech do not determine falsity when the Manufactured Statement was not made in that speech as represented.

The defamatory statement here (the Manufactured Statement) is not a report of a speech or an opinion statement about what the speaker meant by his words in the speech.[28] Rather, the Manufactured Statement is comprised of audio and textual subtitles depicting the speaker as

---

[27] *Issa v. Applegate*, 31 Cal App. 5th 689 (Ct. App. 2019), cited by PUSA (Doc.26: 23), is not applicable here because it involved, not a false quotation from the plaintiff, but an argument that a statement erroneously described a news article critical of the plaintiff. There, the court held that a political advertisement critical of an incumbent congressman, alleging that he "gamed the system" while in Congress and increased his personal wealth and that he obtained earmarks for road projects in his district involved statements that were not "provably false," and moreover, were accurate conclusions from a New York Times article about the congressman. Further, the court held that these assertions were well founded in the news article referenced in the advertisement.

[28] In contrast, *see Storms v. Action Wisconsin Inc.*, 2008 WI 56, ¶¶ 9-15, 20, 56, 59, 61, 309 Wis. 2d 704, 750 N.W.2d 739 (applying rational interpretation analysis to press release reporting upon speech given by plaintiff concerning various matters, characterizing and summarizing speaker's remarks; holding that defendant's interpretation of the remarks at the speech presented a rational interpretation of the speaker's remarks); *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 538–39, 563 N.W.2d 472 (1997), cited at (Doc.26: 26). (holding that news article reporting upon conclusions stated in letters could not establish actual malice on summary judgment; the letters were "ambiguous" and described describe certain improprieties that must be avoided, urged plaintiff to adhere to certain conduct and explained statutory prohibitions; court held that "The newspaper's characterization of the letters as warnings to stay out of title insurance matters is one of several rational interpretations of the letters.")

making a statement he did not make.  Falsity therefore turns on a simple question:  did candidate Trump in fact utter the depicted sentence in the South Carolina Campaign Speech?

The "reasonable interpretation" of what candidate Trump's various and extensive comments in the campaign speech mean or were intended to mean does not answer the falsity question here.  The reasonable interpretation doctrine only applies if the defendant provided a summary or analysis of plaintiff's statements, providing the defendant's own interpretation of those statements, and is not purporting to provide a verbatim quotation of the plaintiff's words.  The rational interpretation analysis does not apply where the issue is falsely presenting the speaker's own words, verbatim or in quotation marks.  Put another way, the Manufactured Statement in the PUSA ads is not providing an "interpretation" of candidate Trump's statements – it is purporting to provide, verbatim, a sentence he actually uttered.

As discussed below, as *Masson* held, the rational interpretation doctrine does not apply to false attribution cases.

### c. "Substantial Truth" of the Entire PUSA Ads is Not at Issue.

PUSA suggests that the Manufactured Statement is not false because there could be different interpretations of what candidate Trump "meant" when he made "the statements reproduced in the advertisement."  (Doc.26: 16).  PUSA argues that the "statements" in the PUSA ads, and the "gist of the President's message conveyed by those statements, are at the very least substantially true."  (Doc.26: 19, 20).  PUSA argues that the PUSA ads as a whole "presented accurate audio clips of the President speaking, and the advertisement as a whole accurately communicated the President's minimization of the pandemic threat."  (Doc.26: 23).  PUSA misunderstands or misstates the defamation claim here.

First, only the Manufactured Statement is claimed to be false and defamatory; this action does not allege that the other eight sentences in the PUSA ads are false and defamatory.  The Trump Campaign has only sued upon the Manufactured Statement, which is its right.  Moreover, excluding the final tagline, all the sentences in the PUSA ads are audio and textual depictions of candidate Trump's own words, stated as individual sentences.  Because these are depicted as verbatim statements in candidate Trump's own voice (akin to quotations), "substantial truth" does not apply but rather the *Masson* test of false attribution applies.

Moreover, the other eight sentences in the PUSA ads are not purported to come from the same South Carolina speech and the Trump Campaign does not allege that those statements derive from that speech.  Rather, defendants concede that those other eight sentences came from different sources.  (Doc.9: 9 n.2); (Doc.26: 20 n.7).

2.      **Because the Manufactured Statement is Depicted as a Verbatim Statement in Candidate Trump's Own Words, its Falsity is Governed by the *Masson* Test.**

As noted above, a defamation action may be premised upon a single statement communicated concerning plaintiff.  PUSA fails to properly apply the *Masson* test and compare the Manufactured Statement to determine whether it is a material alteration of the actual statements made in the South Carolina Campaign Speech, considering the full statements on the subject matter.  Further, under *Masson*, each falsely-attributed quotation must be examined separately to see if it is false and defamatory because the falsely-attributed quotation "materially" alters the speaker's actual words in the source material (in *Masson*, audio tape of the speaker's statements; here, the audio and video of candidate Trump's statements in the South Carolina Campaign Speech).

a.      **The Manufactured Statement is a Material Alteration of Candidate Trump's Statements in the South Carolina Campaign Speech.**

Applying the Supreme Court's *Masson* test, the Manufactured Statement in the PUSA ads must be examined to compare the actual statements to the Manufactured Statement.  The Manufactured Statement is the opening sentence of the ad and is comprised of audio clips of candidate Trump and textual subtitles to falsely represent that he said: "The coronavirus, this is their new hoax."

As in *Masson*, the words of the Manufactured Statement ("The coronavirus, this is their new hoax.") must be compared to the words actually said by candidate Trump in the South Carolina Campaign Speech.  Compared to the actual words, a jury could find the Manufactured Statement to be a material alteration that is defamatory.  The Complaint therefore states a claim for defamation on this basis.  Whether the alteration was in fact material in a defamatory manner

62

is an issue of fact for the fact finder to determine. This is disputed by PUSA, as it asserts that the Manufactured Statement did not materially alter the words actually spoken by candidate Trump in the campaign speech. In short, PUSA cannot prove lack of material alteration on its dismissal motion. The Trump Campaign has alleged material alteration as a matter of law.

For example, in *Corp. Training Unlimited, Inc. v. Nat'l Broad. Co.*, 981 F. Supp. 112, 120 (E.D.N.Y. 1997), cited by PUSA (Doc.26: 25), the court granted dismissal on summary judgment in a false attribution defamation case after earlier denying dismissal. Earlier in the case, the court denied dismissal because plaintiff denied making the falsely-attributed quotation (stating that plaintiff was kicked out of military for "minor financial improprieties"). *See* (*id.*). The court originally denied dismissal because it could not find as a matter of law that the falsely-attributed quote was not materially different than the plaintiff's fuller explanation of the subject. *See Corporate Training Unlimited, Inc. v. National Broadcasting Co., Inc.*, 868 F. Supp. 501, 511-512 (E.D.N.Y. 1994) ("Although the issue is a close one, having reviewed the allegations, the Court cannot find, as a matter of law, that the statement in the Broadcast about Feeney being forced to leave the military "could have produced no worse an effect on the mind of [the viewer] than the truth pertinent to the allegation.'").

i.  **The Manufactured Statement is a Material Alteration of Candidate Trump's Statements.**

The statements made by candidate Trump at the South Carolina campaign rally were extensive, lengthy, and varied. Candidate Trump did not say "The coronavirus, this is their new hoax." Using that seven-word sentence as a quotation to substitute for all the various remarks in the South Carolina Campaign Speech, of course, could reasonably be found by jurors to be a "material alteration." The terse seven-word sentence comprising the Manufactured Statement necessarily is a material alteration of candidate Trump's extensive comments in the campaign

speech.  The Manufactured Statements does not equate to the varied statements concerning the coronavirus, the response to the pandemic, Democrats' politicization of certain matters to attack the Trump administration, the "hoax" matters discussed in the speech, including the Russia matter and the impeachment proceedings.  Comparing those varied and extensive statements to the single sentence, "The coronavirus, this is their new hoax.", the false Manufactured Statement is a material alteration of the words actually said, as properly and adequately alleged in the Complaint.

The material alteration analysis turns upon a plain language, textual comparison of the Manufactured Statement to the words actually spoken at the campaign rally.  They are different, in a material way.  In the South Carolina Campaign Speech, candidate Trump did not say the words:  "The coronavirus is a hoax" or "I believe that the coronavirus is a hoax" or even that "I believe the stated severity of the threat of the coronavirus is a hoax."  Candidate Trump did not say any of those words.  Therefore, the Manufactured Statement is a material alteration from the words actually spoken.

To make the material alteration determination, the purported quotation is compared to the speaker's own words.  If there is a material alteration, falsity and actual malice are established under *Masson*.  PUSA was not given free rein to falsify candidate Trump's words and utilize audio clips and textual subtitles to represent that he uttered a sentence he never made.  Further, PUSA does not avoid falsity under *Masson* to argue that the "import" of the statements in the South Carolina Campaign Speech have the same meaning.  (Doc.26: 25).  That is not the analysis under *Masson*.  *See* below.

As shown in *Masson*, each misattributed quotation is examined on its own compared to the source material to determine if it is a false quotation, and whether the false quotation

materially altered the actual words.  PUSA argues that all the sentences in the PUSA ads must be considered to determine if the Manufactured Statement is a material alteration.  That is not true.  The Manufactured Statement purports to be a statement from candidate Trump's South Carolina Campaign Speech.  The other sentences/statements included in the PUSA ads were derived from different sources.  (Doc.26: 20 n.7); (Doc.9: 10 & n.2).  They do not change or mitigate the falsity of the Manufactured Statement, which rises or falls on its own.

The Manufactured Statement is materially different from the words actually stated by candidate Trump at the South Carolina campaign rally.  The actual words of the candidate in the South Carolina Campaign Speech are materially different from the Manufactured Statement.  In the speech, candidate Trump says that the Democrats' attack on the administration's response to the coronavirus is "politicizing" the coronavirus.  That tactic is the Democrats' new hoax.  Utilizing defendant's "transcript"[29] of the South Carolina campaign rally speech of February 28, 2020 (Doc.10, Ex. A); (Doc.10-1), candidate Trump says "Now the democrats are politicizing the Coronavirus.  You know that, right."  (Doc.10, Ex. A); (Doc.10-1: 6).  Candidate Trump says:  "Coronavirus, they're politicizing it.  We did one of the great jobs.  You say, 'How's President Trump doing?' They go, 'Oh, not good, not good."  (Doc.10-1: 7).  Candidate Trump goes on to discuss the ways in which opponents attempted to attack the administration, including "Russia," and the "impeachment hoax."  (Doc.10-1: 7).  He goes on to say, "They've been doing it since you got in." and some more words.  (Doc.10-1: 6).  He then states: "And this is their new hoax."  (Doc.10-1: 8).

---

[29] Plaintiff does not stipulate to the admissibility or authenticity of the transcript or admit that it is correct.  Plaintiff will accept it for purposes of responding to defendant's motion to dismiss, preserving all rights to challenge its authenticity or admissibility.

The audio clips and textual subtitles comprising the Manufactured Statement materially alter candidate Trump's words stated in the South Carolina Campaign Speech.

The South Carolina Campaign Speech was approximately 1 hour and 25 minutes in total, and during this speech candidate Trump's remarks covered a number of issues, including the coronavirus pandemic, the vote counting issues at the Iowa Caucus, immigration and healthcare policy, and tactics used by his political opponents to affect his reelection, including the "impeachment hoax." *See* pages 11 to 12 and 14, above.  Six minutes and 5 seconds into the speech, candidate Trump says: "Now the Democrats are politicizing the coronavirus …"  (*Id.*)  After saying other words, approximately 45 seconds later, candidate Trump then refers to the "impeachment hoax" and about 15 seconds later he refers to his political opponents' characterization of his response to the coronavirus, saying "this is their new hoax."  (*Id.*)

ii.    <strong><u>The Falsely Attributed Manufactured Statement is<br>Defamatory of the Trump Campaign.</u></strong>

The PUSA ads falsely represent that candidate Trump stated in the South Carolina Campaign Speech that: "The coronavirus, this is their new hoax."  It is a Manufactured Statement by candidate Trump that he never actually said.  The actionable falsity is the representation that this was candidate Trump's statement.

The opening audio and textual sentence of the PUSA ads (the Manufactured Statement) was not said by candidate Trump and the change was a material alteration under the *Masson* test.  And a jury could find the altered statement to be defamatory of the Trump Campaign because the Manufactured Statement has a tendency to deter other persons from dealing with the campaign, affecting votes or monetary support by attempting to harm its reputation.  In short, the Manufactured Statement provided a basis to attack the merits of the Trump Campaign and

directly harms its trade or business.  Indeed, the false representation that candidate Trump made that statement was used by his political opponents to attack him in the presidential campaign.

The statement is defamatory because the altered Manufactured Statement reflects poorly on the candidate and the Trump campaign.  That element is properly pleaded in the Complaint.  *See* pages 15 to 16 and 18, above.  The Complaint alleges that the Manufactured Statement has a tendency to deter third parties from dealing with the Trump Campaign, for example, by not voting for the candidate.  *See* (*id.*)  It has that tendency because the Manufactured Statement is defamatory on its face.[30]  That is, the false representation that candidate Trump made the Manufactured Statement is defamatory.

The PUSA ads' Manufactured Statement comprised of stitched-together audio clips and textual subtitles is defamatory.  A reasonable listener or viewer hearing or seeing the false, Manufactured Statement could hear and/or see that that candidate Trump called the coronavirus a "hoax."  Based upon hearing candidate Trump say the Manufactured Statement and seeing the confirming textual subtitles, the listener or viewer could reasonably conclude that candidate Trump believed the coronavirus was not real or was exaggerated and/or that he did not take the coronavirus danger seriously.  The only nouns in the Manufactured Statement are "The coronavirus" and "new hoax," communicating that candidate Trump was referring to the coronavirus as "their new hoax," suggesting it was a crisis made up by others ("their").  The material alteration of candidate Trump's actual words in the campaign speech therefore could be found to be defamatory.  Like the false quotations in *Masson*, a jury could reasonably find the

---

[30] In that respect, this case is distinguishable from *Tatur v. Solsrud*, 174 Wis. 2d 735, 498 N.W.2d 232 (1993), a case cited by WJFW-NBC (Doc.9: 20).  In that case, letters falsely represented how political candidates voted on particular issues, allegedly causing voters not to vote for them.  The Court held that a defamation claim was not stated because the letters on their face did not contain statements "capable of a defamatory meaning."  (*Id.* at 740.)  To state a claim, the statement must be defamatory on its face, causing the plaintiff to lose votes.  Here, the false, Manufactured Statement is defamatory on its face.

altered Manufactured Statement to be defamatory of the Trump Campaign.  Indeed, the false, Manufactured Statement was utilized to reflect negatively on candidate Trump.

For these reasons, the false, Manufactured Statement could reasonably be interpreted to be defamatory.  Accordingly, the Complaint states a claim for defamation as a matter of law.

### b.    **PUSA Does Not Refute the Allegations of Material Alteration.**

Contrary to PUSA's argument, the Trump Campaign does not "concede[]" that candidate Trump made the Manufactured Statement.  (Doc.26: 19).  The Manufactured Statement does not consist of "words" appearing "as they were stated by the President."  (Doc.26: 23 n.9).

PUSA argues that the Manufactured Statement in the PUSA ads "fairly conveys the 'gist'" of what candidate Trump said in his South Carolina Campaign Speech.  (Doc.26: 20).  PUSA quotes 21 sentences of the actual statements from the South Carolina Campaign Speech and argues that the Manufactured Statement ("The coronavirus, this is their new hoax.") conveys the "gist" of those 21 sentences.  (*Id.*)  PUSA argues from those 21 sentences, which address different subjects including the Democrats' politicization of the coronavirus, evaluation of the response to the coronavirus, the Iowa caucus vote counting, the Russia matter and impeachment proceedings and its alleged basis, and that Democrats will "try anything" to attack candidate Trump.  (*Id.*)

Of course the Manufactured Statement is a material alteration of the numerous statements made in the speech, examining for example the 21 sentences cited by PUSA.  The 21 sentences do not say:  "The coronavirus, this is their new hoax."  Simply providing this statement is not an accurate stand-in for the 21 sentences cited by USA.  The alteration of candidate Trump's actual words eliminates a lengthy exposition showing what is meant by "their new hoax" and the coronavirus's role in the lengthy explanation.  Altering the campaign remarks from 21 sentences

68

to one sentence is certainly a material alteration of the lengthy comments. Indeed, the fact that different persons could understand and interpret differently the lengthy remarks in the South Carolina Campaign Speech demonstrates that distilling those remarks down to the single sentence (the Manufactured Statement) is, necessarily, a "material" alteration of candidate Trump's actual statements.

Contrary to PUSA's argument, substantial truth and the "gist" of the campaign speech remarks is not the determination of falsity where, as here, a false quotation is presented. (Doc.26: 20-21, 22). It is established that the Manufactured Statement was not in fact uttered by candidate Trump. Falsity is established because the Manufactured Statement is a material alteration of his actual words that may be understood to be defamatory. The Manufactured Statement is a fabricated statement of candidate Trump attributing an untrue assertion to him, which is a material alteration of the words he actually said in the South Carolina Campaign Speech.

PUSA's analysis under *Masson* is incomplete because it does not compare all the pertinent statements of the South Carolina Campaign Speech (or even the 21 sentences cited) to the one-sentence Manufactured Statement and determine specifically whether the Manufactured Statement is a material alteration compared to the original source statements. PUSA skips these critical steps, assuming that the lengthy and extensive statements can be distilled down to one conceptual statement, interpreting the meaning of the full words, and then only the distilled is compared to the falsely-attributed quotation to see whether it materially alters the conceptual statement. (Doc.26: 22). That is not the proper analysis under *Masson*.

The South Carolina Campaign Speech did not refer to the coronavirus as a "hoax" or "their new hoax." To say that candidate Trump said that is plainly false. Further, PUSA's

interpretation and point of view on what "their new hoax is" is merely one subjective interpretation.  (Doc.26: 20-21).  It certainly does not refute as a matter of law the allegation that the Manufactured Statement is a material alteration of the extensive campaign statements.  And the nature and substance of candidate Trump's other statements about the coronavirus in the South Carolina speech do not establish the truth of the Manufactured Statement as a matter of law.  (Doc.26: 22).

  C. **The PUSA Ads Depict Candidate Trump Saying the Manufactured Statement as a Complete Sentence and PUSA's Argument About Audio Quality is a Fact Question That Cannot be Determined on a Motion to Dismiss.**

   PUSA argues that the Trump Campaign's allegations of falsity are "verifiably untrue," arguing that the audio depicting the Manufactured Statement is not false and the subtitled sentence depicted by the Manufactured Statement is not false.   (Doc.26: 19).  PUSA argues that all the statements in the PUSA ads "merely quote" candidate Trump's "own words, playing the audio of his own voice . . . . ."  (*Id.*).

   PUSA argues that the PUSA ads do "not assert that the President said the precise sentence, 'The coronavirus, this is their new hoax.'  Rather, the two statements are put on separate slides, and feature two obviously distinct audio clips that sound quite different." (Doc.26: 19-20).  PUSA argues that "no reasonable person viewing the advertisement would understand the words, 'the coronavirus' and 'this is their new hoax,' to have been spoken contiguously."  (Doc.26: 20).  PUSA asserts that the audio clip of "The coronavirus," and the audio clip of "this is their new hoax." are "distinct" audio clips, and they are presented on "separate slides."  (Doc.26: 20 n.7).  PUSA argues:  "The distinct audio, and the presentation of the phrases on separate slides, makes unmistakably clear that the advertisement is not quoting a single spoken sentence."  (*Id.*).

PUSA argues that the PUSA ads cannot reasonably be believed to depict candidate Trump as saying the Manufactured Statement as a complete sentence.  It argues that due to the purported differing sound quality of the audio clips comprising the Manufactured Statement, no viewer could reasonably hear the PUSA ads to depict candidate Trump saying the Manufactured Statement as a complete sentence.

This argument fails to establish truth as a matter of law on defendants' motion to dismiss.  It fails to refute the factual allegations of falsity.  Further, this argument turns upon factual questions that cannot be determined on a motion to dismiss.

The Complaint adequately alleges that the Manufactured Statement is false.  PUSA certainly has not established truth as a matter of law based on its audio quality theory.  This is the case for several reasons.

First, given the fast-moving nature of the PUSA ads, with the three-second-long Manufactured Statement that is the opening sentence in the 30-second ad, the statement is capable of being heard as a complete sentence uttered by candidate Trump.  At this stage, it merely must be "capable" of a defamatory meaning – here, that a viewer/listener might understand the PUSA ads as depicting candidate Trump saying the Manufactured Statement as a complete sentence.  Whether it was in fact so understood is a question of fact that cannot be determined on a motion to dismiss.

Second, PUSA's argument about the quality of the audio clips comprising the Manufactured Statement disregards the fact that, as the audio clips in the PUSA ads are playing, *textual* subtitles run on the screen corresponding to each audio statement.  Those subtitles display a complete sentence and they appear as the corresponding audio statement runs.  As depicted on the screen, the Manufactured Statement is shown to be a complete sentence, beginning with a

capital "T" in the "The," and ending with a period, "their new hoax." Thus, regardless of the asserted quality of the audio clips comprising the statement, visually, the Manufactured Statement is represented to be a complete sentence said by candidate Trump.

Thus, the visual depiction of the Manufactured Statement could lead viewers and listeners of the PUSA ads to *see and hear* the Manufactured Statement as a verbatim statement by candidate Trump, in his own words. PUSA's argument about the sound quality of the audio clips comprising the Manufactured Statement is refuted by the Manufactured Statement shown in the subtitles. This is further confirmed by the fact that the other eight sentences in the PUSA ads are also audio clips of candidate Trump's own words, also with corresponding subtitles presenting each complete sentence in the audio, with punctuation and capitalization. (Doc.38: 29, 39-40); (Doc.9: 9-10 n.2); (Doc.10-7) (Bradshaw Decl., Ex. G, video file).

D.   **Defendant's Criticism and Opinion Arguments Are Inapplicable.**

PUSA does not argue that the Manufactured Statement in the PUSA ads itself is a statement of opinion. It cannot, because, as it must concede, the Manufactured Statement represents that candidate Trump made a statement that he did not in fact utter, through false audio and textual subtitles. Whether candidate Trump in fact uttered the Manufactured Statement is a question of fact that is verifiably false. The PUSA ads do not represent that the Manufactured Statement is opinion – it is depicted as candidate Trump's own words, in his own voice. Whether candidate Trump said the sentence communicated by the Manufactured Statement is a verifiable fact question. It is not a statement of opinion. The defamation in this case is not opinion because it is audio purporting to set forth the candidate's own words.

Excluding the closing tag line of the ad, the PUSA ads purport to communicate verbatim statements by the President. Thus, PUSA is simply wrong to suggest that the falsity of the

Manufactured Statement can be eliminated because the other eight statements in the PUSA ads may be accurate quotations.  Missing the mark, PUSA argues that the Manufactured Statement is not actionable because the PUSA ads as a whole are intended to share PUSA's viewpoint concerning the President's handling of the coronavirus.  (Doc.26: 7, 8).  That confuses the purpose of the PUSA ads with the content of the factual statements in the ads.

Further, the falsity of the Manufactured Statement is not eliminated by the other, separate statements contained in the PUSA ads.  Indeed, as defendant WJFW-NBC has described the PUSA ads, the ads are an "audio montage" of statements by President Trump.  (Doc.9: 9).  A "montage" is a juxtaposition of "heterogeneous elements," a composite picture made by combining several separate pictures, or a mixture of items.  *See*  https://www.merriam-webster.com/dictionary/montage   There are nine separate sentences in the PUSA ad, consisting of audio clips of each sentence made by candidate Trump.  Those statements purportedly come from seven different speeches or statements, made at different times.  (Doc.26: 20 n.7); (Doc.9: 10 & n.2).  Each of these statements purports to be a factual statement, that is, audio of nine different sentences in candidate Trump's own voice.  It is not claimed that the other eight sentences have alterations of the audio clips or that they inaccurately communicate the candidate's words.

The false and defamatory Manufactured Statement at issue in this case is not opinion.  It is not a statement providing a characterization and conclusion by another person (PUSA) expressing its view of what the administration or candidate did or did not do.  Rather, it is a depiction of the candidate's own statement.

1.      **The Manufactured Statement is Not a Statement of Opinion.**

A defamation action may involve another person's statement about the plaintiff, characterizing the plaintiff's position on something, or stating something plaintiff did.  The Manufactured Statement does not take that form.  In this case, the defamation is the representation that candidate Trump made the Manufactured Statement, comprised of stitched-together audio clips and textual subtitles of his words.

PUSA argues that the alleged false and defamatory statement in the PUSA ads might be assumed to be "statements of opinion."  (Doc.26: 28).  As shown, the Manufactured Statement depicts candidate Trump making a statement he did not make, through audio clips and textual subtitles.  The Manufactured Statement is not, on its face, a statement of "opinion."

Some of PUSA's arguments suggest that this case turns upon an opinion statement by a third party, or a statement summarizing or reporting upon candidate Trump's campaign remarks.  That is untrue.  The PUSA ads do not say: "at a campaign rally in South Carolina, President Trump called the coronavirus a hoax."  That would be a characterization of candidate Trump's remarks, expressed as an interpretation of his words in the speech.  Nor do the PUSA ads say: "I believe President Trump called the coronavirus a hoax."  Again, that would be one person's interpretation or opinion based upon hearing the speech.  Those are the types of commentary referenced by PUSA, that some third parties expressed their view of the import or meaning of candidate Trump's remarks in the South Carolina Campaign Speech.  (Doc.26: 17).  That those pundits or commentators have different viewpoints about candidate Trump's statements at the South Carolina campaign rally has no bearing upon the falsity of the Manufactured Statement in this case.

The Manufactured Statement is represented to be candidate Trump's actual words, through audio clips, confirmed by subtitles – it is not represented to be an opinion statement about his speech or a third-party's summary of the speech. The fact that different persons had different interpretations of candidate Trump's South Carolina Campaign Speech does not have anything to do with the truth or falsity of the Manufactured Statement as represented to be candidate Trump's actual statement depicted in his own words through audio clips and textual subtitles.

In this case, the defamation is not a summary or characterization of the candidate's position or words, which were misinterpreted or inaccurately summarized. Rather, the PUSA ads depicted the Manufactured Statement by candidate Trump that he never actually said. The actionable falsity is that this was candidate Trump's statement.

Accordingly, defendant's criticism and substantial truth arguments have no relevance to the allegations and the defamation claim in this case. Moreover, as recognized by *Masson*'s Beatles hypothetical, falsely quoting the plaintiff's own words that contain subjective opinion, which opinion statement the plaintiff did not say, may constitute actionable defamation.

2.      **PUSA's Criticism of President Trump's Handling of the Coronavirus is Not At Issue in this Case and it is Not Asserted to be Defamatory.**

PUSA confuses the intended *purpose* of the PUSA ads as criticism with the contents of the ads themselves, including the Manufactured Statement in the ads. PUSA asserts that the PUSA ads "criticize[] President Trump's handling of the coronavirus pandemic by playing audio" purportedly of candidate Trump's own words. (Doc.26: 7). PUSA argues that the PUSA ads are "political speech criticizing" candidate Trump and thus are "core political speech . . . subject to the First Amendment's most rigorous protections." (Doc.26: 8).

The intended purpose of the PUSA ads does not determine whether the Manufactured Statement is false and defamatory.  Further, the Trump Campaign is not claiming the PUSA ads to be false and defamatory as a whole.  Nor is it complaining or suing upon the critical message PUSA intends to convey through the PUSA ads.

According to PUSA, the PUSA ads address candidate Trump's "handling of the pandemic."  (Doc.26: 9).  The ads' purpose is to criticize the response to the coronavirus.  PUSA argues that candidate Trump "downplay[ed]" the virus's severity and it downplayed the coronavirus by calling it a "Democratic and media 'hoax.'"  (Doc.26: 9).

PUSA asserts that President Trump "gravely misjudged what the coronavirus had in store for the United States."  (Doc.26: 8).  The issue of the adequacy of the Trump administration's response to the Coronavirus, although certainly an important public policy question upon which persons may disagree and debate, is not presented by this case.  These questions have no bearing on the elements of the defamation claim in this case.  Certainly, the timing and substance of the administration's response to the COVID-19 pandemic and the sufficiency of those efforts is a subject upon which people disagree.

Persons with a favorable opinion of the administration's response would point to the fact that on January 31, 2020, the administration prohibited travel of non-U.S. citizens from China.[31] They also may point to the fact that the administration announced a quarantine of U.S. citizens returning to the U.S. from certain regions of China on that same day.[32]  They also might cite to the fact that the Coronavirus Task Force was convened on January 29, 2020 and on February 29,

---

[31] The White House, "Proclamation on Suspension of Entry as Immigrants and Nonimmigrants of Persons who Pose a Rise of Transmitting 2019 Novel Coronavirus" (Feb. 6 2020) available at https://www.whitehouse.gov/presidential-actions/proclamation-suspension-entry-immigrants-nonimmigrants-persons-pose-risk-transmitting-2019-novel-coronavirus/.

[32] E. Werner, Y. Abutaleb, L. Bernstein & L. Sun, The Washington Post, "U.S. to deny entry to foreign nationals who recently visited China" (Jan. 31, 2020) available at  https://www.washingtonpost.com/us-policy/2020/01/31/trump-weighs-tighter-china-travel-restrictions-response-coronavirus/.

2020 Vice President Pence was appointed chair.[33]  The Task Force devoted many hours to coordinating the national response to the pandemic and assisting the States and others in the U.S. and worldwide in responding to the pandemic.[34]  The Task Force, along with the President and Vice President, held numerous several-hour press conferences twice a day between mid-March 2020 and the end of April to answer press questions and inform the public of the work of the Task Force and to keep citizens informed about the coronavirus.[35]

Certainly, others have a different view of the administration's response to the coronavirus.  However, this public policy question, albeit an interesting and important subject of debate, is not posed by this case.  Here, the sole issue is whether candidate Trump actually uttered the Manufactured Statement, and whether the Manufactured Statement materially altered the statements of the candidate made at the South Carolina campaign rally.

## IV.    **The Complaint Properly Pleads Actual Malice.**

Because plaintiff is the campaign committee for a candidate for re-election to the office of President of the United States, it is a public figure or public official under the First Amendment for purposes of a defamation claim.  PUSA, as a publisher of a false and defamatory statement concerning a public official or public figure, is liable for defamation if it knew the statement was false or it acted with reckless disregard of the truth or falsity of the statement.

---

[33] U.S. Department of State, "Coronavirus Disease 2019 (COVID-2019)" (Mar. 13, 2020) available at https://www.state.gov/coronavirus/ ; J. Santucci, "What we know about the White House coronavirus task force now that Mike Pence is in charge" (Feb. 27, 2020) available at https://www.usatoday.com/story/news/politics/2020/02/27/coronavirus-what-we-know-mike-pence-and-task-force/4891905002/.

[34] A. Azar, Secretary of the Department of Health and Human Services, "HHS: Trump Administration Putting Boots on the Ground to Help States Combat COVID-19" (Apr. 27, 2020) available at https://www.hhs.gov/about/leadership/secretary/op-eds/hhs-trump-administration-putting-boots-on-the-ground-to-help-states-combat-covid-19.html.

[35] P. Bump, "13 hours of Trump: The president fills briefings with attacks and boasts, but little empathy" (Apr. 26, 2020) available at https://www.washingtonpost.com/politics/13-hours-of-trump-the-president-fills-briefings-with-attacks-and-boasts-but-little-empathy/2020/04/25/7eec5ab0-8590-11ea-a3eb-e9fc93160703_story.html.

A.    <u>**Actual Malice is Established by Knowing Falsity, Here, the Manufactured Statement Not Actually Made by Plaintiff.**</u>

PUSA fails to set forth a complete and accurate statement of the "actual malice" standard, a standard that is well established in case law.  (Doc.26: 24).[36]  Actual malice requires proof "that the allegedly defamatory statement be made with 'knowledge that it was false or with reckless disregard of whether it was false or not.'  *Sullivan*, 376 U.S. at 280, 84 S. Ct. 710."  *Storms v. Action Wis. Inc.*, 2008 WI 56, ¶ 38, 309 Wis. 2d 704, 750 N.W.2d 522.  Reckless disregard is a "subjective standard."  *Storms*, 2008 WI 56, ¶ 39.  "It requires showing that the false statement was made 'with a high degree of awareness of ... probable falsity,"  *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 13 L.Ed.2d 125 (1964), or that the defendant "in fact entertained serious doubts as to the truth of his publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

If the publisher knew the statement was false, the constitutional protection of actual malice does not apply.  Restatement (Second) of Torts § 580A, Comment d.  That protection also does not apply if the publisher acted in reckless disregard of the truth or falsity of the statement.  (*Id.*)

Actual malice is determined based upon what defendant knew at the time it made the decision to publish the alleged defamatory matter.  *Pippen v. NBCUniversal Media, LLC*, 734

---

[36] That standard is: "Proof of actual malice requires a showing that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard for its truth."  *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 536, 563 N.W.2d 472 (1997).

F.3d 610, 614 (7th Cir. 2013).  It is not actual malice to fail to retract once it is published or broadcast.  (*Id.*)  That general rule does not apply, however, when the defendant faces the decision to publish or broadcast the false matter again after learning of the falsity.  Actual malice must be determined anew.

"Republication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard."  Restatement (Second) of Torts § 580A, Comment d.  *See Young v. Gannett Satellite Info. Network, Inc.*, 837 F. Supp. 2d 758, 766 (S.D. Ohio 2011) ("As this Court has recently explained, a showing of actual malice may be premised on evidence 'demonstrating that the alleged defamer purposefully avoided or deliberately ignored facts establishing the falsity of its statements.' "); *Bentley v. Bunton*, 94 S.W.3d 561, 596 (Tex. 2002) ("An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice.  A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is.  Imagining that something may be true is not the same as belief.").

Evidence of known fabrication proves actual malice.  *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 143–44 (D.D.C. 2017) ("The kinds of evidence that would 'likely support a finding of actual malice' include evidence of fabrication.").  Accordingly, disregard or avoidance of evidence of fabrication and publication of the fabricated statement would establish actual malice.  *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000) (A publisher's presentation of facts is a "calculated falsehood" if "the publisher knows or strongly suspects that it is misleading."); *Stevens v. Sun Pub. Co.*, 240 S.E.2d 812, 815 (S.C. 1978) ("[R]ecklessness

may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.")

In a defamation action relating to advertising statements concerning a candidate for public office, a complaint can plead "actual malice."  Specifically:  "Among other allegations, plaintiffs stated that they repeatedly informed defendants as to the alleged falsity of their statements, but that defendants continued to publish the offending advertisement."  *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893, 901 (N.C. Ct. App. 2002), *writ denied, review denied, appeal dismissed*, 580 S.E.2d 361 (N.C. 2003).

Knowing and intentional fabrication of an audio statement published in an advertisement is by definition actual malice because it is publication with knowledge of or reckless disregard for the truth or falsity of the statement.  *See Masson*, 501 U.S. at 517-18.  In *Masson*, an author misquoted the plaintiff, changing the plaintiff's words in an interview, and falsely representing the plaintiff's words in quotations.  In other contexts, the Court reasoned that there is some room for "rational interpretation" of the plaintiff's meaning when the author is relying upon "ambiguous sources" to write about plaintiff.  (*Id.* at 519.)

However, where the author is purporting to quote the plaintiff's own words, the First Amendment does not afford the author "interpretative license":

> The protection for rational interpretation serves First Amendment principles by allowing an author the interpretive license that is necessary when relying upon ambiguous sources. <u>Where, however, a writer uses a quotation, and where a reasonable reader would conclude that the quotation purports to be a verbatim repetition of a statement by the speaker, the quotation marks indicate that the author is not involved in an interpretation of the speaker's ambiguous statement, but attempting to convey what the speaker said.</u> This orthodox use of a quotation is the quintessential "direct account of events that speak for themselves." *Time, Inc. v. Pape*, supra, 401 U.S., at 285, 91 S. Ct., at 637.  More accurately, the quotation allows the subject to speak for himself.

> The significance of the quotations at issue, absent any qualification, is to inform us that we are reading the statement of petitioner, not Malcolm's rational interpretation of what petitioner has said or thought. Were we to assess quotations under a rational interpretation standard, we would give journalists the freedom to place statements in their subjects' mouths without fear of liability. By eliminating any method of distinguishing between the statements of the subject and the interpretation of the author, we would diminish to a great degree the trustworthiness of the printed word and eliminate the real meaning of quotations. Not only public figures but the press doubtless would suffer under such a rule. Newsworthy figures might become more wary of journalists, knowing that any comment could be transmuted and attributed to the subject, so long as some bounds of rational interpretation were not exceeded. We would ill serve the values of the First Amendment if we were to grant near absolute, constitutional protection for such a practice. We doubt the suggestion that as a general rule readers will assume that direct quotations are but a rational interpretation of the speaker's words, and we decline to adopt any such presumption in determining the permissible interpretations of the quotations in question here.

*Masson*, 501 U.S. at 519 (emphasis added). The Court held that "deliberate alteration" of a plaintiff's words in a quotation included in an article will equate with knowledge of falsity for purposes of the actual malice standard if "the alteration results in a material change in the meaning conveyed by the statement." (*Id.* at 517). "The use of quotations to attribute words not in fact spoken bears in a most important way on that inquiry, but it is not dispositive in every case." (*Id.*)

*Masson* makes clear that the First Amendment does not permit a publisher to manipulate the words of the plaintiff as the audio clips of candidate Trump's words were manipulated to create the false Manufactured Statement in the PUSA ads. Actual malice is established where the words are manipulated to make a statement the plaintiff did not in fact make, when the difference between the actual statement and the manipulated statement (here, the Manufactured Statement) is material.

Contrary to PUSA's argument, the truth or falsity of the Manufactured Statement represented to be audio clips and textual subtitles of a statement uttered by candidate Trump does

81

not turn upon the candidate's intended meaning in his statements in the South Carolina

Campaign Speech or third parties' assessments of the meaning of those statements.   PUSA

argues that the PUSA ads "adopted a rational interpretation of ambiguous statements by a public

figure . . . ."  (Doc.26: 8).  PUSA argues that because candidate Trump's extensive and varied

statements in the South Carolina Campaign Speech are subject to different interpretations by

different people, the meaning of those statements is "ambiguous" at "best" and therefore the

Manufactured Statement cannot establish actual malice because it is "a single interpretation of

the speech."  (Doc.26: 26).  PUSA argues that the Trump Campaign's defamation claim is based

upon an "alternative interpretation of the President's remarks."  (Doc.26: 27).

That is not true.  As shown above, the Manufactured Statement is not a statement of

opinion about what candidate Trump intended to mean at the South Carolina campaign speech.

Nor is it a summary of that speech by a third-party or a pundit.  The rational interpretation

doctrine does not apply because the Manufactured Statement is a false quotation falling within

*Masson*.  Indeed, it is more actionable than the quotations in *Masson* because it utilizes audio of

candidate Trump's voice and textual subtitles to represent he made the statement, as a complete

sentence.

*Masson* directly rejects PUSA's argument that the "rational interpretation" approach to

falsity applies in this case.[37]  As held in *Masson*, the "rational interpretation" approach to the

meaning of a plaintiff's words *does not apply* when the plaintiff's words are purported to be

---

[37] *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 848 (9th Cir. 2001) (even if a complete, unpublished
statement would be subject to the rational interpretation doctrine, it is lost when the publisher uses only a
small portion of the full text and substantially changes its meaning by removing qualifications; "The
sound bite presented by Wornick and the station finds no protection in the rational interpretation
doctrine."); *see also Anderson v. The Augusta Chronicle*, 585 S.E.2d 506, 517 (S.C. Ct. App. 2003)
("Masson, however, explicitly rejected 'rational interpretation' protection for defamatory statements in
the context of alleged misquotations.), *aff'd*, 619 S.E.2d 428 (S.C. 2005).

presented verbatim in quotation marks.[38]  Thus, *Masson* expressly held that the rational

interpretation analysis of *Time, Inc. v. Pape*, 401 U.S. 279 (1971) and *Bose Corp. v. Consumers*

*Union of United States, Inc.*, 466 U.S. 485 (1984) does not apply to claims of defamation based

upon falsely-attributed statements.  PUSA is simply wrong in suggesting that the "rational

interpretation" doctrine applies here.[39]

B.     **The Complaint Adequately Pleads Actual Malice.**

The day after the PUSA ads began airing, the Trump Campaign sent the Cease and Desist

Letters to WJFW-NBC and other TV stations throughout the country explaining the falsity of the

Manufactured Statement in the PUSA ads and providing information from third-party fact

checkers confirming the falsity of the Manufactured Statement.[40]  *See* pages 23 to 26, above.

The Cease and Desist Letter explained the nature of the false, Manufactured Statement, that it

consisted of stitched-together fragments from different speeches and that it was falsely

represented to be a statement of the candidate which he did not in fact make.  *See* (*id.*)[41]  The

Cease and Desist Letter included a summary of the Washington Post Article, which states that

the Biden ad utilizing the same false audio statement was "video manipulation."  *See* pages 23 to

26.  The ad manipulated video to have candidate Trump call the coronavirus a hoax.  (*Id.*)  It also

summarizes the PolitiFact article calling the manipulated video "misleading" and stating that

audio clips were edited and stitched together to create a statement the candidate did not make.

(*Id.*)  The Cease and Desist Letter further provided the actual words of candidate Trump at the

---

[38] For example, *John v. Journal Commc'ns, Inc.*, 801 F. Supp. 210, 211 (E.D. Wis. 1992), is an example of an article reviewing historical matters and relying upon various sources.  The rational interpretation analysis properly applied in that case.

[39] *Masson*'s holding applies with even more force to a statement comprised of audio clips and textual subtitles purportedly of the plaintiff's own words.  The rational interpretation doctrine does not apply to audio clips purporting to be the speaker's own words uttered as a complete sentence and textual subtitles depicting that complete sentence.

[40] *See* (Doc.1-2: 5, 15, 58); (Compl. ¶¶ 2, 47-50, Ex. G).

[41] *See* (Doc.1-2: 5, 15, 59-61); (Compl. ¶¶ 47-50, Ex. G).

South Carolina rally, showing that he did not say: "The coronavirus, this is their new hoax." *See* pages 23 to 24, above.

Thus, the Cease and Desist Letter provided in great detail information and evidence to show that the stitched-together Manufactured Statement in the PUSA ads was false. Further, PUSA's Letter Response to TV stations establishes knowing and reckless disregard for the falsity of the Manufactured Statement. PUSA told TV stations the Manufactured Statement was true and it reflects candidate Trump's actual words in the South Carolina Campaign Speech, to urge them to continue airing the PUSA ads and to not retract or reject them. Faced with proof of its knowing and intentional falsity in the Manufactured Statement in the PUSA ads, PUSA doubled down, expanding the distribution of the PUSA ads and strongly arguing to TV stations to ignore the Cease and Desist Letters and to continue airing the PUSA ads, in flagrant disregard of the falsity of the Manufactured Statement.

PUSA's Letter Response apparently was relied upon by TV stations to continue airing the PUSA ads. Despite the overwhelming evidence provided by the Cease and Desist Letters, WJFW-NBC and other TV stations, apparently persuaded by PUSA's Letter Response, decided to continue broadcasting the PUSA ads, with WJFW-NBC airing them at least 36 more times between March 25 and April 6. *See* pages 23 to 26, above. The Complaint therefore fully and adequately pleads actual malice in order to plead a plausible defamation claim.

PUSA's initial distribution and broadcast of the PUSA ads and its continued airing of the ads after receiving the Cease and Desist Letters and its circulation of its Letter Response establish actual malice sufficient to state a claim for defamation. *See Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 901 (9th Cir. 1992) ("Even if it finds that The New Yorker's editors did not make a conscious decision to let Malcolm alter Masson's statements, the jury

could nevertheless conclude that The New Yorker had developed 'obvious reasons to doubt' the accuracy of the quotations but, in an effort to 'purposeful[ly] avoid[ ] ... the truth,' failed to conduct a reasonable investigation of Masson's claims of inaccuracy.")

PUSA argues that the Complaint fails to adequately allege actual malice, that the Manufactured Statement was published with knowledge of its falsity or reckless disregard of its falsity.  (Doc.26: 24-27).  PUSA argues that the Trump Campaign "cannot show that the statements in [the PUSA ads] were false or made with actual malice."  (Doc.26: 18).  PUSA argues that the Trump Campaign is relying upon candidate Trump's "intended meaning" in his statements made in the South Carolina Campaign Speech to prove actual malice.  (Doc.26: 24).  That is not true.  One party's subjective interpretation and understanding of the "intended meaning" of lengthy source statements available in audio and video does not determine the falsity of a purported verbatim quotation (here, audio clip and textual subtitles comprising the Manufactured Statement).

The Trump Campaign alleges that the Manufactured Statement in the PUSA ads is false because it depicts candidate Trump, through audio clips and textual subtitles, saying a sentence he never in fact uttered: "The coronavirus, this is their new hoax."  Contrary to the audio and textual depiction of the Manufactured Statement, candidate Trump did not in fact say the Manufactured Statement.  The Complaint alleges actual malice because PUSA knew the Manufactured Statement is false and certainly acted with reckless disregard as to its falsity.

Further, the publications of independent fact-checkers also show that the Manufactured Statement is verifiably false.  *See* pages 20 to 23, above.  The Cease and Desist Letter, which PUSA obtained, also showed PUSA that the Manufactured Statement was false.

Additionally, as conceded by PUSA, "deliberate alteration" of a speaker's actual words in a quotation "equate[s] with knowledge of falsity" establishing actual malice if the alteration resulted in a material change in the meaning conveyed by the actual words.  (Doc.26: 25).

PUSA argues that the alteration of candidate Trump's words in the South Carolina Campaign Speech to create the Manufactured Statement did not "materially change" the meaning of the statements made in the campaign speech.  (Doc.26: 25).  As shown above, the Manufactured Statement materially altered the statements made by candidate Trump in the South Carolina Campaign Speech.

The Manufactured Statement falsely attributes a quotation to candidate Trump that he did not say and the Manufactured Statement is a material alteration to the far lengthier source material, the South Carolina Campaign Speech.

PUSA's attempt to distinguish *Masson* does not change the analysis.  (Doc.26: 25-27).  Each false quotation in *Masson* was examined on its own terms to determine if there was a material alteration to the source material, which was false and defamatory.  As shown above, the Manufactured Statement is a material alteration of candidate Trump's actual words, which is defamatory.  Indeed, PUSA does not genuinely develop an argument that the difference between the Manufactured Statement and the actual campaign statements was not "material" and defamatory.  PUSA does not refute the defamatory nature of the Manufactured Statement and its arguments on that issue are conclusory and undeveloped.  *See* (Doc.26: 21).  Therefore, it has not refuted the defamatory meaning element for purposes of its dismissal motion.[42]

---

[42] *Kamtel, Inc. v. Bore Tech Constr., LLC*, No. 16-CV-633-BBC, 2017 WL 532337, at *2 (W.D. Wis. Feb. 9, 2017) (Holding that argument for dismissal on Rule 12(b)(6) grounds was waived because it was undeveloped, and merely mentioned in passing in a footnote.); *see also Mahaffey v. Ramos*, 588 F.3d 1142, 1146, 2009 WL 4894670 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.");  *United States v. Hook*, 471 F.3d 766, 775 (7th

The Complaint states a claim upon which relief may be granted against PUSA for defamation, including the element of actual malice.  Accordingly, the motion to dismiss should be denied.

## **CONCLUSION**

Defendant-intervenor Priorities USA Action's motion to dismiss should be denied.

Dated this 17th day of July, 2020.

By:
        s/Eric M. McLeod             
        Eric M. McLeod
        Lane E. Ruhland
        Husch Blackwell LLP
        P.O. Box 1379
        33 East Main Street, Suite 300
        Madison, WI 53701-1379
        Email: eric.mcleod@huschblackwell.com
        Email: lane.ruhland@huschblackwell.com

        s/Lisa M. Lawless             
        Lisa M. Lawless
        Husch Blackwell LLP
        555 East Wells Street, Suite 1900
        Milwaukee, WI 53202-3819
        Email: lisa.lawless@huschblackwell.com

        *Attorneys for Plaintiff Donald J. Trump for President, Inc.*

Cir.2006) ("[P]erfunctory and undeveloped arguments that are unsupported by pertinent authority, are waived . . . .").